UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE

———————————————————————— )
WIND TOWER TRADE COALITION,      )
                                    )
            Plaintiff,       )
                                      )
        v.             )      Court No. 20-003692
                                      )
UNITED STATES,      )
                                      )
            Defendant.    )
———————————————————————— )

## **<u>ORDER</u>**

Upon consideration of plaintiff's motion for judgment upon the administrative record,

defendant's response, the administrative record, and all other pertinent papers, it is hereby

ORDERED that plaintiff's motion is DENIED; and it is further

ORDERED that the Department of Commerce's determination is sustained in all

respects.


Dated: _____, 2021     _____
      New York, NY                      JUDGE

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| WIND TOWER TRADE COALITION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Court No. 20-003692 |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant. ) | |

## DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:                          JOSHUA E. KURLAND
MYKHAYLO GRYZLOV                      Trial Attorney
Senior Counsel                       Commercial Litigation Branch
Office of the Chief Counsel          Civil Division
for Trade Enforcement & Compliance   U.S. Department of Justice
U.S. Department of Commerce          Commercial Litigation Branch
                                     P.O. Box 480, Ben Franklin Station
                                     Washington, D.C. 20044
                                     Tel.: (202) 616-0477
                                     Email: Joshua.E.Kurland@usdoj.gov

May 26, 2021                         *Attorneys for Defendant United States*

## <u>TABLE OF CONTENTS</u>

STATEMENT PURSUANT TO RULE 56.2 ................................................................................1

    I.    Administrative Determination Under Review ...............................................................1

    II.    Issues Presented For Review ........................................................................................2

STATEMENT OF FACTS ...............................................................................................................2

SUMMARY OF THE ARGUMENT ...............................................................................................5

ARGUMENT ...................................................................................................................................6

    I.    Standard Of Review .....................................................................................................6

    II.    Commerce Lawfully Declined To Apply Adverse Facts Available In Calculating The Benefit Under The Import Duty Exemptions On Raw Materials Program ............9

        A.    Legal Framework ..............................................................................................9

        B.    There Is No Basis To Apply Adverse Facts Available In This Case ...............11

    III.    Commerce Lawfully Calculated The Denominator In The Benefit Calculation .........15

CONCLUSION ..............................................................................................................................24

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Atl. Sugar, Ltd., v. United States*,
   744 F.2d 1556 (Fed. Cir. 1984)........................................................................7

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
   467 U.S. 837 (1984)......................................................................................8

*Cleo Inc. v. United States*,
   501 F.3d 1291 (Fed. Cir. 2007)......................................................................7

*Consol. Edison Co. of N.Y. v. NLRB*,
   305 U.S. 197 (1938)......................................................................................7

*Consolo v. Fed. Mar. Comm'n*,
   383 U.S. 607 (1966)......................................................................................7

*Fujitsu Gen. Ltd. v. United States*,
   88 F.3d 1034 (Fed. Cir. 1996)............................................................6, 8, 18

*Goldlink Indus. Co. v. United States*,
   431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) .................................................7

*Guangdong Wireking Housewares & Hardware Co. v. United States*,
   745 F.3d 1194 (Fed. Cir. 2014)......................................................................9

*INS v. Elias-Zacarias*,
   502 U.S. 478 (1992)......................................................................................7

*JBF RAK LLC v. United States*,
   790 F.3d 1358 (Fed. Cir. 2015)......................................................................8

*LMI-La Metalli Industriale, S.p.A. v. United States*,
   912 F.2d 455 (Fed. Cir. 1990)......................................................................23

*Mukand, Ltd. v. United States*,
   767 F.3d 1300 (Fed. Cir. 2014)....................................................................10

*Nippon Steel Corp. v. United States*,
   337 F.3d 1373 (Fed. Cir. 2003)....................................................................10

*Nippon Steel Corp. v. United States*,
   458 F.3d 1345 (Fed. Cir. 2006)......................................................................7

*Nucor Corp. v. United States*,
  414 F.3d 1331 (Fed. Cir. 2005) ................................................................. 9

*Shandong Rongxin Imp. & Exp. Co. v. United States*,
  203 F. Supp. 3d 1327 (Ct. Int'l Trade 2017) ........................................... 7

*Timken Co. v. United States*,
  354 F.3d 1334 (Fed. Cir. 2004) ................................................................. 9

*Torrington Co. v. United States*,
  68 F.3d 1347 (Fed. Cir. 1995) ................................................................... 8

*United States v. Eurodif S.A.*,
  555 U.S. 305 (2009) ................................................................ 8, 23, 24

**Statutes**

19 U.S.C. § 1677e ................................................................................. 10

19 U.S.C. § 1677m ................................................................................. 10

**Regulations**

19 C.F.R. § 351.525 ......................................................................... *passim*

**Administrative Determinations**

*Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses
from the People's Republic of China*,
  75 Fed. Reg. 59,212 (Dep't of Commerce Sept. 27, 2010) ..................... 19

*Certain Fabricated Structural Steel from Canada*,
  85 Fed. Reg. 5,387 (Dep't of Commerce Jan. 30, 2020) ................... 21, 22

*Certain Tool Chests and Cabinets from the People's Republic of China*,
  82 Fed. Reg. 56,582 (Dep't of Commerce Nov. 29, 2017) ..................... 21

*Circular Welded Austenitic Stainless Pressure Pipe from the People's Republic of China*,
  74 Fed. Reg. 4,936 (Dep't of Commerce Jan. 28, 2009) ......................... 20

*Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China*,
  75 Fed. Reg. 41,801 (Dep't of Commerce July 19, 2010) ....................... 20

*Utility Scale Wind Towers from Canada, Indonesia, and the Socialist Republic of Vietnam*,
  84 Fed. Reg. 38,216 (Dep't of Commerce Aug. 6, 2019) .......................... 2

*Utility Scale Wind Towers from the Socialist Republic of Vietnam*,
85 Fed. Reg. 40,229 (Dep't of Commerce July 6, 2020)........................................................ 1

**Legislative Materials**

Statement of Administrative Action accompanying the Uruguay Round Agreements Act,
H.R. Doc. No. 103-316 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 .................................. 10

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE

_____
                                                                  )
WIND TOWER TRADE COALITION,          )
                                                                  )
                              Plaintiff,              )
                                                                  )
                    v.                                      )          Court No. 20-003692
                                                                  )
UNITED STATES,                                  )
                                                                  )
                              Defendant.         )
_____)

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S
MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD**

Defendant, the United States, respectfully responds to the motion for judgment upon the

administrative record filed by plaintiff, Wind Tower Trade Coalition (WTTC), challenging the

Department of Commerce's (Commerce's) final determination in its countervailing duty

investigation of Utility Scale Wind Towers from Vietnam.  We demonstrate below that the Court

should deny WTTC's motion and enter judgment for the Government.

