NON-CONFIDENTIAL VERSION

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **WIND TOWER TRADE COALITION,**<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>**UNITED STATES,**<br>　　　　　　　　　Defendant. | Before:　Hon. Timothy M. Reif, Judge<br><br>Court No. 20-03692<br><br><u>NON-CONFIDENTIAL VERSION</u><br><br>Business Proprietary Information Removed from Pages: 3, 4, and 14 |

<u>**WIND TOWER TRADE COALITION'S REPLY BRIEF**</u>

　　　　　　　　　　　　　　　　　　　　Alan H. Price, Esq.
　　　　　　　　　　　　　　　　　　　　Daniel B. Pickard, Esq.
　　　　　　　　　　　　　　　　　　　　Robert E. DeFrancesco, III, Esq.
　　　　　　　　　　　　　　　　　　　　Laura El-Sabaawi, Esq.

　　　　　　　　　　　　　　　　　　　　W<small>ILEY</small> R<small>EIN</small> LLP
　　　　　　　　　　　　　　　　　　　　1776 K Street, NW
　　　　　　　　　　　　　　　　　　　　Washington, DC 20006
　　　　　　　　　　　　　　　　　　　　(202) 719-7000

　　　　　　　　　　　　　　　　　　　　*Counsel to the Wind Tower Trade Coalition*

**Dated: June 24, 2021**

## **TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................................................................1

II.   ARGUMENT......................................................................................................................1

      A.    Commerce Erred in Relying on CS Wind's Reporting that It Purchased Vietnamese Steel Plate for Purposes of the Import Duty Exemptions on Raw Materials for Exporting Goods Program..................................1

      B.    Commerce's Reliance on CS Wind Korea's Sales Revenues in the Denominator of its Subsidy Benefit Calculation Was Unsupported by Substantial Evidence and Inconsistent with Law .......................................................5

           1.    Commerce's Use of CS Wind Korea's Sales Revenues in the Denominator Was Inconsistent with Its Regulations...................................6

           2.    Commerce's Use of CS Wind Korea's Sales Revenues in the Denominator Was Inconsistent with Its Past Practice ................................9

           3.    Commerce's Use of CS Wind Korea's Sales Revenues Unreasonably Disregarded the Potential of Margin Manipulation, and Commerce Failed to Address the WTTC's Arguments Regarding the Same .................................................13

III.  CONCLUSION ................................................................................................................16

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Altx, Inc. v. United States*,
    25 CIT 1100, 167 F. Supp. 2d. 1353 (2001) ............................................................................15

*CS Wind Vietnam Co. v. United States*,
    721 F. App'x 993 (Fed. Cir. 2018) ...........................................................................................14

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) .....................................................................................................................5

**Regulations**

19 C.F.R. § 351.525(b)(6)(i) ................................................................................................6, 7, 11

19 C.F.R. § 351.525(b)(7) ............................................................................................................6, 7

**Administrative Materials**

*Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed
    Presses from the People's Republic of China*, 75 Fed. Reg. 59,212 (Dep't of
    Commerce Sept. 27, 2010) ........................................................................................................9

*Certain Fabricated Structural Steel from Canada*, 85 Fed. Reg. 5,387 (Dep't
    Commerce Jan. 30, 2020) ........................................................................................................13

*Certain Tool Chests and Cabinets from the People's Republic of China*, 82 Fed.
    Reg. 56,582 (Dep't Commerce Nov. 29, 2017) .......................................................................12

*Circular Welded Austenitic Stainless Pressure Pipe from the People's Republic of
    China*, 74 Fed. Reg. 4,936 (Dep't Commerce Jan. 28, 2009) .................................................11

*Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China*,
    75 Fed. Reg. 41,801 (Dep't Commerce July 19, 2010) ..........................................................10

*Utility Scale Wind Towers from Malaysia*, 86 Fed. Reg. 30,593 (Dep't Commerce
    June 9, 2021) .............................................................................................................................8

*Utility Scale Wind Towers from the People's Republic of China*, 77 Fed. Reg.
    75,992 (Dep't Commerce Dec. 26, 2012) .................................................................................8