**STATEMENT PURSUANT TO RULE 56.2**

**I.      Administrative Determination Under Review**

The administrative determination under review is *Utility Scale Wind Towers from the*

*Socialist Republic of Vietnam*, 85 Fed. Reg. 40,229 (Dep't of Commerce July 6, 2020) (final

determ.) (Final Results), and the accompanying Issues and Decision Memorandum (IDM) (P.R.

215).[1]  The period of investigation is January 1, 2018, through December 31, 2018.

---

[1] "P.R." and "C.R." refer to documents in the public and confidential records, respectively.

II.    **Issues Presented For Review**

1.    Whether Commerce's decision not to apply adverse facts available to the mandatory respondent is supported by substantial evidence and otherwise lawful, when the mandatory respondent responded fully to Commerce's initial and supplemental questionnaires and Commerce found that all of the necessary information was on the administrative record.

2.    Whether Commerce's calculation of the benefit from certain programs, for which Commerce based the denominator on sales value data from the mandatory respondent's parent company instead of using the amount of the tolling (processing) fee paid by the parent company to the mandatory respondent, is supported by substantial evidence and otherwise lawful.

## STATEMENT OF FACTS

Based on a domestic industry petition, Commerce initiated a countervailing duty investigation of utility scale wind towers from Vietnam. *Utility Scale Wind Towers from Canada, Indonesia, and the Socialist Republic of Vietnam*, 84 Fed. Reg. 38,216 (Dep't of Commerce Aug. 6, 2019) (initiation notice). Commerce selected CS Wind Tower Co. Ltd. (CS Wind), a Vietnamese producer of subject merchandise, for individual examination as the mandatory respondent.[2] Respondent Selection Memo (Aug. 19, 2019) (P.R. 57; C.R. 31). CS Wind is a 100 percent foreign-owned enterprise, wholly owned by a Korean company, CS Wind Corporation (CS Wind Korea). CSW IQR at 2; Verification Report at 6 (Mar. 18, 2020) (P.R. 186; C.R. 105). The two companies' financial statements are consolidated. Verification Report at 4. The parent company, CS Wind Korea, has financial statements reporting the sales revenue from sales of subject merchandise to the United States, while the Vietnam subsidiary, CS Wind,

---

[2] CS Wind indicated that CS Wind Tower Co. Ltd. merged with CS Industries Ltd. in 2008 to form CS Wind Vietnam Co. Ltd. That CS Wind entity provided the responses to Commerce's questionnaires on CS Wind's behalf. *See* CS Wind Initial Questionnaire Response at 1-2 (Oct. 9, 2019) (P.R. 103-04; C.R. 55-67) (CSW IQR)

has financial statements reflecting revenue from the sale of processing or "tolling" services, which in turn are recorded as processing costs in CS Wind Korea's statements.  *Id.*  The cost of processing in Vietnam is also included in the cost of goods sold by CS Wind Korea.  *Id.*

The consolidated financial statements reflect how CS Wind and CS Wind Korea conduct business.  CS Wind Korea's subsidiary in Vietnam, CS Wind, manufactures subject merchandise pursuant to a tolling agreement with CS Wind Korea.  *Id.*  Specifically, for projects that CS Wind Korea negotiates, CS Wind produces wind towers using primary raw materials supplied by CS Wind Korea.  *Id.* at 7.  CS Wind Korea negotiates long-term tower purchase agreements with its United States customers, which serve as a framework agreement governing business between the parties.  *Id.* at 8.  These long-term framework agreements governed the sales during the period of investigation between CS Wind Korea and its United States customers.  *Id.*  CS Wind Korea and its United States customers negotiate specific sales terms, such as volume or time period, on a project-by-project basis.  *Id.*  Following these commercial negotiations, customers issue purchase orders to CS Wind Korea.  *Id.*

CS Wind Korea internally estimates the price for each project based on estimates for tolling, materials, and profit.  *Id.* at 9.  Further, because the costs of labor and actual material purchases are recorded in the consolidated accounting system, CS Wind Korea determines the exact cost of each item—including tolling.  *Id.*  CS Wind Korea and CS Wind engage in a "standardized process," through which CS Wind Korea populates the processing (tolling) contract for the project and issues it to CS Wind for approval.  *Id.*  CS Wind uses raw material supplied by CS Wind Korea to produce wind towers for various projects, providing processing (tolling) services in exchange for a processing/tolling fee under its tolling arrangement with CS

Wind Korea, but the details of projects involving sales to United States customers are arranged and managed by CS Wind Korea. *Id.* at 7.

Because one of the subsidy programs Commerce examined in its investigation concerned "Import Duty Exemptions on Raw Materials for Exported Goods," CS Wind's raw material input reporting became an issue during the proceeding. *See* IDM at 11-19.  For each project, CS Wind Korea provides raw materials to CS Wind.  Verification Report at 7 (P.R. 186; C.R. 105).  In its questionnaire responses, CS Wind reported its raw material purchases during the investigation period, such as purchases of steel plate (the primary input in wind towers).  CS Wind First Supp. Questionnaire Response at Ex. SQ2-20 (Nov. 6, 2019) (P.R. 122-28; C.R. 76-82) (CSW FSQR).  Among other things, CS Wind's spreadsheet with this information identified the country of origin and applicable duty rate for each input purchase. *Id.* (spreadsheet reporting purchases).