*Utility Scale Wind Towers from the People's Republic of China*, 77 Fed. Reg.
    75,978 (Dep't Commerce Dec. 26, 2012) .................................................................................8

Ct. No. 20-03692 NON-CONFIDENTIAL VERSION

I. **INTRODUCTION**

On behalf of the Wind Tower Trade Coalition ("WTTC"), we respectfully submit the following reply to the response brief filed by Defendant the United States ("the Government"). *See* Def.'s Resp. in Opp'n to Pl.'s Mot. for J. Upon the Admin. R. (May 26, 2021), ECF No. 15 ("Defendant Brief").

II. **ARGUMENT**

This appeal arises from a countervailing duty investigation into utility scale wind towers from Vietnam. *See Utility Scale Wind Towers from the Socialist Republic of Vietnam*, 85 Fed. Reg. 40,229 (Dep't Commerce July 6, 2020) (final affirm. countervailing duty deter. and negative deter. of critical circumstances), P.R. 216 and accompanying Issues and Decision Memorandum, P.R. 215 ("I&D Memo").[1] WTTC has appealed (1) the U.S. Department of Commerce's ("Commerce") reliance on CS Wind's reporting that it purchased Vietnamese steel plate when calculating a subsidy rate for the Import Duty Exemptions on Raw Materials for Exporting Goods program; and (2) Commerce's reliance on CS Wind Korea's, rather than CS Wind Vietnam's, sales revenues in the denominator of its subsidy benefit calculation.

A. **Commerce Erred in Relying on CS Wind's Reporting that It Purchased Vietnamese Steel Plate for Purposes of the Import Duty Exemptions on Raw Materials for Exporting Goods Program**

Commerce erred in concluding that CS Wind Vietnam properly reported the country of origin of a portion of its steel plate purchases as Vietnam and thus in not calculating a benefit

---

[1]   In this brief, documents contained in the public administrative record are identified by name and date, followed by "P.R.", followed by the corresponding administrative record number. Documents contained in the confidential administrative record are identified by name and date, followed by "C.R.", followed by the corresponding administrative record number.

1

received on those purchases under the Import Duty Exemptions on Imports of Raw Materials for Exporting Goods Program. *See* I&D Memo at cmt. 2.

In defense of Commerce's action, the Government argues that CS Wind fully cooperated with the agency's information requests and thus that the application of partial facts available with an adverse inference ("AFA") to CS Wind regarding the origin of its plate purchases would not have been justified. Defendant Brief at 11-15. As an initial matter, that is not the WTTC's only argument. First, the WTTC argues that Commerce failed to fully investigate the origin of CS Wind's steel plate, as the evidence indicated that further investigation was likely to confirm that the plate was imported, rather than Vietnamese-origin. In failing to fully investigate, Commerce improperly disregarded evidence contrary to its ultimate conclusion. *See* Wind Tower Trade Coalition's Mem. in Supp. of Rule 56.2 Mot. For J. Upon the Agency R. (Mar. 4, 2021) at 13-16, ECF No. 13 ("WTTC Opening Brief"). This failure to fully investigate on its own justifies remand to the agency, and the Government has not addressed this argument.

In the alternative, the WTTC argues that, even without further investigation, the record facts justified, and indeed required, the application of partial AFA, because CS Wind made contradictory statements and did not provide critical information until its rebuttal brief. With regard to the AFA argument, and contrary to the Government's assertions, Commerce did not adequately explain or support its determination that CS Wind cooperated to the best of its ability and did not provide contradictory information to or withhold information from the agency. For example, the Government argues that CS Wind only reported that it obtained "most" of its raw materials through imports, not "all" such materials, and thus that this statement did not conflict with its reporting of Vietnamese-origin steel plate. Defendant Brief at 13. However, in the entire relevant portion of the passage to which the Government refers, CS Wind states: "CS Wind