Further, in a second supplemental questionnaire response, CS Wind reported that there is a zero percent import duty on all Most Favored Nation (MFN)[3] imports of steel plate to Vietnam. CS Wind Second Supp. Questionnaire Response at 1-2, Exs. 1-3 (Nov. 26, 2019) (P.R. 143) (CSW SSQR); *see also* CSW FSQR at 9 (P.R. 122-28; C.R. 76-82).  To substantiate this fact, CS Wind identified the Harmonized Tariff Schedule (HTS) numbers under which the steel plate was imported, entered these numbers on Vietnam's customs webpage, and provided Commerce screen shots of the results confirming that each HTS number was subject to a zero percent duty rate.  CSW SSQR at 2, Ex. 1.  In other words, even without any specific import duty exemption program or free trade agreement, the MFN duty rate for each steel plate HTS category was zero. *Id*.  Commerce examined documentation regarding CS Wind's raw material purchases on-site

---

[3] Under the WTO Agreements, WTO Members cannot discriminate between their trading partners, and if a nation lowers a tariff rate for a product, it must do so for all WTO members. *See*, *e.g.,* General Agreement on Tariffs and Trade of 1947 (GATT 1947), Art. 1 (General Most-Favoured-Nation Treatment).  This principle is known as "Most Favored Nation" treatment.

during verification, tracing the information to CS Wind's accounts and source documents, and found no material discrepancies.  Verification Report at 16-17 (P.R. 186; C.R. 105); Verification Exhibits at VE-15 (Mar. 4, 2020) (P.R. 185; C.R. 101-04).

In its final determination, Commerce made an affirmative determination of subsidization, which ultimately resulted in issuance of a countervailing duty order.  Final Results, 85 Fed. Reg. at 40,229; Order (Aug. 26, 2020) (P.R. 221).  Relevant to this action, Commerce countervailed the Import Duty Exemptions on Raw Materials for Exported Goods program.  IDM at 11-19.  In calculating the program's benefit, however, Commerce ascribed zero benefit to steel plate that was subject to the zero percent MFN duty rate regardless of any exemptions under the program. *E.g.*, Final Calculation – Excel File at Tab "Raw Materials.Rev.ATT2.BPI" lines 11729, 12940 (July 8, 2020) (C.R. 121).[4]  In calculating the program's benefit more generally, Commerce used the value of CS Wind Korea's sales in the denominator, rather than the amount of the processing fee that CS Wind Korea paid to CS Wind.  *Id*. at Tab "Benefit.Chart.ATT2. BPI" Cells E14 and G14 (using "Total Export Sales" figure from Tab "Korea.AUL.Sales.ATT2. BPI" Cell N113 in denominator of program rate calculation).  Even though the existence of this countervailing duty order does not depend on the resolution of these issues, and neither CS Wind nor the government of Vietnam challenge Commerce's determination, WTTC filed this action.

## SUMMARY OF THE ARGUMENT

Commerce's final determination should be sustained.  WTTC challenges Commerce's decision not to apply facts available with an adverse inference (AFA) to CS Wind with respect to Commerce's determination of the benefit (or lack thereof) that CS Wind received from the Import Duty Exemptions on Raw Materials for Exported Goods program.  Specifically, WTTC

---

[4] In cases involving duty exemptions or reductions, Commerce determines the benefit by comparing the applicable tariff rate in the absence of the program—in this case, zero percent—to the reduced rate under the subsidy program.

contends that certain steel plate for which CS Wind listed Vietnam as the country of origin could have been imported into Vietnam, and thus Commerce should have applied AFA. The fundamental problem with WTTC's argument is that the record evidence demonstrates that the MFN import duty rate for steel plate in Vietnam is zero percent. Moreover, the record shows that CS Wind purchased the steel plate at issue from an unaffiliated company in Vietnam for which CS Wind reported Vietnam as the country of origin to Vietnam Customs. Accordingly, regardless of whether the steel plate was produced in Vietnam or imported, CS Wind received no benefit with respect to the steel plate at issue under the import duty exemption program.

WTTC also challenges Commerce's calculation of the denominator in the benefit calculation, which includes sales value data from CS Wind's parent company, CS Wind Korea, rather than the tolling fee CS Wind Korea paid to CS Wind. However, Commerce's regulations require Commerce to "determine the *sales value* of a *product* . . . ." and divide the amount of benefit allocated by "the sales value" of the product to which Commerce attributes the subsidy. 19 C.F.R. § 351.525(a) (emphasis added). As a result of the tolling arrangement in this case, the sales of subject merchandise produced by CS Wind are negotiated and made by CS Wind Korea. Thus, Commerce properly attributed the subsidy to those sales and used them in the benefit calculation denominator. Consistent with its regulation, Commerce based the denominator on the "sales value" of United States sales made by CS Wind Korea, rather than on the amount of the tolling fee that CS Wind received from its parent company for processing services.

## **ARGUMENT**

### I.   **Standard Of Review**

This Court sustains any determination, finding, or conclusion by Commerce unless it is unsupported by substantial evidence on the record, or otherwise unlawful. *See Fujitsu Gen. Ltd.*

*v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)). "Substantial evidence" connotes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence may be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from the record does not render Commerce's findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Indeed, when Congress entrusts an agency to administer a statute that demands inherently fact-intensive inquiries, agency conclusions may be set aside only if the record is "so compelling that no reasonable factfinder" could reach the same conclusion. *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992); *Shandong Rongxin Imp. & Exp. Co. v. United States*, 203 F. Supp. 3d 1327, 1338 (Ct. Int'l Trade 2017) (recognizing tremendous deference to Commerce's factual findings). It is thus improper to overturn a determination "simply because the reviewing court would have reached a different conclusion based on the same record," *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007) (citations omitted), and the Court will not substitute its judgment for Commerce in choosing between two fairly conflicting views, even if it could justifiably have made a different choice had the matter been before it *de novo*. *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006). Hence, a party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted), and the Court sustains Commerce's factual determinations if they are reasonable and supported by the record as a whole, even if evidence detracts from them. *See Atl. Sugar, Ltd., v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

When the Court examines Commerce's interpretations of the statute that it administers, the Court employs the two-pronged test established in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  First, the Court examines "whether Congress has directly spoken to the precise question at issue," and if it has, the agency and Court must comply with Congress's clear intent.  *Id*. at 842-43.  If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."  *Id*. at 843.  If so, "{a}ny reasonable construction of the statute is a permissible construction," *Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004) (citation and quotation marks omitted), and Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous."  *United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009) (citation omitted).  Indeed, "the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency."  *Id.* (citation omitted); *see Torrington Co. v. United States*, 68 F.3d 1347, 1351 (Fed. Cir. 1995) (recognizing Commerce as "master" of antidumping laws).