2

Corporation supplies *all main materials – steel plate*, flange, steel plate for door frame and internal mounting items – *from outside of Vietnam* for the production of the wind towers. Therefore, *most* of raw materials are exported to Vietnam by CS Wind Corporation." Letter from Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP to Sec'y Commerce, re: *CS Wind Initial Questionnaire Response: Countervailing Duty Investigation of Utility Scale Wind Towers from Vietnam (C-552-826)* (Oct. 9, 2019) at 21, C.R. 55-67, P.R. 103-104 ("CS Wind IQR") (emphasis added). While the Government focuses on the second statement, that "most" of the raw materials were exported to Vietnam, it disregards the first sentence. That first sentence states that *"all"* of the main raw materials, including steel plate, are obtained via import. *Id.* (emphasis added). Steel plate is undoubtedly a "main raw material" – indeed *the* main raw material – in the production of wind towers, a fact that is not in dispute. Thus, CS Wind effectively stated to Commerce that its steel plate was imported into Vietnam. Yet, the agency and the Government now appear to have disregarded this key evidence that was contrary to the ultimate conclusion that CS Wind's steel plate was Vietnamese-origin, and that demonstrated CS Wind's lack of full cooperation with the investigation.

Moreover, the Government fails to acknowledge the importance of key information revealed for the first time by CS Wind in its rebuttal brief – far beyond the information-collection stage of the investigation, further demonstrating the respondent's lack of full cooperation. There, in response to evidence demonstrating that CS Wind's steel plate [                    ] because [                                              ], *see* Letter from Wiley Rein LLP to Sec'y Commerce, re: *Utility Scale Wind Towers from the Socialist Republic of Vietnam: Comments on CS Wind's Initial Questionnaire Response* (Oct. 23, 2019) at 8-9 and Exhibits 6 and 7, C.R. 71, P.R. 111, CS Wind noted that "in this case, despite Petitioner's protestations, the

3

Department did not question CS Wind's reporting of some of its steel plate as having a Vietnam country of origin." Letter from Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP to Sec'y Commerce, re: *CS Wind Rebuttal Brief: Countervailing Duty Investigation on Utility Scale Wind Towers from Vietnam (C-552-826)* (Apr. 20, 2020) at 19, C.R. 112, P.R. 200. CS Wind Vietnam went on to note that it "never stated that the product was [

]," and, instead, implied that its steel plate may have only undergone some level of further processing in Vietnam, after being imported into Vietnam from an unidentified foreign country. *Id.* at 17-18 ("it is entirely possible that {the [          ]} [          ] imported steel product from other country and then processed it into steel plate, substantially transforming it into country of origin Vietnam"). *See also* Defendant Brief at 15 n.6.

Again, CS Wind Vietnam raised this "possibility" for the first time in its rebuttal brief – a fact that the Government does not raise in its defense of CS Wind's alleged full cooperation. CS Wind Vietnam's failure to disclose this critical information previously when asked about the country of origin of its inputs justified the application of partial AFA. Moreover, because of both CS Wind's failures to cooperate and the agency's failure to inquire adequately into the origin of the respondent's input, whether and to what extent CS Wind Vietnam's steel plate was merely further processed in Vietnam, and whether or not that further processing was in fact sufficient to transform the country of origin of the plate, was never explored. Contrary to the Government's attempt to brush aside this information as "unnecessary to resolve this issue," *id.*, this point is central to the issue at hand. As the subsidy program at issue related to *import duty* exemptions on *imports* of raw materials, it was critically important to determine whether CS Wind Vietnam's steel plate – the most significant input in the production of wind towers – was of imported- or domestic-origin. Thus, it was indeed necessary for Commerce to resolve whether the steel plate

that CS Wind reported as Vietnamese-origin was in fact Vietnamese-origin plate – or not – in order to conduct a comprehensive investigation of the subsidy program at issue.