Finally, the Court affords Commerce especially great deference "when a statute fails to make clear any Congressionally mandated procedure or methodology for assessment of the statutory tests."  *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363 (Fed. Cir. 2015) (citation and quotation marks omitted).  In that circumstance, "Commerce may perform its duties in the way it believes most suitable."  *Id.*  Consequently, Commerce receives "tremendous deference" that is "both greater than and distinct from that accorded the agency in interpreting the statutes it administers" when it exercises its technical expertise to select and to apply methodologies to implement the trade statute.  *Fujitsu*, 88 F.3d at 1039.

## II.    Commerce Lawfully Declined To Apply Adverse Facts Available In Calculating The Benefit Under The Import Duty Exemptions On Raw Materials Program

In this investigation, domestic interested parties, including WTTC, received a remedy in the form of a countervailing duty order to the full extent that the law provides and that the facts support.  Even so, WTTC challenges Commerce's decision not to apply AFA to the mandatory respondent, CS Wind, with respect to determining the benefit for the Import Duty Exemptions on Raw Materials for Exporting Goods program.  Under the program, "import duty exemptions are provided for imported raw materials that are incorporated in the exported goods, or directly used in the production of such goods."  Prelim. Decision Memo at 9 (Dec. 6, 2019) (P.R. 152) (PDM). Further, the "amount of the exemption is equal to the amount of the duty corresponding to the value of imported materials actually used in the production of the finished goods that are exported."  *Id*.  WTTC contends that certain inputs of steel plate CS Wind reported as originating from Vietnam could actually have been imported, and thus that Commerce should apply partial AFA to CS Wind in calculating the benefit for those inputs under the import duty exemption program.  *See* WTTC Br. 13-17.  We explain below why WTTC's argument lacks merit.

### A.    Legal Framework

The antidumping and countervailing duty laws "are remedial in nature."  *Guangdong Wireking Housewares & Hardware Co. v. United States*, 745 F.3d 1194, 1205 (Fed. Cir. 2014); *see also Nucor Corp. v. United States*, 414 F.3d 1331, 1336 (Fed. Cir. 2005) ("{T}he purpose of antidumping and countervailing duty laws is remedial, not punitive or retaliatory{.}" (citation omitted)); S. Rep. No. 1221, 92d Cong., 2d Sess., at 8 (1972) ("[C]ountervailing duties are not, nor were they ever intended to be, penal in nature; they are remedial in nature inasmuch as they operate to offset the effect of subsidies afforded foreign merchandise.").  To effectuate the remedial purpose of the countervailing duty statute, among other things, Commerce collects

information from interested parties that is necessary for determining the countervailing duty rate, including information regarding the benefit under various alleged programs.

As a general matter, if the necessary information is not available on the record, or if a respondent (1) withholds information that Commerce has requested; (2) fails to provide such information by Commerce's deadlines or in the form and manner requested; (3) significantly impedes the proceeding; or (4) provides information that cannot be verified pursuant to 19 U.S.C. § 1677m(i), Commerce may "use the facts otherwise available in reaching the applicable determination{.}" 19 U.S.C. § 1677e(a). Using "facts otherwise available" fills the gap in the record caused by the respondent's failure to provide information about its own business. *Id.*

Further, Commerce may apply an adverse inference in selecting among the facts otherwise available if it "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information{.}" *Id.* § 1677e(b)(1). A respondent's failure to cooperate to "the best of its ability" is "determined by assessing whether {it} has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries . . . ." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003); *see also Mukand, Ltd. v. United States*, 767 F.3d 1300, 1304 (Fed. Cir. 2014). The statute does not have an intent element and "recognizes that mistakes sometimes occur," but it "does not condone inattentiveness, carelessness, or inadequate record keeping." *Nippon Steel*, 337 F.3d at 1382. Commerce's application of adverse inferences is meant "to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully." Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, at 870 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4199 (SAA).

**B.**     **There Is No Basis To Apply Adverse Facts Available In This Case**

WTTC contends that Commerce "erred by concluding that CS Wind Vietnam properly reported the country of origin of {a} portion of its steel plate purchases as Vietnam and thus in not calculating a benefit received on those purchases under the Import Duty Exemptions on Imports of Raw Materials for Exporting Goods Program."  WTTC Br. 13.  It also contends that "Commerce erred by failing to investigate this critical issue and, thereby, failing to adequately address relevant arguments by the parties," while asserting that it "does not believe that its AFA argument is in conflict with its argument that the agency did not fully investigate the program." *Id*. at 15 & n. 3.  These arguments do not overcome Commerce's reasonable determination.

Contrary to WTTC's claims, there is no basis for applying partial AFA to CS Wind in determining the benefit that CS Wind received from the import duty exemption program.  CS Wind fully cooperated with Commerce's information requests, provided detailed questionnaire responses, and provided all necessary information for determining the import duty exemption program's benefit.  In its questionnaire responses, CS Wind reported all its raw material purchases during the period of investigation.  *See* IDM at 17; CSW FSQR at Ex. SQ2-20 (P.R. 122-28; C.R. 76-82) (spreadsheet containing raw material data).  Indeed, CS Wind in doing so provided a detailed table identifying the country of origin for each input purchase (both domestic and imported), the total value of the purchase, the applicable duty rate, the import duty amount paid, and the benefit that CS Wind received (if any).  CSW FSQR at Ex. SQ2-20.  The table includes almost 13,000 individual raw materials purchases that CS Wind reported.  *Id.*