Finally, the Government argues that CS Wind reported that Vietnam imposes a zero-percent import duty on all most favored nation ("MFN") imports of steel plate into the country. Defendant Brief at 4-5. Thus, the Government argues, even if the steel plate was not Vietnamese-origin and was instead imported, a zero-duty rate would have applied and there would have been no import duty from which to be exempted. *Id.* Yet, the Government points to nowhere in Commerce's decision that would indicate that this formed part of the agency's reasoning in making its determination. *See id.* "It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983). The evidence on the record did not support CS Wind's assertion that its plate was Vietnamese-origin and, in part due to reporting failures by CS Wind itself, Commerce never uncovered the actual country of origin of CS Wind's plate. There was thus no way to confirm whether import duties applied to CS Wind's imports of plate, whether they received MFN treatment, and/or whether import duties were exempted and at what rate.

    **B.**    <u>**Commerce's Reliance on CS Wind Korea's Sales Revenues in the Denominator of its Subsidy Benefit Calculation Was Unsupported by Substantial Evidence and Inconsistent with Law**</u>

Commerce unreasonably and unlawfully used the sales revenue of CS Wind Vietnam's parent company, CS Wind Corporation ("CS Wind Korea"), rather than that of CS Wind Vietnam itself, as the denominator in calculating the subsidy benefits received by CS Wind Vietnam during the period of investigation ("POI"). As set forth in the WTTC's opening brief, Commerce's use of CS Wind Korea's sales revenue was inconsistent with its past practice and with its regulations, which state that the agency normally will attribute a subsidy to the products produced by the

corporation that received the subsidy and that it normally will attribute the subsidy to products produced by the firm within the country of the government that granted the subsidy. 19 C.F.R. § 351.525(b)(6)(i) and (b)(7). Commerce's unreasonable conclusion that its "multinational company" regulation was inapplicable in this case, finding that CS Wind Vietnam is not a multinational company, was also unsupported by substantial evidence and contrary to law.

        1.    **Commerce's Use of CS Wind Korea's Sales Revenues in the Denominator Was Inconsistent with Its Regulations**

As the Government acknowledges, Defendant Brief at 16, when a corporation has cross-ownership, like CS Wind Vietnam with CS Wind Korea, Commerce's regulations state that it "normally will attribute a subsidy to the products produced by the corporation that received the subsidy." 19 C.F.R. § 351.525(b)(6)(i). Commerce acted contrary to this regulation in this case, by attributing the subsidies to CS Wind Korea, even though the Korean entity did not produce any subject wind towers and "did not receive any type of financial assistance from the Government of Vietnam during the POI or AUL period." Letter from Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP to Sec'y Commerce, re: *CS Wind First Supplemental Questionnaire Response: Countervailing Duty Investigation of Utility Scale Wind Towers from Vietnam (C-552-826)* (Nov. 6, 2019) at 7, C.R. 76-82, P.R. 122-128 ("CS Wind First SQR"). In other words, the subsidies were *not* attributed to the products "produced by the corporation that received the subsidy," but rather to a parent company in a third country that produced no wind towers and received no subsidies from the Vietnamese government.

The Government relies on the word "normally" in the regulations to excuse Commerce's attribution using a method inconsistent with section 351.525(b)(6)(i). *See* Defendant Brief at 16. The Government is wrong, however, in implying that Commerce was instead permitted under its regulations to use any method it so chose to attribute the subsidies received by CS Wind. It ignores

that section 351.525(b)(6) of the regulations, in addition to subsection (i) (*i.e.*, the subsection setting forth the "normal" attribution method), includes subsections (ii) through (vi) as well, which set forth the attribution methods to be used under certain specified alternative circumstances (*i.e.*, the specific circumstances under which Commerce may depart from the "normal" method). The circumstances specified in sections 351.525(b)(6)(ii)-(vi) did not apply in the underlying case, and the Government does not allege that they did. Therefore, the regulations dictated that Commerce was to apply the "normal" method of attribution under section 351.525(b)(6)(i), and attribute CS Wind's subsidies to the products produced by CS Wind Vietnam. Commerce failed to do so.