Additionally, as Commerce documented in its Verification Report, CS Wind's officials explained that CS Wind included *domestic* purchases of steel plate in its reporting to Commerce (even though the issue concerns exemptions from duties on imports) because it was required to

report the purchases to Vietnam Customs.  Specifically, "{o}fficials explained that if the supplier is from outside Vietnam, but the raw materials are *sourced from inside Vietnam*, then these raw material inputs still need to be entered into the E-customs system *even if they are ultimately not imported*."  Verification Report at 16 (P.R. 186; C.R. 105) (emphasis added); IDM at 17 (quoting same).  Relatedly, notwithstanding WTTC's arguments challenging whether the steel plate was *produced* in Vietnam based on the supplier's facilities, Commerce explained that the supporting documentation, including invoices and packing lists, showed the materials were *sourced* within Vietnam.  *See* IDM at 17 (citation omitted).  The raw material sales were made through CS Wind Korea, but only on paper, because the materials themselves were sourced in Vietnam.  *See id*.[5]

If anything, as Commerce observed, CS Wind's reporting was *overinclusive* because it included domestically-purchased raw materials.  *See* IDM at 17 (also explaining that Commerce only "requested that CS Wind submit to Commerce a schedule of all inputs of raw materials used in the production of subject merchandise during the {period of investigation} for which import duty exemptions were received").  Thus, rather than signaling non-cooperation, CS Wind's over-reporting of its raw material inputs indicates that applying AFA would be improper.

Further, contrary to WTTC's claims that Commerce failed to investigate the issue, not only did Commerce extensively document its consideration of WTTC's arguments (*see* IDM at 11-12, 15-16), it also explained that it examined CS Wind's purchases at verification and "found no discrepancy."  IDM at 17.  Commerce elaborated that "{i}n addition to the verbal explanation provided by company officials as to why those purchases were included in the spreadsheet, we examined source documentation supporting those purchases that were made from within

---

[5] The record evidence also indicates that the steel plate supplier in Vietnam was unaffiliated with CS Wind.  *See* CS Wind Affiliation Response at 2-3 & Exs. 1-3 (Sept. 3, 2019) (P.R. 67; C.R. 32); CSW FSQR at Ex. SQ2-18, pp. 18-19 (C.R. 80) (listing Vietnamese supplier).

Vietnam," which showed that the materials were sourced in Vietnam. *Id.* (citing Verification Exhibits at VE-15, pp. 68-75 (P.R. 185; C.R. 101-04)). Specifically, as Commerce explained in its verification report, it traced selected line items among CS Wind's reported purchases to the company's accounts and source documents, requiring company officials to prepare documentation for the purchases, and found no material discrepancies. *See* Verification Report at 17 (P.R. 186; C.R. 105); Verification Exhibits at VE-15 (P.R. 185; C.R. 101-04).

Accordingly, based on the record and its investigation, Commerce reasonably found that "CS Wind provided relevant and accurate documentation that identified the country of origin" for its purchases, that "documentation examined at the verification demonstrated that CS Wind paid appropriate amounts of duties on its raw materials," and that "there is nothing missing from the record{.}" *Id.* (citing Verification Report at 16-17 (P.R. 186; C.R. 105); Verification Exhibits at VE-15 (P.R. 185; C.R. 101-04); CSW IQR at Ex. C-3 (P.R. 103-04; C.R. 55-67)).

WTTC nonetheless advocates for application of partial AFA by questioning the country of origin of a portion of CS Wind's steel plate for which CS Wind reported Vietnam as the country of origin. *See* WTTC Br. 13. WTTC bases its position on a statement in CS Wind's reporting that "CS Wind Corporation supplies *all* main materials – *steel plate*, flange, steel plate for door frame and internal mounting items – *from outside of Vietnam* for the production of the wind towers. Therefore, most of {the} raw materials are exported to Vietnam by CS Wind Corporation." *Id.* (quoting CSW IQR at 21 (P.R. 103-04; C.R. 55-67) (emphasis added by WTTC)). The passage WTTC quotes, however, does not state that CS Wind Korea exported *all* raw material to Vietnam, but rather that "*most of* {the} raw materials are exported to Vietnam by CS Wind Corporation." *Id*. (emphasis added). This statement is consistent with how CS Wind reported its purchases of steel plate. *See* CSW FSQR at Ex. SQ2-20 (P.R. 122-28; C.R. 76-82).

For a significant portion of the steel plate purchases, CS Wind reported China as the country of origin (making them irrelevant to WTTC's claim), while reporting Vietnam as the country of origin for a subset of steel plate purchases.  *See id.* (*Compare*, *e.g.*, lines 3948-51, 4002, 4073, 4075, 4104, 4105, 4107-09, 4136-37, 4139-40, 4144-47, 5520, 9826, 10288, 10394 *with* line 12940); *see also* CSW Additional First Supplemental Questionnaire Response at 1 & Ex. SQ2-6a (Nov. 8, 2019) (P.R. 130: C.R. 83) (listing internal component suppliers, including Vietnamese steel plate supplier); CSW FSQR at SQ2-18, pp. 18-19 (C.R. 80) (listing Vietnamese supplier).

Further, as we discussed above, CS Wind provided invoices and official customs import declarations with respect to purchases of steel plate listing Vietnam as the country of origin. *Compare*, *e.g.*, CSW FSQR at SQ2-18, pp. 5-17 (C.R. 80) (official customs declaration listing Vietnam as country of origin) *with id.* at Ex. SQ2-20, line 12940 (C.R. 82); *compare also id.* at Ex. SQ2-20, line 11729 (listing Vietnamese origin) *with* Verification Exhibits at VE-15, pp. 68-75 (P.R. 185; C.R. 101-04) (invoice and packing list showing Vietnamese supplier and port of loading).  In other words, the record evidence corroborates that CS Wind reported to *both Commerce and in Vietnam's official customs system* that the country of origin for the steel plate at issue was Vietnam.  *See id.*  It defies logic and common sense that CS Wind would report to Vietnam customs authorities that the steel plate at issue was sourced *domestically* and—at the same time—claim an *import* duty exemption for the same plate, as WTTC appears to suggest. WTTC's arguments that the steel could have originated elsewhere based on the geographic distribution of the supplier's facilities do not negate this inconsistency in its position.