There is a more specific regulation that applies to CS Wind Vietnam and further confirms that its own sales revenue was the appropriate denominator for attribution – the multinational firm provision of 19 C.F.R. § 351.525(b)(7). When a firm that received a subsidy has production facilities in two or more countries, Commerce "will attribute the subsidy to products produced by the firm within the country of the government that granted the subsidy" (unless "it is demonstrated that the subsidy was tied to more than domestic production"). 19 C.F.R. §351.525(b)(7). In this case, that country was Vietnam.

The Government argues that the multinational corporation provision was "inapplicable to CS Wind." Defendant Brief at 18. In so arguing, the Government first cites Commerce's finding that CS Wind "does not have operations, such as production facilities, in any countries other than in Vietnam." *Id.* (citing I&D Memo at 30). This is simply incorrect. CS Wind Vietnam is part of the multinational CS Wind conglomerate. Commerce is well aware that CS Wind has wind tower production facilities in other countries. In fact, CS Wind China is subject to the antidumping and countervailing duty orders on *Utility Scale Wind Towers from China*, and Commerce just found CS Wind Malaysia to be receiving countervailable subsidies in its final countervailing duty

7

determination in *Utility Scale Wind Towers from Malaysia*. *Utility Scale Wind Towers from the People's Republic of China*, 77 Fed. Reg. 75,992 (Dep't Commerce Dec. 26, 2012) (final deter. of sales at less than fair value); *Utility Scale Wind Towers from the People's Republic of China*, 77 Fed. Reg. 75,978 (Dep't Commerce Dec. 26, 2012) (final affirm. countervailing duty deter.); *Utility Scale Wind Towers from Malaysia*, 86 Fed. Reg. 30,593 (Dep't Commerce June 9, 2021) (final affirm. countervailing duty deter.). With regard to Korea, CS Wind Vietnam reported that its Korean parent company was created in 2008 "by the merger of two *factories*," which then came under the sole ownership of CS Wind Korea. Letter from Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP to Sec'y Commerce, re: *CS Wind Affiliation Response: Countervailing Duty Investigation of Utility Scale Wind Towers from Vietnam (C-552-826)* (Sept. 3, 2019) at 4, C.R. 32-33, P.R. 67 (emphasis added). Thus, to the extent the decision that the multinational corporation provision did not apply was based on a finding by Commerce that CS Wind does not have production facilities in other countries, as the Government asserts, that finding was factually incorrect and unsupported by substantial evidence.

  While the Government further alleges that the attribution was nonetheless consistent with the multinational corporation provision because subsidies were attributed only to products produced by the firm in Vietnam, the subsidies were not attributed to the value of that *Vietnamese* production. *See* Defendant Brief at 18-19 (emphasis added). They were instead attributed to the sales of a Korean company in Korea, contrary to the multinational corporation provision. In so doing, Commerce disregarded CS Wind's well-established record of restructuring its subsidiaries for the purpose of avoiding antidumping and subsidy duties and instead allowed CS Wind to restructure its sales transactions and thereby themselves select which affiliate's sales denominator would be used.

8

Ct. No. 20-03692                                                NON-CONFIDENTIAL VERSION

### 2. Commerce's Use of CS Wind Korea's Sales Revenues in the Denominator Was Inconsistent with Its Past Practice

The Government next argues that Commerce's subsidy calculation for CS Wind was not inconsistent with its past practice, but rather was "consistent with how Commerce has treated similar tolling arrangements in prior cases." *Id.* at 19. First, the Government cites *Coated Paper from China*, where it alleges that the respondent had a tolling arrangement, but Commerce attributed the subsidy to the full sales value of the finished products, not the tolling fees. *See id.* (citing Issues and Decision Memorandum accompanying *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China*, 75 Fed. Reg. 59,212 (Dep't of Commerce Sept. 27, 2010) (final affirm. countervailing duty deter.) at cmt. 32 ("*Coated Paper from China* I&D Memo")). While noting that Commerce used a sales value from outside of the country of subsidization as the denominator, the Government has failed to discuss a critical aspect of this case. In *Coated Paper from China*, the agency did note a concern "regarding the use of sales values outside the country for which subsidies are measured." *Coated Paper from China* I&D Memo at 106. However, Commerce explained that the facts of that specific case showed that "the price of the merchandise sold to the United States is set by the {Chinese respondents'} paper producers. Thus, although the actual sales revenue may be collected outside the PRC, we are calculating a subsidy rate using the sales price set or sales value of the product from the PRC . . . ." *Id.* For that specific reason, Commerce found that it was "fulfilling {its} obligation under section 701(a) of the Act to collect the amount {of} duties owed based on subsidization of the product."[2] *Id.*