Separately, and equally important, CS Wind reported in its second supplemental questionnaire response that Vietnam imposes a zero percent import duty on all MFN imports of steel plate into the country.  *See* CSW SSQR at 1-2 & Exs. 1-3 (P.R. 143); *see also* CSW FSQR

at 9 (P.R. 122-28; C.R. 76-82).  To substantiate that a zero percent duty rate applies to imported

steel plate, CS Wind identified the HTS numbers under which it imported steel plate, entered

these numbers on Vietnam's customs webpage, and provided Commerce with screen shots of

results confirming that each steel plate HTS number is subject to zero percent duty rate.  CSW

SSQR at 2 & Ex. 1 (P.R. 143).  This demonstrates that, regardless of any import duty exemption

program, the MFN duty rate for each steel plate HTS category is zero.  *See id.*  Thus, whether or

not the steel plate was produced in Vietnam, the import duty exemption program that Commerce

was investigating would not have altered the applicable zero percent import duty rate for steel

plate—and there is no benefit for countervailing duty purposes.[6]

Under these facts, there is no basis for including the steel plate sourced from a domestic

supplier in calculating the benefit to CS Wind from the import duty exemption program, to seek

further information regarding the country of origin of the steel plate at issue, or to resort to AFA.

### III.  Commerce Lawfully Calculated The Denominator In The Benefit Calculation

WTTC challenges Commerce's methodology for calculating the denominator in the

benefit calculation using sales value data for CS Wind's parent company, CS Wind Korea,

instead of the amount of the tolling fee that CS Wind paid CS Wind Korea.  WTTC Br. 17-24.

Specifically, WTTC contends that Commerce improperly attributed the subsidy received by CS

Wind to its parent company in a manner inconsistent with its regulations because Commerce's

regulations provide that Commerce "normally will attribute a subsidy to the products produced

by the corporation that received the subsidy."  *Id*. at 17 (quoting 19 C.F.R. § 351.525(b)(6)(i)).

---

[6] During the administrative proceeding, CS Wind argued that it correctly reported Vietnam as the country of origin for the steel plate at issue because the suppler is a processing facility and there are various types of further processing that can substantially transform different forms of steel from one country of origin to another.  *See* CS Wind Rebuttal Case Br. 15-19 (Apr. 20, 2020) (P.R. 200; C.R. 112).  It is unnecessary to resolve this issue, however, because there was no benefit regardless of the steel plate's country of origin.

WTTC also contends that Commerce attributed the subsidy to a company located in a third country, which did not produce any products and did not receive a subsidy. *See id.* at 17-18. We demonstrate below that Commerce's subsidy benefit calculation is consistent with its regulations and supported by substantial evidence.

Contrary to WTTC's contentions, Commerce's benefit calculation is consistent with its regulations. The regulations provide that Commerce "*normally* will attribute a subsidy *to the products* produced by the corporation that received the subsidy." 19 C.F.R. §351.525(b)(6) (emphasis added). Use of the term "normally" indicates that Commerce retains a degree of flexibility or discretion for addressing various factual circumstances it may encounter. Further, Commerce's regulations require Commerce to "determine the *sales value* of a product . . . ." and to divide the amount of benefit allocated by "the sales value" of the product to which Commerce attributes the subsidy. 19 C.F.R. § 351.525(a) (emphasis added). Accordingly, Commerce's regulations expressly provide that Commerce should attribute subsidies to the "products" at issue, or more specifically, to the "sales value" of those products.

Under the circumstances of this case, as a result of the tolling arrangement, sales of the subject merchandise produced by CS Wind are actually negotiated and made by CS Wind Korea. Thus, Commerce properly attributed the subsidy to those sales and used them in the denominator of the calculation for the raw materials import duty exemption program. *See* Final Calculation – Excel File at Tab "Benefit.Chart.ATT2.BPI" Cells E14 and G14 (using "Total Export Sales" figure from Tab "Korea.AUL.Sales.ATT2.BPI" Cell N113 in denominator of calculation). Specifically, consistent with its regulation, Commerce based the denominator on the "sales value" of the United States sales made by CS Wind Korea, rather than the amount of the tolling

fee that CS Wind received from its parent company for processing services.  *See id.*  Commerce

explained how its approach comports with its regulations:

> Consistent with the intent of Commerce's regulations and the
> normal subsidy calculation methodology, we determine it
> appropriate to use CS Wind Korea's FOB sales value of the subject
> merchandise that was produced by CS Wind, as it is the parent
> company that sold the merchandise to the United States. The sales
> value used in the denominator of our subsidy calculations is
> limited to sales of subject merchandise produced by CS Wind and
> sold by its parent company, CS Wind Korea, in the United States.
> That is, there was no mark-up by an affiliated company, for
> instance, that would require an entered value adjustment to the
> sales of merchandise under investigation.

IDM at 29-30.  The alternative, as WTTC proposes, would be to base the benefit calculation

denominator solely on the toll proceeding fees, or revenue, that CS Wind earned from its

contribution to the product, rather than the value of the exported sales.  *See id.* at 29.

The disagreement between Commerce and WTTC thus boils down to a straightforward

question of whether the subsidy should have been attributed to the "sales value" of *products*

produced by CS Wind and exported by CS Wind Korea (as Commerce's regulations require and

as Commerce did), or to an amount of a tolling fee for processing services paid by CS Wind

Korea to CS Wind, as WTTC advocates.  Consistent with Commerce's regulations, Commerce's

approach allocates the amount of subsidy to the "sales value" of *products* produced by CS Wind,

whereas WTTC's preferred approach allocates the subsidy to the value of *processing services*.

The value of processing services does not include, among other things, the value of raw material

inputs, and thus does not properly represent the sales value of the products.  As Commerce

explained, moreover, the sales value that Commerce used in the benefit calculation denominator

is limited to sales of subject merchandise produced by CS Wind and sold by its parent company.

IDM at 30.  By contrast, WTTC's preferred approach understates the sales value of the product

because it limits allocation to the value of CS Wind's processing services, while excluding the value of raw material inputs consumed to make the product. *See Fujitsu*, 88 F.3d at 1039 (Commerce receives "tremendous deference" that is "both greater than and distinct from that accorded the agency in interpreting the statutes it administers" when it exercises its technical expertise to select and to apply methodologies to implement the trade statute).