---

[2] Commerce also noted in *Coated Paper from China* the petitioner's concern about the Chinese respondents' "ability to manipulate the CVD rate in the future by adjusting its sales price to" the companies for which it toll processed. *Coated Paper from China* I&D Memo at 106. Commerce noted that it would "carefully monitor" this issue in future administrative reviews. *Id.*

9

In the underlying case, unlike in *Coated Paper from China*, the ultimate sales price of the product produced by CS Wind Vietnam was not set by CS Wind Vietnam in Vietnam. Instead, CS Wind Vietnam reported that CS Wind Korea "negotiates all sales," and, it follows, the price of the wind towers. *See* CS Wind IQR at 5. There is no evidence that CS Wind Vietnam set, within Vietnam, the ultimate price of the wind towers. Thus, the very concern that Commerce identified in *Coated Paper from China* was *not* satisfactorily addressed in the case at hand. To the contrary, by not addressing this important issue, Commerce instead opened a loophole for multinational companies like CS Wind to mask their dumping and subsidization by improperly attributing costs and revenue among the subject country. If the corporate parent in Korea is responsible for setting prices and costing, and the Vietnamese subsidiary is only a toller, then arguably CS Wind should have been subject to the antidumping duty ("AD") order on wind towers from Korea as well. Instead, CS Wind has been permitted to set up a structure using its multinational status to evade U.S. AD/CVD duties.

The Government attempts to distinguish the cases advanced by WTTC as evidence of Commerce's past practice, but cannot effectively do so. For example, it notes that, in *Narrow Woven Ribbons with Woven Selvedge from China*, "there was no tolling arrangement at issue." Defendant Brief at 20. Indeed, the WTTC acknowledged this in its opening brief. WTTC Opening Brief at 19. Yet, the circumstances of that case were still analogous, as the Chinese respondent argued that Commerce should rely on a consolidated sales value, including sales data from a Hong Kong affiliate, as the denominator because its unconsolidated sales allegedly reflected an artificial intra-company transfer price that did not fully reflect the total sales value as billed to the U.S. customer. Issues and Decision Memorandum accompanying *Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China*, 75 Fed. Reg. 41,801 (Dep't Commerce July 19,

2010) (final affirm. countervailing duty deter.) at cmt. 4. Commerce refused to use a denominator incorporating the Hong Kong affiliate's sales of the Chinese merchandise, citing its regulations at 19 C.F.R. § 351.525(b)(6)(i), and the agency relied on the Chinese respondent's unconsolidated sales as the corporation that received the subsidies. *Id.*

Next, the Government argues that WTTC's citation to *Circular Welded Austenitic Stainless Pressure Pipe from China* was inapposite, because in that case Commerce made an adjustment to include a "mark-up" charged by the Hong Kong affiliate through which the sales were made. Defendant Brief at 19-21. However, regardless of whether an entered value adjustment was made, the reasoning in *Circular Welded Austenitic Stainless Pressure Pipe from China* is instructive. The agency did not utilize the sales value of the respondent's Hong Kong affiliate in that case, even though – as in the underlying case – the Hong Kong affiliate was technically responsible for making the sales. Issues and Decision Memorandum accompanying *Circular Welded Austenitic Stainless Pressure Pipe from the People's Republic of China*, 74 Fed. Reg. 4,936 (Dep't Commerce Jan. 28, 2009) (final affirm. countervailing duty deter.) at 11 (the Hong Kong affiliate "consigned {stainless steel coil} to {the Chinese respondent} and {the Chinese respondent's affiliate} for manufacturing into subject merchandise that {the Chinese respondent} returned to {the Hong Kong affiliate} for sale"). Commerce reasoned that it normally attributes a subsidy to the products produced by the corporation that received the subsidy, the relevant Chinese respondent was the only one of its cross-owned companies that received benefits under the income tax reduction program,[3] and, as a result, only the Chinese respondent's sales value was used as the denominator. *Id.* at 12-13. The underlying cases were based on similar facts, but CS Wind Vietnam

---

[3]   Commerce did grant an entered value adjustment in that case, as the respondent has established that the six established criteria for such an adjustment were met, unlike in the instant case.