WTTC additionally argues that the "multinational firm" provision of the regulations requires Commerce to attribute the subsidy to CS Wind's products within the country of the government that granted the subsidy. WTTC Br. 18. As Commerce explained, however, that regulation is inapplicable to CS Wind. *See* IDM at 30. The regulation provides in relevant part: "If the firm that received a subsidy has production facilities in two or more countries, the Secretary will attribute the subsidy to the products produced by the firm within the country of the government that granted the subsidy." 19 C.F.R. 351.525(b)(7). Commerce explained that "CS Wind is a subsidiary, and not a multinational company," and that "it does not have operations, such as production facilities, in any countries other than in Vietnam." IDM at 30.

WTTC acknowledges Commerce's explanation but contends that "it does not logically follow from CS Wind Vietnam's status as a subsidiary that it could not also be a multinational firm." WTTC Br. 18. However, WTTC's argument fails to account for both the regulatory language and the full rationale that Commerce articulated. First, by its express terms, the regulation applies only *if* "the firm that received a subsidy *has production facilities in two or more countries*." 19 C.F.R. 351.525(b)(7). As Commerce explained, CS Wind "does not have operations, such as production facilities, in any countries other than in Vietnam." IDM at 30. Thus, CS Wind does not satisfy the regulatory precondition of having production facilities in more than one country, meaning the "multinational firm" provision does not apply. Moreover,

as we explained above, and consistent with the thrust of the "multinational firm" provision, Commerce attributed the subsidy to only the products that were produced by CS Wind within Vietnam, the country of the government granting the subsidy. *See* IDM at 30 ("The sales value used in the denominator of our subsidy calculations is limited to sales of subject merchandise produced by CS Wind and sold by its parent company, CS Wind Korea, in the United States.").

WTTC next contends that Commerce's approach is inconsistent with its practice and that Commerce did not sufficiently explain its departure from that practice. *See* WTTC Br. 19. To the contrary, Commerce's determination is consistent with its prior decisions in cases involving similar tolling arrangements, whereas the prior determinations that WTTC cites are inapposite.

As an initial matter, Commerce's methodology is consistent with how Commerce has treated similar tolling arrangements in prior cases. In *Certain Coated Paper from China*, for example, Commerce addressed a situation in which a respondent had a tolling arrangement, and consistent with this case, *declined* to attribute the subsidy to the amount of the tolling/processing fee, instead attributing it to the sales value of the finished products. *See Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China*, 75 Fed. Reg. 59,212 (Dep't of Commerce Sept. 27, 2010) (final determ.), at IDM Cmt. 32. In that case, Commerce explained that attributing a subsidy to a processing fee "has the net effect of resulting in an overcollection of duties due to the actual value of merchandise entering the United States." *Id.* (citation omitted). Consequently, in a situation involving a similar tolling arrangement, Commerce replaced the processing fee with the sales value of the product, as in this case. Although Commerce took this action in the context of making an Entered Value Adjustment (which it did not do in this case), *Certain Coated Paper from China* demonstrates that Commerce's actions in this case are consistent with its practice based on similar facts.

19

By contrast, WTTC's reliance on *Woven Ribbons from China* is misplaced.  Although WTTC argues that the case is analogous to this one, the facts are different.  *See* WTTC Br. 19. In *Woven Ribbons from China*, there was no tolling arrangement at issue, but rather the case involved a situation in which subsidies were received by both a respondent producer and its affiliated trading company, with the respondent advocating that Commerce attribute the subsidy to their combined sales.  *See Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China*, 75 Fed. Reg. 41,801 (Dep't of Commerce July 19, 2010) (final determ.), at IDM Cmt. 4.  Commerce ultimately allocated the subsidy to the sales value of the product sold by the respondent producer, rather than using the consolidated sales of both the producer and affiliate.  *See id.* ("Therefore, we have attributed subsidies received by Yama and Yama Trading to Yama's unconsolidated sales.").  *Woven Ribbons from China* did not address the issue of whether it is appropriate to attribute the subsidy to the sales value of the product (as Commerce did), or merely to the amount of a processing/tolling fee (as WTTC advocates).

WTTC's reliance on *Pressure Pipe from China* is equally misplaced.  WTTC contends that Commerce in that case determined to attribute subsidies "only to the Chinese respondent's standalone sales value" and "did not utilize the sale value of the respondent's Hong Kong affiliate, even though – as in the underlying case – the Hong Kong affiliate was technically responsible for making sales."  WTTC Br. 20 (citations omitted).  In that case, however, although Commerce indeed allocated the subsidy to the sales value of the Chinese respondent's sales, it also made an adjustment to include a "mark-up" charged by the Hong Kong affiliate through which the sales were made.  *See Circular Welded Austenitic Stainless Pressure Pipe from the People's Republic of China*, 74 Fed. Reg. 4,936 (Dep't of Commerce Jan. 28, 2009) (final determ.), at IDM Cmt. 3 ("We agree, however, with the respondent's argument concerning

the manner in which to account for the mark-up that Winner HK applies on sales to the United

States.").  In this case, by contrast, the sales did not go through a trading company, and thus the

sales value of product sold through CS Wind Korea is consistent with the entered value of the

subject merchandise upon entry to the United States.  *See* IDM at 30.  Thus, contrary to WTTC's

contentions, *Pressure Pipe from China* does not require Commerce to allocate the subsidy to the

amount of the processing fee rather than the sales value of a product.  *See* 19 C.F.R. § 351.525(a)

(requiring Commerce to utilize sales value of product).

Similarly, Commerce's determination in *Tool Chests and Cabinets from China*—another

instance of respondent having an affiliated reseller—does not support WTTC's contentions.  *See*

*Certain Tool Chests and Cabinets from the People's Republic of China*, 82 Fed. Reg. 56,582

(Dep't of Commerce Nov. 29, 2017) (final determ.), at IDM Cmt. 14.  WTTC contends that

Commerce utilized the sales value of the Chinese respondent's sales to its Macau affiliate (*i.e.*,

analogous to, in this case, utilizing the value of CS Wind Vietnam's sales to CS Wind Korea),

reasoning that Commerce's regulations state that subsidies will normally be attributed to the

products produced by the corporation that received the subsidy.  *See* WTTC Br. 21.  Like

WTTC's other cases, however, *Tool Chests and Cabinets from China* did not involve a tolling

arrangement, and thus did not address the issue of whether it is appropriate to allocate a subsidy

to the amount of the tolling/processing fee rather than the sales value of the product.  *See* 82 Fed.