11

did not demonstrate that the six criteria necessary for an entered value adjustment were met, and thus such an adjustment should not have been granted, regardless of the denominator used.

The Government then argues that WTTC's citation to *Certain Tool Chests and Cabinets from China* was inapposite, because there was technically no tolling arrangement involved. Defendant Brief at 21. Again, even though the form of the agreement between the respondent companies was not a technical tolling arrangement, the agency's reasoning in the case is still analogous and, combined with the other cases cited in WTTC's opening brief, establishes a practice that Commerce failed to follow in this case. In *Certain Tool Chests and Cabinets from China*, the respondent argued that Commerce should utilize as the subsidy calculation denominator the sales value of its cross-owned reseller located in Macau, because those sales reflected the first unaffiliated export sale. Issues and Decision Memorandum accompanying *Certain Tool Chests and Cabinets from the People's Republic of China*, 82 Fed. Reg. 56,582 (Dep't Commerce Nov. 29, 2017) (final affirm. countervailing duty deter.) at cmt. 14. Commerce declined to do so, and instead utilized the sales value of the Chinese respondent's sales to its Macau affiliate (*i.e.*, analogous to, in this case, utilizing the value of CS Wind Vietnam's sales to CS Wind Korea), reasoning that its regulations state that subsidies will normally be attributed to the products produced by the corporation that received the subsidy. *Id.*

Finally, the Government fails to show that the WTTC's citation to *Certain Fabricated Structural Steel* ("*FSS*") *from Canada* was not reflective of Commerce's practice. *See* Defendant Brief at 21-22. The Government stresses that the fabricated structural steel industry is unique, but cannot show that the reasoning employed in that case does not equally apply here. As explained in WTTC's opening brief, in *FSS from Canada*, Commerce excluded respondents' post-importation U.S. activities with regard to the subject merchandise from the sales denominator, even though

Ct. No. 20-03692                                                                                       NON-CONFIDENTIAL VERSION

those activities were technically included in the ultimate sales value of the product. Issues and Decision Memorandum accompanying *Certain Fabricated Structural Steel from Canada*, 85 Fed. Reg. 5,387 (Dep't Commerce Jan. 30, 2020) (final neg. countervailing duty deter.) at cmt. 3. As Commerce stated in that case:

> We find the respondents' argument that the governments of Canada intended for the subsidies to apply beyond its own borders, because respondents have activities beyond those borders, to be unpersuasive. An examination of the subsidy programs at issue in this case indicates that they are intended to benefit the facilities and workers of the respondents in Canada – *i.e.*, they are tax credits and grants specific to the respondents' facilities and employees in Canada. *Because we cannot say that the governments that provided these subsidies intended to subsidize activities outside their territories, absent evidence on the record showing that they intended to do so, and that they did so, we find it necessary to remove the revenue associated with post-exportation activities from the sales denominators of the respondents.*

*Id.* (emphasis added). This is fully analogous to the underlying investigation. The Government of Vietnam intended to subsidize the activities of CS Wind Vietnam – *i.e.*, the toll processing of wind towers. There was no reason to believe that the Government of Vietnam intended to subsidize activities in Korea and, yet, such activities were captured in the sales denominator that the agency selected to use. Commerce made no attempt to distinguish these cases when making its inconsistent determination in the underlying case, and it thereby unreasonably departed from its past practice without explanation.