Reg. 56,582, at IDM Cmt. 14.  Moreover, Commerce expressly recognized that, if a third-

country reseller marks up the price it pays to an affiliated producer of subject merchandise, it

may be appropriate to make an adjustment to its subsidy calculation to account for that fact.  *Id*.

*Fabricated Structural Steel from Canada* likewise does not support WTTC's contentions.

*See Certain Fabricated Structural Steel from Canada*, 85 Fed. Reg. 5,387 (Dep't of Commerce

Jan. 30, 2020) (final determ.), at IDM Cmt. 3 (*FSS from Canada*).  In that case, Commerce dealt with a unique industry-specific situation in which the respondents sold fully assembled products, but much of the assembling activity occurred in the United States after importation.  *Id*.  ("As noted by all parties, the Canadian fabricated structural steel industry is unique, in that Beauce-Atlas and Canatal sell fully assembled structures and a significant amount of activity occurs outside of Canada following importation into the United States.  *This is not a sales situation that we normally encounter in a CVD proceeding.*" (emphasis added)).  Based on the "unique facts" presented in that investigation, Commerce declined to "include the respondents' post-importation activities in the United States in the sales denominator."  *Id*.  WTTC contends that Commerce's reasoning that governments generally provide subsidies for the general purpose of promoting the economic and social health of the country, as well as to support domestic manufacturing and production related activities (such as employment), also applies in this case.  *See* WTTC Br. 21.  But WTTC's arguments are, again, misplaced.

    As an initial matter, the factual circumstances in this case are distinct from those in *FSS from Canada*.  Unlike *FSS from Canada*, there is no evidence that a significant portion of CS Wind's production assembly occurred in the United States.  The issue in this case is how to reasonably handle attribution of subsidies in a situation that involves a tolling arrangement, and whether it is appropriate to attribute the subsidy to the sales value of the product (as Commerce did), or to the amount of the processing fee (as WTTC advocates).  Indeed, in *FSS from Canada*, Commerce explained that "the *CVD Preamble* makes clear that *our attribution rules do not account for all situations that may arise* because, if Commerce tried to account for all possible permutations, the result would be an extremely lengthy set of rules that could prove unduly rigid."  85 Fed. Reg. 5,387, at IDM Cmt. 3 (emphasis added).  WTTC improperly relies on *FSS*

*from Canada* in advocating a rigid approach that would result in inappropriately attributing the subsidy to the value of processing/tolling services.  *See* WTTC Br. 21; *but see* 19 C.F.R. § 351.525(a) (requiring Commerce to use sales value of product in determining subsidy rate).

Further, WTTC contends that allowing companies to engage in tolling arrangements that could affect the sales denominator used in the subsidy calculations "opens a significant and concerning loophole for subsidy manipulation."  WTTC Br. 22.  Specifically, WTTC asserts that CS Wind was excluded from a prior antidumping duty order through litigation and entered into a tolling arrangement "with its affiliates in order to manipulate its potential duty liability," while alleging that Commerce failed to consider the evidence of manipulation.  *Id.* at 22-23.  WTTC is wrong.  Commerce takes manipulation concerns seriously, but the party alleging manipulation must substantiate its allegations with more than speculation and conjecture.  *Cf. LMI-La Metalli Industriale, S.p.A. v. United States*, 912 F.2d 455, 460 (Fed. Cir. 1990) ("Manipulation may be possible, but speculation as to its existence must yield to evidence.").  The ostensible "evidence" of manipulation that WTTC offered (*e.g.*, the existence of a tolling arrangement, exclusion from a prior antidumping order, and other events that occurred prior to this investigation) does not demonstrate that CS Wind is improperly manipulating a countervailing duty rate.  Moreover, Commerce documented its consideration of WTTC's arguments in this regard.  *See* IDM at 28.

Finally, WTTC's reliance on the *Eurodif* decision is misplaced.  *See* WTTC Br. 22.  In *Eurodif*, the Supreme Court upheld Commerce's decision to treat the sale of low enriched uranium under separative work unit (SWU) contracts as a sale of goods within the meaning of section 1673 of the antidumping duty statute.  *See* 555 U.S. at 308.  Under the SWU contracts, certain domestic utilities in the United States held title to inputs (such as natural uranium) and the foreign producer enriched (processed) the natural uranium into low enriched uranium, which

was sold to the utilities.  *Id*. at 309-10.  The exporters unsuccessfully sought to avoid application

of an antidumping duty order by arguing that they did not sell low enriched uranium, but rather

only enrichment services.  *Id.* at 312.  In contrast, no party in this case argues that Commerce

lacks authority to apply countervailing duty law because a party sells services only in the United

States.  There is no dispute that wind towers are a product subject to countervailing duties.  The

only issue is what amount properly represents the value of the exported product to which the

subsidy should be attributed, the sales value of the exported product (as Commerce's contends),

or the tolling fee paid for processing services (as WTTC argues).

In short, Commerce adopted a reasonable approach that is consistent with the statute, its

regulations, its past administrative decisions, and record evidence.  The Court should apply the

standard of review, defer to the agency's expertise, and sustain Commerce's determination.

## CONCLUSION

For these reasons, we respectfully request that the Court sustain Commerce's final results.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Reginald T. Blades, Jr.
REGINALD T. BLADES, JR.
Assistant Director

24

OF COUNSEL:                              /s/ Joshua E. Kurland
MYKHAYLO GRYZLOV                         JOSHUA E. KURLAND
Senior Counsel                          Trial Attorney
Office of the Chief Counsel             Commercial Litigation Branch
for Trade Enforcement & Compliance      Civil Division
U.S. Department of Commerce             U.S. Department of Justice
                                        Commercial Litigation Branch
                                        P.O. Box 480, Ben Franklin Station
                                        Washington, D.C. 20044
                                        Tel.: (202) 616-0477
                                        Email: Joshua.E.Kurland@usdoj.gov

May 26, 2021                            *Attorneys for Defendant United States*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with the word limitation of Court of International Trade Standard Chambers Procedures § 2(B)(1) and contains approximately 7.569 words, excluding the parts of the brief exempted from the word limitation.  In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.

<u>/s/ Joshua E. Kurland</u>