    **3.**  **Commerce's Use of CS Wind Korea's Sales Revenues Unreasonably Disregarded the Potential of Margin Manipulation, and Commerce Failed to Address the WTTC's Arguments Regarding the Same**

The Government attempts to brush aside the WTTC's arguments regarding the dangerous loophole for manipulation created by Commerce's decision, casting it as mere "speculation and conjecture." Defendant Brief at 23. But it is quite the opposite, as CS Wind's calculated – and largely effective – efforts to diminish its countervailing duty liability show. As explained at length in WTTC's case brief to the agency and in its opening brief, *see* Letter from Wiley Rein LLP to

13

Sec'y Commerce, re: *Utility Scale Wind Towers From The Socialist Republic of Vietnam: Case Brief* (Apr. 3, 2020) at 25-31, C.R. 107-108, P.R. 194 ("WTTC Case Brief"); WTTC Opening Brief at 22-24, CS Wind's global entity has a well-established record of restructuring its subsidiaries for the purpose of evading antidumping and countervailing duties. [

], just as it was excluded from a prior antidumping duty order through appeal litigation. *See* Letter from Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP to Sec'y Commerce, re: *CS Wind Supplemental Affiliation Response: Countervailing Duty Investigation of Utility Scale Wind Towers from Vietnam (C-552-826)* (Sept. 20, 2019) at Exhibits [          ], C.R. 35, P.R. 76; *CS Wind Vietnam Co. v. United States*, 721 F. App'x 993 (Fed. Cir. 2018). This [                              ], but not the fundamentals – wind towers continued to be manufactured in Vietnam by CS Wind Vietnam.

        As a result of this [          ], for its U.S. sales, [

], which did, of course, materialize. WTTC Case Brief at 26-27. Thus, CS Wind Korea's sales values were [                              ]. [                    ] uncovered at verification also indicated that [

].

Letter from Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP to Sec'y Commerce, re: *CS Wind Verification Exhibits in the Countervailing Duty Investigation of Utility Scale Wind Towers from Vietnam (C-552-826)* (Mar. 4, 2020) at [          ], C.R. 101-104, P.R. 185

(emphasis added). When the agency requested information from CS Wind Vietnam regarding why its sales were made through toll processing agreements, CS Wind Vietnam balked, telling Commerce that such questions were "not relevant to the CVD case," and noting only that it was done to "better control costs." CS Wind First SQR at 3. Contrary to the Government's assertions, this constituted evidence on the record indicating that CS Wind entered into this sales structure with its affiliates in order to manipulate its potential duty liability – evidence that the agency failed to consider.

Finally, the Government argues that Commerce adequately documented its consideration of WTTC's arguments with regard to the potential of subsidy margin manipulation. Defendant Brief at 23. In support of this argument, the Government merely points to Commerce's summary of the WTTC's arguments in its I&D Memo. *See id.* (citing I&D Memo at 28). While Commerce may have briefly noted that Petitioner made this argument below, it never actually *addressed* the argument. As such, Commerce unreasonably and unlawfully failed to address significant arguments of the WTTC that seriously undermined the agency's reasoning and conclusions. *See Altx, Inc. v. United States*, 25 CIT 1100, 1117-18, 167 F. Supp. 2d 1353, 1374 (2001).

## III. CONCLUSION

For the reasons detailed above and in its opening brief, WTTC respectfully submits that this Court should remand the final results of Commerce's countervailing duty investigation into wind towers from Vietnam for further consideration regarding the issues raised in WTTC's appeal.

Respectfully submitted,

*/s/ Alan H. Price*
Alan H. Price, Esq.
Daniel B. Pickard, Esq.
Robert E. DeFrancesco, III, Esq.
Laura El-Sabaawi, Esq.

**WILEY REIN LLP**
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

*Counsel to the Wind Tower Trade Coalition*

Dated: June 24, 2021

CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Wind Tower Trade Coalition's Reply Brief, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 4,865 words.

/s/ *Alan. H. Price*
(Signature of Attorney)

Alan H. Price
(Name of Attorney)

Wind Tower Trade Coalition
(Representative Of)

June 24, 2021
(Date)