Slip Op. 22-27

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **WIND TOWER TRADE COALITION**, | |
| Plaintiff, | **Before: Timothy M. Reif, Judge** |
| v. | **Court No. 20-03692** |
| **UNITED STATES**, | **PUBLIC VERSION** |
| Defendant. | |

## <u>OPINION AND ORDER</u>

[ Sustaining in part and remanding in part Commerce's Final Determination. ]

Dated: <u>March 24, 2022</u>

<u>Maureen E. Thorson and Derick G. Holt</u>, Wiley Rein, LLP, of Washington, D.C., argued for plaintiff Wind Tower Trade Coalition.  On the brief were <u>Alan H. Price</u>, <u>Daniel B. Pickard</u>, <u>Robert E. DeFrancesco, III</u> and <u>Laura El-Sabaawi</u>.

<u>Joshua E. Kurland</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant United States.  With him on the brief were <u>Brian M. Boynton</u>, Acting Assistant Attorney General, <u>Jeanne E. Davidson, Dir</u>ector, and <u>Reginald T. Blades, Jr</u>., Assistant Director.  Of counsel on the brief was <u>Mykhaylo Gryzlov</u>, Senior Counsel, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

* * *

Reif, Judge:  This action pertains to the final determination of the U.S. Department of Commerce ("Commerce") in the countervailing duty ("CVD") investigation on utility scale wind towers from the Socialist Republic of Vietnam ("Vietnam") for the period of investigation ("POI") January 1, 2018, through December 31, 2018.  *See Utility Scale Wind Towers from the Socialist Republic of Vietnam: Final Affirmative Countervailing Duty Determination and Negative Determination of Critical*

**PUBLIC VERSION**

Court No. 20-03692                                                                                          Page 2

*Circumstances* ("Final Determination"), 85 Fed. Reg. 40,229 (Dep't of Commerce July 6,

2020) (final affirm. countervailing duty deter. and negative deter. of critical

circumstances) and accompanying Issues and Decision Memorandum ("IDM"), PR 215.

  Plaintiff Wind Tower Trade Coalition ("WTTC" or "plaintiff"), "an association of

domestic utility scale wind tower producers" qualifying as an "interested party" under 19

U.S.C. § 1677(9)(E), Compl. ¶ 3, ECF No. 6, challenges Commerce's Final

Determination in a motion for judgment on the agency record with respect to: (1) the

denominator Commerce used in its subsidy calculation; and (2) Commerce's

acceptance of certain steel plate documentation for its subsidy calculation for the Import

Duty Exemptions on Imports of Raw Materials for Exporting Goods program ("Import

Duty Exemptions program").  WTTC's Mem. in Supp. of Rule 56.2 Mot. for J. upon

Agency R. ("Pl. Br.") at 2, ECF No. 13.  Defendant United States ("Government")

asserts that Commerce: (1) followed its regulations to apply the appropriate

denominator in its subsidy calculation; and (2) reached a reasonable determination and

was correct to not apply adverse facts available ("AFA") as related to documentation for

the Import Duty Exemptions program.  Def's Resp. in Opp'n. to Pl.'s Mot. for J. upon

Admin. R. ("Def. Br.") at 5-6, 11, ECF No. 15.

  As discussed herein, the court sustains the Final Determination with respect to

Commerce's decision not to apply AFA as related to the Import Duty Exemptions

program and remands the Final Determination with respect to Commerce's failure to

address the evidence and argument related to manipulation for the benefit calculation

**PUBLIC VERSION**

Court No. 20-03692                                                                                    Page 3

and Commerce's failure to substantiate its finding as to the origin of the steel plate in question.

## BACKGROUND

On July 9, 2019, WTTC filed a petition regarding utility scale wind towers from Vietnam.  Pet'r's Letter, "Petitions for the Imposition of Antidumping and Countervailing Duties on Utility Scale Wind Towers from Canada, Indonesia, the Republic of Korea, and the Socialist Republic of Vietnam" (July 9, 2019), CR 1-18, PR 1-18.  On July 29, 2019, Commerce initiated the CVD investigation, and, on August 19, 2019, Commerce selected CS Wind Tower Co., Ltd. ("CSWT") as the mandatory respondent. Respondent Selection Mem., CR 31, PR 57 (Aug. 19, 2019).  However, in 2008, CSWT and CS Industries Ltd. ("CSI") merged to form CS Wind Vietnam Co., Ltd. ("CS Wind Vietnam"),[1] a wholly owned subsidiary of CS Wind Corporation ("CS Wind Korea").[2] Letter from Grunfeld, Desiderio, Lebowitz, Silverman and Klestadt LLP to Sec'y

---

[1] Documents in the record also refer to CS Wind Vietnam Co., Ltd. as "CSWV."

[2] CSWT and CSI were both Vietnamese companies.  Oral Argument Tr. at 7:10-16; Letter from Grunfeld, Desiderio, Lebowitz, Silverman and Klestadt LLP to Sec'y Commerce, re: *CS Wind Initial Questionnaire Response: Countervailing Duty Investigation of Utility Scale Wind Towers from Vietnam (C-522-826)* (Oct. 9, 2019) ("Initial Questionnaire Resp.") at 2, CR 55-67, PR 103-104; Letter from Grunfeld, Desiderio, Lebowitz, Silverman and Klestadt LLP to Sec'y Commerce, re: *CS Wind Affiliation Response: Countervailing Duty Investigation of Utility Scale Wind Towers from Vietnam (C-522-826)* (Sept. 3, 2019) ("Affiliation Resp.") at 4, CR 32-33, PR 67. The effective date of the merger was January 1, 2009.  Initial Questionnaire Resp. at 2. The reason that Commerce selected CSWT as the mandatory respondent is unclear since it no longer existed as a corporate entity; however, the issue over identification appears to have been resolved because it appears based on the record that CS Wind Vietnam is the entity that provided questionnaire responses.

**PUBLIC VERSION**

Commerce, re: *CS Wind Affiliation Response: Countervailing Duty Investigation of Utility Scale Wind Towers from Vietnam (C-522-826)* (Sept. 3, 2019) ("Affiliation Resp.") at 4, CR 32-33, PR 67; Memorandum from John McGowan and Julie Geiger, International Trade Analysts, Office VI, Antidumping and Countervailing Duty Operations, to The File, re: *Verification of the Questionnaire Responses of CS Wind Vietnam Co., Ltd., Countervailing Duty Investigation of Utility Scale Wind Towers from the Socialist Republic of Vietnam* (Mar. 18, 2020) ("Verification Mem.") at 6, CR 105, PR 186. Therefore, CS Wind Vietnam responded to Commerce's investigation. *See, e.g.*, Affiliation Resp.

On August 20, 2019, Commerce issued its initial questionnaire.  IDM at 3.  On September 3, 2019, and September 20, 2019, CS Wind Vietnam provided affiliation responses.  *See* Affiliation Resp.; Letter from Grunfeld, Desiderio, Lebowitz, Silverman and Klestadt LLP to Sec'y Commerce, re: *CS Wind Supplemental Affiliation Response: Countervailing Duty Investigation of Utility Scale Wind Towers from Vietnam (C-522-826)* (Sept. 20, 2019) ("Suppl. Affiliation Resp."), CR 35, PR 76.  In its first response, CS Wind Vietnam reported no sales through any export trading company in Vietnam nor any affiliates in Vietnam, but instead explained that "all of . . . [CS Wind Vietnam]'s export sales are made through [it]s parent company, CS Wind Corporation, in Korea." Affiliation Resp. at 2.

As to its affiliates, CS Wind Vietnam further explained: "Several of its overseas affiliates provide the company with raw materials, including CS Wind [Vietnam]'s parent

**PUBLIC VERSION**

corporation, CS Wind Corporation, which provides a majority of the company's inputs

free-of-charge under a tolling operation agreement."[3]  *Id.* at 3.  CS Wind Vietnam also

noted that it "falls within [Commerce]'s meaning of cross-ownership."  *Id.*  In addition,

CS Wind Vietnam clarified that "[a]ll exports (to the United States and other markets)

during the POI were made by CS Wind Corporation.  All subject merchandise sales to

[sic] U.S. during the POI were carried out by negotiation between the customer and CS

Wind Corporation."  Suppl. Affiliation Resp. at 1.  CS Wind Vietnam and CS Wind Korea

utilized "tolling agreements" for all sales in the POI.[4]  *Id.*

On October 9, 2019, CS Wind Vietnam provided its initial questionnaire

response.  Letter from Grunfeld, Desiderio, Lebowitz, Silverman and Klestadt LLP to

Sec'y Commerce, re: *CS Wind Initial Questionnaire Response: Countervailing Duty*

*Investigation of Utility Scale Wind Towers from Vietnam (C-522-826)* (Oct. 9, 2019)

("Initial Questionnaire Resp."), CR 55-67, PR 103-104.  CS Wind Vietnam explained

that its "sales revenue is not based on invoice prices or amounts of wind towers sold to

unaffiliated U.S. customers (or the entered value of such merchandise), but the tolling

---

[3] "Toll manufacturing," also called "toll processing," is "[a]n arrangement under which a customer provides the materials for a manufacturing process and receives the finished goods from the manufacturer. . . .  The same party owns both the input and the output of the manufacturing process.  This is a specialized form of contract manufacturing." *Toll Manufacturing*, *Black's Law Dictionary* (11th ed. 2019).

[4] CS Wind Vietnam and its predecessor companies used tolling agreements with CS Wind Korea as early as 2007 and 2008.  Verification Mem. at 6 (noting the existence of processing agreements between CS Wind Vietnam and CS Wind Korea from January 1, 2009), 9 (noting the existence of processing agreements for 2007 and 2008); *see also* Oral Argument Tr. at 6:11-25.

processing fees issued to [its] parent company (equating to the latter's tolling expenses)."  *Id.* at 5.  CS Wind Vietnam further noted:

> Under the per-project processing contract between CSWV and CS Wind Corporation, CS Wind Corporation supplies all main materials — steel plate, flange, steel plate for door frame and internal mounting items — from outside of Vietnam for the production of the wind towers.  Therefore, most of [sic] raw materials are exported to Vietnam by CS Wind [Korea].

*Id.* at 21.

Regarding the materials, CS Wind Vietnam reported that it "merely imports them and then re-exports them" without ever purchasing anything from CS Wind Korea.  *Id.* CS Wind Vietnam further provided: "Because of the processing contracts and the fact that all final goods are being exported, Vietnam Customs permits [CS Wind Vietnam] to be exempt from import duties for all imported raw materials according to Article 10 of Decree 134 [of the Government of Vietnam ("GOV")]."  *Id.*

On October 23, 2019, WTTC requested that Commerce ask CS Wind Vietnam for clarification regarding its purchases of steel plate from [[                    ]] based on [[                                                        ]].  Letter from Wiley Rein LLP to Sec'y Commerce, re: *Utility Scale Wind Towers from the Socialist Republic of Vietnam: Comments on CS Wind's Initial Questionnaire Response* (Oct. 23, 2019) ("Comments on CS Wind Initial Questionnaire Resp.") at 8, CR 71; *see also* Oral Argument Tr. at 58:24-59:2.  On November 8, 2019, CS Wind Vietnam provided to Commerce a list of suppliers of raw materials that CS Wind Vietnam used to produce internal components; the list included steel plate supplied by "[[

**PUBLIC VERSION**

Court No. 20-03692                                                                              Page 7

]]" in [[          ]] and purchased by [[                    ]], as

well as steel plate supplied by [[                                                              ]].

Letter from Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP to Sec'y

Commerce, re: *CS Wind First Supplemental Questionnaire Response – Remaining*

*Questions*: *Countervailing Duty Investigation of Utility Scale Wind Towers from Vietnam*

*(C-552-826)* (Nov. 8, 2019) ("First Suppl. Questionnaire Resp. – Remaining Questions")

at 1, Ex. SQ2-6a, CR 83-84.

        On November 6, 2019, CS Wind Vietnam also noted that it "imports steel plate . .

. .  In addition, some steel scrap is generated from steel plates sourced from

Vietnamese suppliers (for internal components) and comingled."  Letter from Grunfeld,

Desiderio, Lebowitz, Silverman and Klestadt LLP to Sec'y Commerce, re: *CS Wind First*

*Supplemental Questionnaire Response: Countervailing Duty Investigation of Utility*

*Scale Wind Towers from Vietnam (C-522-826)* (Nov. 6, 2019) ("First Suppl.

Questionnaire Resp.") at 9, CR 76-82, PR 122-128.  Moreover, CS Wind Vietnam

stated: "Tracking the steel scrap generated from imported steel plate . . . is not

necessary since the import duty, without the exemption, is zero because of the various

Free Trade Agreements in place."  *Id.*

        On November 26, 2019, CS Wind Vietnam expanded upon this response, noting

that there is a zero percent duty on the Harmonized Tariff Schedule ("HTS") codes for

its steel plate imports under most favored nation ("MFN") treatment, as CS Wind

Vietnam confirmed through a search of those HTS codes on the Vietnam Customs

**PUBLIC VERSION**

Court No. 20-03692                                                                                    Page 8

website.  Letter from Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP to Sec'y

Commerce, re: *CS Wind Second Supplemental Questionnaire Response:*

*Countervailing Duty Investigation of Utility Scale Wind Towers from Vietnam (C-552-*

*826)* (Nov. 26, 2019) ("Second Suppl. Questionnaire Resp.") at 1-2, PR 143.  CS Wind

Vietnam described:

> This search confirms that the most favored nation ("MFN") tariff for each of
> these HTS provisions is 0%, even without any applicable free trade
> agreements.  Thus, steel plate imports do not need to be exempt under the
> import processing provision or subject to a free trade agreement to have a
> 0% duty.

*Id*. at 2 (emphasis omitted).  CS Wind Vietnam also provided the tariff reduction

schedules of the free trade agreements, denoting the zero percent duty rates.  *Id.*

   In addition, CS Wind Vietnam expressed confusion as to the relevance of

Commerce's question as to the "reason behind" its tolling agreements with CS Wind

Korea.  First Suppl. Questionnaire Resp. at 3.  Still, CS Wind Vietnam clarified that,

"[s]ince CS Wind [Korea] handles all of the sales, including the negotiations with those

sales, it decided to establish tolling agreements with CS [Wind Vietnam] so that it could

better control costs."  *Id.*

   On December 6, 2019, Commerce determined preliminarily that the GOV

provided countervailable subsidies to producers and exporters of the subject goods and

that there was a 2.43 percent preliminary subsidy rate.  *Utility Scale Wind Towers From*

*the Socialist Republic of Vietnam*, 84 Fed. Reg. 68,104, 68,105 (Dep't of Commerce

Dec. 13, 2019) (prelim. affirm. countervailing duty deter. and alignment of final deter.

**PUBLIC VERSION**

Court No. 20-03692                                                                 Page 9

with final antidumping duty deter.) and accompanying Preliminary Decision

Memorandum ("PDM") at 13, PR 152.  Further, Commerce stated that "CS Wind Korea

did not receive countervailable subsidies from the GOV attributable to CS Wind

[Vietnam] during the POI."  PDM at 5 (citing First Suppl. Questionnaire Resp. at 7).

As to the denominator used for the subsidy rate, Commerce explained the

reason that it used CS Wind Korea's sales values:

> [G]iven the circumstances of the unique relationship between the parent
> and respondent, the sales denominator reflects the value of subject
> merchandise that is entering the United States. . . .  [W]e have used, where
> appropriate, the reported POI sales values of CS Wind Korea's sales of CS
> Wind [Vietnam]'s merchandise, which includes sales of subject
> merchandise, in the denominator of the subsidy calculations, as well as,
> where appropriate, the values reported by CS Wind [Vietnam].

*Id.* at 6.  Therefore, Commerce "preliminarily f[ou]nd that no further adjustments to CS

Wind [Vietnam]'s entered value are appropriate."  *Id.* at 13.

Commerce further pointed out that under the GOV's Import Duty Exemptions

program, "[t]he amount of the exemption is equal to the amount of the duty

corresponding to the value of imported materials actually used in the production of the

finished goods that are exported."[5]  *Id.* at 9.  As to the import duty exemptions that CS

Wind Vietnam received, Commerce "preliminarily determine[d] a net countervailable

subsidy rate of 2.12 percent *ad valorem* for CS Wind [Vietnam]."  PDM at 9, 12 (citing

---

[5] "Under the [Import Duty Exemptions] program, import duty exemptions are provided
for imported raw materials that are incorporated into exported goods, or directly used in
the production of such goods."  PDM at 9 (citing GOV's Letter, "Utility Scale Wind
Towers from Vietnam, Case No. C-552-826: Government of Vietnam's Initial
Questionnaire Response" (Oct. 3, 2019) at Ex. E-1).

**PUBLIC VERSION**

Memorandum, "CS Wind Tower Co., Ltd. Calculations for the Preliminary

Determination" (Dec. 6, 2019)).

From February 24, 2020, through February 27, 2020, Commerce conducted

verification of CS Wind Vietnam's questionnaire responses.  Verification Mem. at 1.

The verification memorandum stated: "[CS Wind Vietnam] [o]fficials explained that if the

supplier is from outside of Vietnam, but the raw materials are sourced from inside

Vietnam, then these raw material inputs still need to be entered into the E-customs

system even if they are ultimately not imported."  *Id.* at 16 (citing Verification Exs. at VE-

15 at 68-75).  Commerce added that it reviewed sales reconciliation information for CS

Wind Vietnam and CS Wind Korea and "confirmed that the reported sales information

did not include sales to affiliates, service income, sales from merchandise produced

outside of the country, *etc.*"  *Id.* at 9.

On June 29, 2020, Commerce issued its Final Determination with the applicable

subsidy rate of 2.84 percent.  *See* Final Determination, 85 Fed. Reg. at 40,230 and

accompanying IDM.  As to the denominator issue, Commerce recited WTTC's concern

about manipulation as a result of its reading of CS Wind Vietnam's business practices.

IDM at 28; *see also* Oral Argument Tr. at 46:19-47:13.  Commerce noted also WTTC's

request, were Commerce to maintain the use of CS Wind Korea's sales value in the

denominator, that Commerce

> should modify the attribution of benefit from this program to reflect the
> products produced by the corporation that received the subsidy, *i.e.*, CS
> Wind in Vietnam, in accordance with the multinational tying rule under 19

PUBLIC VERSION

CFR 351.525(b)(7), even though no record evidence indicates that this subsidy is tied to more than domestic production.

*Id.* at 29 (citing Petitioner's Comments at 36; 19 C.F.R. § 351.525(b)(7)).  The

Government asserts: "Commerce explained why its regulations required the calculations

be on the value and not the tolling fee."  Oral Argument Tr. at 47:11-13.

Commerce ultimately determined that the relationship between CS Wind Vietnam

and CS Wind Korea "does not lend itself to the typical situation in which the respondent

sells subject merchandise to the United States" due to the tolling arrangement.  IDM at

29.  Therefore, Commerce used CS Wind Korea's sales value for the denominator

"consistent with the intent of Commerce's regulations and the normal subsidy

calculation methodology."  *Id*. at 29-30.  Commerce explained: "The sales value used in

the denominator of our subsidy calculations is limited to sales of subject merchandise

produced by CS Wind [Vietnam] and sold by its parent company, CS Wind Korea, in the

United States."  *Id*. at 30.  Further, Commerce determined that its multinational firm

regulation was inapplicable because "[t]he mandatory respondent in this investigation

which received subsidies is CS Wind [Vietnam], located in Vietnam," and CS Wind

Vietnam is not itself multinational.  *Id.  See generally* 19 C.F.R. § 351.525(b)(7).

With respect to the Import Duty Exemptions program, Commerce summarized

WTTC's argument that CS Wind Vietnam did not "identify the ultimate supplier and

country of origin of domestic steel purchases," and, therefore, required the application of

AFA.  IDM at 11-12 (citing Petitioner's Letter, "Utility Scale Wind Towers from the

Socialist Republic of Vietnam: Case Brief," dated Apr. 6, 2020); *see* IDM at 16-17 ("With

**PUBLIC VERSION**

respect to the petitioner's argument that Commerce should apply AFA for CS Wind

[Vietnam]'s identification of certain raw material inputs as having been supplied by

Vietnam, we disagree that AFA is warranted. . . .  [T]he petitioner claims that CS Wind

[Vietnam] did not properly identify the supplier of those inputs.").  Commerce also stated

CS Wind Vietnam's comment in the investigation on rebuttal that, contrary to WTTC's

assertion, "CS Wind [Vietnam] responded to all questions concerning the steel plate,

including country of origin." *Id.* at 14.  Commerce noted further the GOV's comment

that "there is no basis to countervail the raw material imports made by CS Wind

[Vietnam] during the POI because all of CS Wind [Vietnam]'s imports of steel plate are

duty free." *Id.*  Commerce also highlighted CS Wind Vietnam's assertion in its rebuttal

brief in the investigation that "[t]here exists no information on the record to contradict the

fact that the steel place [sic] could have been substantially transformed prior to

purchase." *Id.* at 15; *see* Letter from Grunfeld, Desiderio, Lebowitz, Silverman &

Klestadt LLP to Sec'y Commerce, re: *CS Wind Rebuttal Brief: Countervailing Duty*

*Investigation on Utility Scale Wind Towers from Vietnam (C-552-826)* (Apr. 20, 2020)

("CS Wind Rebuttal Br.")  at 17-19, CR 112, PR 200.  *But see* Oral Argument Tr. at

91:1-12 ([[

                                                                        ]]).  In addition,

Commerce noted CS Wind Vietnam's conclusion: "Thus, even if Commerce disagreed

with the country of origin as being Vietnam, the record demonstrates a duty exemption

**PUBLIC VERSION**

rate of zero percent for this input under the Most Favored Nations (MFN) status."[6]  IDM at 15; *see* CS Wind Rebuttal Br. at 17-19.  Commerce determined not to apply AFA as related to the Import Duty Exemptions program based on CS Wind Vietnam's "merely over-report[ing] raw material inputs in its questionnaire response."  IDM at 16-17.

---

[6] Commerce stated later in its IDM:

> Pursuant to Commerce's questionnaire, we requested that CS Wind submit to Commerce a schedule of all inputs of raw materials used in the production of subject merchandise during the POI for which import duty exemptions were received.  In its questionnaire response, CS Wind reported all imports of raw materials during the POI, which included the imports of raw materials sourced from outside and from within Vietnam.  We examined all purchases at verification and found no discrepancy.  We also examined sourced documentation pertaining to the inputs of raw materials sourced from within Vietnam.  In addition to the verbal explanation provided by company officials as to why those purchases were included in the spreadsheet, we examined source documentation supporting those purchases that were made from within Vietnam.

> Contrary to the petitioner's assertions, the supporting documentation, including invoices and packing lists, showed the origin of certain raw materials to be within Vietnam.  That is, the sales of these certain raw materials were made through CS Wind Korea, but only on paper; the raw material for those transactions was sourced from a supplier within Vietnam.  As stated in the verification report, "these raw material inputs still need to be entered into the E-customs system even if they are not ultimately imported."  Thus, for these transactions at issue, we find that CS Wind provided relevant and accurate documentation that identified the country of origin for these transactions.  Further, documentation examined at verification demonstrated that CS Wind paid the appropriate amount of duties on its raw material purchases.  Therefore, we find that there is nothing missing from the record, as alleged by the petitioner; accordingly, it is not appropriate to apply AFA to any of CS Wind's raw material inputs.

IDM at 17 (footnotes omitted).

**PUBLIC VERSION**

Court No. 20-03692                                                                                    Page 14

On August 20, 2020, Commerce issued its CVD order for utility scale wind towers from Vietnam.  *Utility Scale Wind Towers from Canada, Indonesia, and the Socialist Republic of Vietnam*, 85 Fed. Reg. 52,543 (Dep't of Commerce Aug. 26, 2020) (amended final affirm. countervailing duty deter. and countervailing duty orders).

Plaintiff brought this action on September 25, 2020, Summons (Sept. 25, 2020), ECF No. 1, seeking a remand of the Final Determination, Compl. at 6.

**STANDARD OF REVIEW**

The court exercises jurisdiction pursuant to sections 516A(a)(2)(A)(i)(II) and (a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(A)(i)(II) and (a)(2)(B)(i) (2018), and 28 U.S.C. § 1581(c) (2018).[7]

The Court will hold a CVD determination by Commerce to be unlawful if it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  To meet the substantial evidence standard, there must be "more than a mere scintilla" of evidence.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)); *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004) (quoting *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).  However, the standard "is satisfied by 'something less than the weight of the evidence.'"  *Altx, Inc.*, 370 F.3d at 1116 (quoting *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed.

---

[7] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, and references to the U.S. Code are to the 2018 edition.

**PUBLIC VERSION**

Cir. 1984) (citations omitted)).  In addition, "the possibility of drawing two inconsistent

conclusions from the evidence does not prevent an administrative agency's finding from

being supported by substantial evidence."  *Id.* (quoting *Matsushita Elec. Indus. Co.*, 750

F.2d at 933) (internal quotation marks and citations omitted)).  "A reviewing court must

consider the record as a whole, including that which 'fairly detracts from its weight', to

determine whether there exists 'such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion.'"  *Nippon Steel Corp. v. United States*, 458

F.3d 1345, 1351 (Fed. Cir. 2006) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S.

474, 477-478 (1951) (quoting *Consol. Edison Co.*, 305 U.S. at 229)); *see Shandong*

*Huarong Gen. Corp. v. United States*, 25 CIT 834, 837, 159 F. Supp. 2d 714, 718

(2001) ("[T]he Court will not disturb an agency determination if its factual findings are

reasonable and supported by the record as a whole, even if there is some evidence that

detracts from the agency's conclusion.") (citation omitted), *aff'd sub nom. Shandong*

*Huarong Gen. Grp. Corp. v. United States*, 60 F. App'x 797 (Fed. Cir. 2003).

Importantly, "an agency's action must be upheld, if at all, on the basis articulated

by the agency itself."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto.*

*Ins. Co.* ("*State Farm*"), 463 U.S. 29, 50 (1983) (citing *Burlington Truck Lines, Inc. v.*

*United States*, 371 U.S. 156, 168 (1962); *SEC v. Chenery Corp.*, 332 U.S. 194, 196

(1947); *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 539 (1981)); *see SKF*

*USA Inc. v. United States*, 263 F.3d 1369, 1382-83 (Fed. Cir. 2001); *Bowman Transp.,*

*Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285-286 (1974) (citing *Chenery*

**PUBLIC VERSION**

*Corp.*, 332 U.S. at 196) (noting the court "may not supply a reasoned basis for the

agency's action that the agency itself has not given").

An agency's final determination must provide "an explanation of the basis for its

determination that addresses relevant arguments, made by interested parties . . . ,

concerning the establishment of . . . a countervailable subsidy, or the suspension of the

investigation, with respect to which the determination is made."  19 U.S.C. §

1677f(i)(3)(A); *see NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1320 (Fed. Cir.

2009) (citing *Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1355 (Fed. Cir. 2005))

("[Section] 1677f(i) is . . . a partial codification of the Supreme Court's standard for

judicial review of administrative decisions from *State Farm*.").  Moreover, "§ 1677f(i)

does not require [the Court] to invalidate a decision . . . if Commerce failed to explicitly

address a party's non-dispositive argument."  *NMB Sing. Ltd.*, 557 F.3d at 1323 (citing

*Timken*, 421 F.3d at 1357).

"When an agency changes its practice, it is obligated to provide an adequate

explanation for the change."  *SKF USA Inc. v. United States*, 630 F.3d 1365, 1373 (Fed.

Cir. 2011) (citing *State Farm*, 463 U.S. at 42).  "The more complex the statute, the

greater the obligation on the agency to explain its position with clarity."  *Id.* (quoting *SKF

USA Inc. v. United States*, 263 F.3d 1369, 1382-83 (Fed. Cir. 2001)).  Moreover,

"Commerce also has an 'obligation' to address important factors raised by comments

from petitioners and respondents."  *Id.* at 1374 (quoting *Timken*, 421 F.3d at 1358).

Court No. 20-03692                                                                        Page 17

Still, the Court will "uphold a decision of less than ideal clarity if the agency's path

may reasonably be discerned." *State Farm*, 463 U.S. at 43 (quoting *Bowman Transp.*

*Inc.*, 419 U.S. at 286); *see also NMB Sing. Ltd.*, 557 F.3d at 1319, 1326 (stating that

Commerce's "explanations do not have to be perfect" but that there should be "a

reasonable way to consider the data as a whole and arrive at Commerce's conclusion").

## LEGAL FRAMEWORK

Commerce will impose a countervailing duty when: (1) Commerce determines

that a "government . . . or any public entity . . . is providing, directly or indirectly, a

countervailable subsidy with respect to the manufacture, production, or export of a class

or kind of merchandise imported, or sold (or likely to be sold) for importation, into the

United States"; and (2) the U.S. International Trade Commission ("Commission")

determines that a U.S. industry is "materially injured" or "threatened with material injury"

or "the establishment of a[] [U.S.] industry is materially retarded" due to the imports.  19

U.S.C. § 1671(a).  A subsidy is countervailable when a government or public entity

"provides a financial contribution" to a person that confers a benefit.  19 U.S.C. §

1677(5)(B).  A countervailable subsidy confers a benefit when a recipient receives such

benefit.  *Id.* § 1677(5)(B), (5)(E).

## DISCUSSION

The court concludes that Commerce did not act inconsistently with its regulations

and with the prior determinations presented by the parties in deciding to use CS Wind

Korea's sales value as a denominator for the subsidy calculation.  However, the court

**PUBLIC VERSION**

Court No. 20-03692                                                              Page 18

remands because Commerce failed to explain adequately its position with respect to the

evidence and relevant argument on manipulation raised by WTTC.  In addition, the

court remands because Commerce's determination regarding CS Wind Vietnam's steel

plate documentation for the subsidy calculation for the Import Duty Exemptions program

was not based on substantial evidence.  However, the court sustains Commerce's

decision not to apply AFA for the Import Duty Exemptions program.

I.      **Whether Commerce's use of CS Wind Korea's sales value as the
        denominator for the subsidy calculation is supported by substantial
        evidence and is in accordance with law**

        The court concludes that Commerce's Final Determination is not inconsistent

with its regulations or with the prior determinations presented by the parties.  However,

the court remands the Final Determination with respect to Commerce's failure to

address the evidence and argument related to manipulation for the benefit calculation.

        A.      **Legal framework**

        To calculate the "ad valorem subsidy rate" in a CVD investigation,

> [Commerce] will . . . divid[e] the amount of the benefit allocated to the [POI]
> . . . by the sales value during the same period of the product or products to
> which [Commerce] attributes the subsidy . . . .  Normally, [Commerce] will
> determine the sales value of a product on an f.o.b. (port) basis (if the product
> is exported) . . . .  However, if [Commerce] determines that countervailable
> subsidies are provided with respect to the movement of a product from the
> port . . . to the place of destination (*e.g.,* freight or insurance costs are
> subsidized), [Commerce] may make appropriate adjustments to the sales
> value used in the denominator.

19 C.F.R. § 351.525(a).

**PUBLIC VERSION**

"Ad valorem" is defined as "that is in proportion to value; proportional." *Ad Valorem*, OXFORD ENGLISH DICTIONARY, https://www.oed.com/view/Entry/2882 (last visited Mar. 4, 2022). In cases of corporations with cross-ownership, "[Commerce] normally will attribute a subsidy to the products produced by the corporation that received the subsidy." 19 C.F.R. § 351.525(b)(6)(i).

Further, in the context of multinational firms, the Code of Federal Regulations ("CFR") states:

> If the firm that received a subsidy has production facilities in two or more countries, the Secretary will attribute the subsidy to products produced by the firm within the country of the government that granted the subsidy. However, if it is demonstrated that the subsidy was tied to more than domestic production, the Secretary will attribute the subsidy to multinational production.

*Id.* § 351.525(b)(7). The CFR defines a "firm" as "the recipient of an alleged countervailable subsidy, including any individual, company, partnership, corporation, joint venture, association, organization, or other entity." *Id.* § 351.102(b)(23). In the *CVD Preamble*, Commerce provides a clarification as to the applicability of the regulation:

> In all other sections of these regulations, the term "firm" is used to describe the recipient of the subsidy. However, for purposes of certain attribution rules, where we are describing how subsidies will be attributed within firms, "firm" is too broad. Therefore, for the purposes of paragraphs (b)(5) and (b)(6), we are using the term "corporation."

*Countervailing Duties*, 63 Fed. Reg. 65,348, 65,400 (Dep't of Commerce Nov. 25, 1998) (final rule).

**PUBLIC VERSION**

Court No. 20-03692                                                                 Page 20

There is no CVD regulation that governs tolling arrangements specifically.  Oral

Argument Tr. at 17:17-18:20.  *See generally* 19 C.F.R. §§ 351.501-.528.

### B.      Positions of the parties

Plaintiff asserts that "Commerce unreasonably and unlawfully used the sales

revenue of . . . CS Wind Korea . . . as the denominator in calculating the subsidy

benefits received by CS Wind Vietnam."  Pl. Br. at 2 (citing 19 C.F.R. § 351.525(b)(6)(i),

(b)(7)).  Plaintiff argues that Commerce's decision in this respect was "inconsistent with

its past practice and regulations."  *Id*.  Plaintiff also declares that Commerce's

"unreasonable conclusion that its 'multinational company' regulation was inapplicable in

this case . . . was also unsupported by substantial evidence and contrary to law."  *Id.* at

2-3.  In furtherance of these points, plaintiff raises three primary arguments to which the

Government responds.  *See* Pl. Br. at 17-24; Def. Br. at 5-24.

### 1.      Whether Commerce acted consistently with its regulations

First, plaintiff asserts that "Commerce erred by attributing the subsidies received

by CS Wind Vietnam within Vietnam to the value of sales by CS Wind Korea, in a

manner inconsistent with its regulations."  Pl. Br. at 17.  Plaintiff considers Commerce's

use of CS Wind Korea's sales value in the denominator to be contrary to the language

of 19 C.F.R. § 351.525(b)(6)(i) and (b)(7).  *Id.* at 17-18.  As to subsection (b)(7), which

addresses subsidy attribution for multinational firms as described *supra*, Section I.A.,

plaintiff also raises language in the *CVD Preamble* that notes in part: "The government

of a country normally provides subsidies for the general purpose of promoting the

Court No. 20-03692                                                                                           Page 21

economic and social health of that country and its people, and for the specific purposes

of supporting, assisting or encouraging domestic manufacturing or production and

related activities . . . ."  *Id.* at 18 (quoting *Countervailing Duties*, 63 Fed. Reg. at 65,403).

On this basis, plaintiff insists that Commerce's actions were also "inconsistent

with its understanding of the purpose of foreign government subsidies."  *Id.*  Instead,

plaintiff contends that Commerce "mixes and matches" a denominator based on

Vietnamese and Korean activities with a numerator based on only Vietnamese

activities.  Oral Argument Tr. at 45:10-14.  Plaintiff argues that "both [the numerator and

denominator] should have reflected only Vietnamese activities."  Oral Argument at

57:28-32.  Further, plaintiff argues that the sales value is not "reflective of the full value

of that wind tower" because some inputs are received "free of charge."  Oral Argument

Tr. at 53:10-17, 54:12-13.  *But cf.* First Suppl. Questionnaire Resp. at 3 ("Normally, the

sales price of wind towers comprises of material costs and processing costs.").

Plaintiff also argues that Commerce should have but did not follow its "'normal'

method of attribution" under 19 C.F.R. § 351.525(b)(6)(i) and instead selected CS Wind

Korea's sales value as the denominator.  Wind Tower Trade Coalition's Reply Brief ("Pl.

Reply Br.") at 7, ECF No. 17.  Plaintiff asserts that Commerce should not have changed

its method because "the specific circumstances under which Commerce may depart

from the 'normal' method" are described only in 19 C.F.R. § 351.525(b)(6)(ii) through

(vi) and do not apply here.[8]  *Id.*

The Government argues to the contrary that "the actions [Commerce] took flow

directly from the regulation."  Oral Argument Tr. at 9:14-15, 10:8-10 (discussing 19

C.F.R. § 351.525(a) and (b)(6)).  Namely, the Government asserts:

> As a result of the tolling arrangement in this case, the sales of subject
> merchandise produced by CS Wind [Vietnam] are negotiated and made by
> CS Wind Korea.  Thus, Commerce properly attributed the subsidy to those
> sales and used them in the benefit calculation denominator.  Consistent with
> its regulation, Commerce based the denominator on the "sales value" of
> United States sales made by CS Wind Korea, rather than on the amount of
> the tolling fee that CS Wind [Vietnam] received from its parent company for
> processing services.

Def. Br. at 6.  The Government points to two textual aspects of 19 C.F.R. § 351.525 to

support its position that Commerce attributed properly the subsidies to the sales value

of the products: (1) the use of the word "normally" in the subsection discussing subsidy

attribution "to the products produced by the corporation that received the subsidy,"

which, the Government maintains, denotes a built-in "degree of flexibility or discretion"

for Commerce; and (2) the subsection discussing subsidy calculation directs Commerce

to use "'the sales value' of the product to which Commerce attributes the subsidy" as

the denominator — rather than attributing subsidies to an entity such as CS Wind

---

[8] Provisions (ii) through (vi) pertain to situations involving multiple corporations
producing the same product, a holding or parent company receiving a subsidy, input
suppliers, subsidy transfers and the definition of cross-ownership, respectively.  19
C.F.R. § 351.525(b)(6)(ii)-(vi).

**PUBLIC VERSION**

Korea.  *Id.* at 16 (first quoting 19 C.F.R. § 351.525(b)(6)(i); then quoting 19 C.F.R. §

351.525(a)) (emphases omitted).

The Government describes the dispute as follows:

The disagreement between Commerce and WTTC thus boils down to a straightforward question of whether the subsidy should have been attributed to the "sales value" of *products* produced by CS Wind [Vietnam] and exported by CS Wind Korea (as Commerce's regulations require and as Commerce did), or to an amount of a tolling fee for processing services paid by CS Wind Korea to CS Wind [Vietnam], as WTTC advocates.

*Id.* at 17.  As further support, the Government explains that the processing services

value would have been *underinclusive* and therefore inaccurate.  *Id.* at 17-18.  By

contrast, the Government explains that the sales value that Commerce used was not

*overinclusive* as the sales value "is limited to sales of subject merchandise produced by

CS Wind [Vietnam] and sold by its parent company."  *Id.* at 17 (citing IDM at 30).[9]  The

Government closes its argument by contending that Commerce took a "reasonable

approach" that warrants deference by the court.  *Id.* at 24.[10]

---

[9] At oral argument, plaintiff raised "selling expenses" and the Government raised "purchasing raw materials and engaging in selling activities" as the cost elements from CS Wind Korea going toward the wind towers.  Oral Argument Tr. at 19:14-21:2.  CS Wind Vietnam also reported that "CS Wind Corporation has only sales and administrative functions in Korea."  First Suppl. Questionnaire Resp. at 3.

[10] At oral argument, the Government also asserted that Commerce's cross-border regulation covers tolling arrangements in the absence of a separate CVD tolling regulation.  Oral Argument Tr. at 17:22-18:2.  Plaintiff countered by raising a preliminary decision memorandum in another case to highlight the way in which, plaintiff asserted, Commerce stated that it perceived similarities between a situation involving tollers and situations involving a trading company under 19 C.F.R. § 351.525(c).  Oral Argument (footnote continued)

**PUBLIC VERSION**

Countering what plaintiff calls Commerce's "conclusory statement" that CS Wind Vietnam is not a multinational firm under 19 C.F.R. § 351.525(b)(7), plaintiff insists that "[i]t does not logically follow from CS Wind Vietnam's status as a subsidiary that it could not also be [sic] multinational firm."  Pl. Br. at 18-19 (citing IDM at cmt. 6).  Plaintiff supports its argument by pointing out that "CS Wind Vietnam is part of the multinational CS Wind conglomerate."  Pl. Reply Br. at 7; *see also* Oral Argument Tr. at 13:23-14:2. Plaintiff also alleges: "With regard to Korea, CS Wind Vietnam reported that its Korean parent company was created in 2008 'by the merger of two *factories*,' which then came under the sole ownership of CS Wind Korea."  Pl. Reply Br. at 8 (quoting Affiliation Resp. at 4).[11]  Plaintiff concludes that "[subsidies] were not attributed to the value of that *Vietnamese* production," *id.* (citing Def. Br. at 18-19), but that "[t]hey were instead attributed to the sales of a Korean company in Korea, contrary to the multinational corporation provision," *id.*

---

Tr. at 18:9-20; *see Steel Concrete Reinforcing Bar From the Republic of Turkey: Preliminary Results of Countervailing Duty Administrative Review and Intent To Rescind the Review in Part; 2016* ("*Turkey Rebar 2018*"), 83 Fed. Reg. 63,472 (Dep't of Commerce Dec. 10, 2018) and accompanying PDM ("*Turkey Rebar 2018* PDM"); *see also* IDM at 10.

[11] Plaintiff's statement confuses the facts.  The correct facts are that in 2008, two Vietnamese companies merged to form CS Wind Vietnam; CS Wind Korea "became the sole owner of the company at that time."  Affiliation Resp. at 4.  CS Wind Korea existed before the merger.  *See id.*; Initial Questionnaire Resp. at 1-2 ("CSI and CSWT merged at the end of 2008 and the company was renamed CSWV.  Both the old entities and the new entity were 100% owned by CS Wind Corporation in Korea.").

PUBLIC VERSION

The Government retorts that "by its express terms, the [multinational firm] regulation applies only *if* 'the firm that received a subsidy *has production facilities in two or more countries*.'"  Def. Br. at 18 (quoting 19 C.F.R. § 351.525(b)(7) (emphasis supplied)).  In this case, Commerce found that "CS Wind [Vietnam] 'does not have operations, such as production facilities, in any countries other than in Vietnam.'"[12]  *Id.* (quoting IDM at 30).  The Government concludes that, as Commerce determined, the provision does not apply in this case.  Def. Br. at 18-19 (citing IDM at 30); IDM at 30; *cf.* Oral Argument Tr. at 12:5-7, 16:15-17:14 (asserting that Commerce still acted consistently with 19 C.F.R. § 351.525(b)(7), notwithstanding that Commerce maintained, and the Government argues, that the subsection is inapplicable).

## 2.      Whether Commerce acted consistently with its past practice

Plaintiff's second argument is that Commerce "unacceptably departed from its past practice" without providing a "reasonable explanation" when it used the CS Wind Korea sales value (rather than the CS Wind Vietnam processing services value) in the denominator.  Pl. Br. at 19 (citing *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003)).  To support its argument, plaintiff discusses several administrative proceedings in its briefs and at oral argument and asserts that "Commerce made no attempt to distinguish these cases."  *Id.* at 19-21.

---

[12] CS Wind Vietnam has only two production facilities, both in Vietnam.  Initial Questionnaire Resp. at 1.

Court No. 20-03692                                                                                      Page 26

For instance, plaintiff describes that in *Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China*, which involved a Chinese respondent and a Hong Kong affiliate, but no tolling arrangement, Commerce used an unconsolidated sales value as the denominator, to the exclusion of the Hong Kong sales data. *Id.* (citing *Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China* ("*Woven Ribbons from China*"), 75 Fed. Reg. 41,801 (Dep't of Commerce July 19, 2010) (final affirm. countervailing duty deter.) and accompanying IDM at cmt. 4); *see* Pl. Reply Br. at 10 (describing the facts as "still analogous," despite the lack of a tolling arrangement, such that the case is pertinent).

The Government counters that "*Woven Ribbons from China* did not address the issue of whether it is appropriate to attribute the subsidy to the sales value of the product (as Commerce did), or merely to the amount of a processing/tolling fee (as WTTC advocates)."  Def. Br. at 20.

Plaintiff also discusses *Circular Welded Austenitic Stainless Pressure Pipe from the People's Republic of China* ("*Pressure Pipe*"), in which plaintiff summarizes that Commerce granted an entered value adjustment ("EVA")[13] and again used a Chinese

---

[13] Commerce noted in the instant case: "The purpose of an EVA is to ensure that assessment on the U.S. value of imported subject merchandise is at the appropriate *ad valorem* rate."  IDM at 30.  In its PDM in the instant case, Commerce also explained the circumstances under which it has granted an EVA, which adjusts the subsidy calculation described in 19 C.F.R. § 351.525(a) to account for certain variations.  *Utility Scale Wind Towers from the Socialist Republic of Vietnam*, 84 Fed. Reg. 68,104 (Dep't of Commerce Dec. 13, 2019) (prelim. affirm. countervailing duty deter. and alignment of (footnote continued)

**PUBLIC VERSION**

respondent's sales value for the denominator and not that of a Hong Kong affiliate —

despite the affiliate making the sales.  Pl. Br. at 20 (citing *Pressure Pipe*, 74 Fed. Reg.

4,936 (Dep't of Commerce Jan. 28, 2009) (final affirm. countervailing duty deter.) and

_____

final deter. with final antidumping duty deter.) and accompanying PDM at 13.
Specifically, Commerce described as follows the discrepancy between the sales value
and the entered value of the goods and the six additional elements required for
Commerce to grant an EVA:

> Commerce's practice is to use the [free on board or] FOB sales value for
> the denominator in its subsidy calculations.   However, in limited
> circumstances, Commerce has adjusted the calculation of the subsidy rate
> when the sales value used to calculate that subsidy rate does not match the
> entered value of the subject merchandise, *e.g.*, where subject merchandise
> is exported to the United States with a mark-up from an affiliated company,
> and where the respondent can demonstrate that: 1) the price on which the
> alleged subsidy is based differs from the U.S. invoiced price; 2) the
> exporters and the party that invoices the customer are affiliated; 3) the U.S.
> invoice establishes the customs value to which the CVD duties are applied;
> 4) there is a one-to-one correlation between the invoice that reflects the
> price on which subsidies are received and the invoice with the mark-up that
> accompanies the shipment; 5) the merchandise is shipped directly to the
> United States; and 6) the invoices can be tracked as back-to-back invoices
> that are identical except for price.
>
> . . .
>
> Commerce has generally limited the sales adjustment to instances where a
> respondent can demonstrate that all of its sales to the United States met
> the six criteria listed above.

*Id.* (footnotes omitted).  In other words, Commerce can grant an EVA to address a
mismatch between the sales value and the entered value when each of these criteria
are met.  *See id.*  The court notes that there has been other litigation before this court
pertaining to an inconsistency in the way in which Commerce calculates generally an
EVA.  *See Canadian Solar Inc. v. United States*, 45 CIT __, __, 537 F. Supp. 3d 1380,
1394-99 (2021).  Still, this case differs in that no mark-up existed that would have
necessitated an EVA, and Commerce states that it did not grant one.  *See* IDM at 30.

accompanying IDM at cmt. 3); *see also* Oral Argument Tr. at 27:14-28:1; Pl. Reply Br. at 11-12 (insisting the facts of *Pressure Pipe* are still related despite an EVA and mark-up by the affiliate).

The Government emphasizes that *Pressure Pipe* involved "an adjustment to include a 'mark-up' charged by the Hong Kong affiliate," whereas this case did not involve a mark-up by CS Wind Korea.  Def. Br. at 20-21 (citing *Pressure Pipe* IDM at cmt. 3; IDM at 30).  Citing this difference, the Government concludes that *Pressure Pipe* "does not require Commerce to allocate the subsidy to the amount of the processing fee rather than the sales value of a product."  *Id.* at 21 (citing 19 C.F.R. § 351.525(a)); *see also* Oral Argument Tr. at 28:18-23 (stressing that the *Pressure Pipe* dispute involved *which* sales value or values to use, not *whether* to use the sales value at all).

Next, plaintiff raises *Certain Tool Chests and Cabinets from the People's Republic of China*, in which the denominator was based on the value of a Chinese respondent's sales to a Macau affiliate and not the value of the Macau affiliate's export sales.  Pl. Br. at 20-21 (citing *Certain Tool Chests and Cabinets from the People's Republic of China* ("*Tool Chests*"), 82 Fed. Reg. 56,582 (Dep't of Commerce Nov. 29, 2017) (final affirm. countervailing duty deter.) and accompanying IDM at cmt. 14).  Here, plaintiff's point is that "utilizing the value of CS Wind Vietnam's sales to CS Wind

**PUBLIC VERSION**

Korea"[14] would be analogous to Commerce utilizing the Chinese respondent's sales

value in the denominator in *Tool Chests*. *Id.* at 21; *see also* Pl. Reply Br. at 12.

      The Government, by contrast, seeks to distinguish *Tool Chests* by pointing out

that it "did not involve a tolling arrangement, and thus did not address the issue of

whether it is appropriate to allocate a subsidy to the amount of the tolling/processing fee

rather than the sales value of the product." Def. Br. at 21 (citing *Tool Chests*, 82 Fed.

Reg. 56,582 and accompanying IDM at cmt. 14).

      The last case to which plaintiff cites to establish that Commerce had a practice in

this area is *Certain Fabricated Structural Steel from Canada*. *See* Pl. Br. at 21 (quoting

*Certain Fabricated Structural Steel from Canada* ("*Fabricated Structural Steel*"), 85 Fed.

Reg. 5,387 (Dep't of Commerce Jan. 30, 2020) (final neg. countervailing duty deter.)

and accompanying IDM at cmt. 3); Pl. Reply Br. at 13. In that case, Commerce

"remove[d] the revenue associated with post-exportation activities from the sales

denominators of the respondents" due to a lack of evidence that "the governments that

provided these subsidies intended to subsidize activities outside their territories." Pl. Br.

---

[14] This value would be CS Wind Vietnam's "toll processing fees, or revenue." IDM at 29; *see* Initial Questionnaire Resp. at 5 (describing CS Wind Vietnam's sales revenue as "the tolling processing fees issued to CSWV's parent company (equating to the latter's tolling expenses)"); *see also* Letter from Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP to Sec'y Commerce, re: *CS Wind Rebuttal Brief: Countervailing Duty Investigation on Utility Scale Wind Towers from Vietnam (C-552-826)* (Apr. 20, 2020) at 29, CR 112, PR 200 (noting that "CSWV's sales revenue is processing service income").

at 21 (quoting *Fabricated Structural Steel* IDM at cmt. 3); *accord* Pl. Reply Br. at 13

(citation and emphasis omitted); *see also* Oral Argument Tr. at 50:22-51:3.

The Government counters that the facts in *Fabricated Structural Steel* are readily

distinguishable from those in this case.  Def. Br. at 22 (quoting *Fabricated Structural

Steel* IDM at cmt. 3).  In particular, the Government notes that, unlike the extensive

post-importation assembly activities in the United States in *Fabricated Structural Steel*,

"there is no evidence that a significant portion of CS Wind [Vietnam]'s production

assembly occurred in the United States." *Id.*[15]  Accordingly, the Government argues

that *Fabricated Structural Steel* dealt with peculiar and divergent facts such that it does

not support plaintiff's point.  *Id.* at 21-23.

In any event, the Government adds that Commerce, in reliance on the *CVD

Preamble*, explained in *Fabricated Structural Steel* that its attribution rules were not

exhaustive.  *Id.* at 22 (quoting *Fabricated Structural Steel* IDM at cmt. 3).[16]  Based on

Commerce's description of this flexibility within the rules, the Government argues that a

"rigid approach" would lead to an inappropriate attribution result here.  *Id.* at 22-23.

---

[15] In its determination, Commerce noted that "a significant amount of activity occurs outside of Canada following importation into the United States."  *Certain Fabricated Structural Steel from Canada*, 85 Fed. Reg. 5,387 and accompanying IDM at cmt. 3. Commerce also explained specifically that "[t]his is not a sales situation that [it] normally encounter[s] in a CVD proceeding."  *Id.*

[16] Commerce stated: "[T]he *CVD Preamble* makes clear that our attribution rules do not account for all situations that may arise because, if Commerce tried to account for all possible permutations, the result would be an extremely lengthy set of rules that could prove unduly rigid."  *Id.*

**PUBLIC VERSION**

Overall, plaintiff concludes that "Commerce made no attempt to distinguish these cases," Pl. Br. at 21, which collectively "establish[] a practice that Commerce failed to follow in this case," Pl. Reply Br. at 12.[17]

The Government, as noted previously, comments on each of the four prior Commerce determinations presented by plaintiff and presents one additional determination in support of its view that Commerce in this case acted consistently with its past practice — in particular, consistent with "prior decisions in cases involving similar tolling arrangements." Def. Br. at 19. Specifically, the Government raises

---

[17] At oral argument, plaintiff raised one additional case, *Turkey Rebar 2018*, to argue that Commerce has previously "viewed tolling arrangements through the lens of [the trading company regulation]." Oral Argument Tr. at 18:9-20; *see Turkey Rebar 2018* PDM (citing *Turkey Rebar 2017* IDM at 12). There, Commerce described an earlier investigation of Turkish rebar:

> In the second CVD investigation of rebar from Turkey ([*Turkey Rebar 2017*]), we found that it was appropriate to attribute subsidies received by certain tolling companies to a company respondent when the relationship between the tolling company and the respondent is akin to the relationship between a producer and its trading company under 19 CFR 351.525(c) (*i.e.*, the tolling company performs all production activities and the respondent sells the finished product).

*Turkey Rebar 2018* PDM at 8 (citing *Steel Concrete Reinforcing Bar from the Republic of Turkey, Final Affirmative Countervailing Duty Determination* ("*Turkey Rebar 2017*"), 82 Fed. Reg. 23,188 (May 22, 2017) and accompanying IDM at 12 (explaining that Commerce was "'cumulating' subsidies provided to Habas' toller under similar circumstances"), and accompanying PDM at 13-14).

However, in this case, Commerce found that the comparison to the trading company scenario was inapposite. *See* IDM at 10 (finding that *Turkey Rebar 2017* differed from the current scenario). As Commerce also explained, "[i]n this case, sales of the subject merchandise did not go through any trading companies." *Id.* at 30. The court notes plaintiff's argument regarding the Turkish rebar cases, *supra* note 10.

**PUBLIC VERSION**

*Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China*.  *Id.* (citing *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China* ("*Coated Paper*"), 75 Fed. Reg. 59,212 (Dep't of Commerce Sept. 27, 2010) (final determ.) and accompanying IDM at cmt. 32).  In that case, the Government states: "Commerce addressed a situation in which a respondent had a tolling arrangement, and consistent with this case, *declined* to attribute the subsidy to the amount of the tolling/processing fee, instead attributing it to the sales value of the finished products." *Id.* (citing *Coated Paper*, 75 Fed. Reg. 59,212, and accompanying IDM at cmt. 32).[18]

---

[18] In *Coated Paper*, to follow 19 C.F.R. § 351.525(a), Commerce explained:

> [A]lthough the [] companies do not have title to the raw materials, the production of the subject merchandise is occurring in [China] using these materials.  Thus, the export product leaving [China] for which subsidies should be attributed is not just the processing fee, but also the actual product produced.

*Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China* ("*Coated Paper*"), 75 Fed. Reg. 59,212 (Dep't of Commerce Sept. 27, 2010) (final determ.) and accompanying IDM at cmt. 32. Commerce concluded:

> [T]he most effective manner to attribute the subsidies is to remove toll processing fees . . . and replaced [sic] it [sic] with the sales values reported by [two affiliated trading companies'] reported sales of each of the paper producers' products.  Using this methodology comes closest to ensuring that the amount of subsidies assigned to the [tolling] companies is reflected in the calculated CVD rate because it is the actual value by which the merchandise enters the United States.

*Id.*

**PUBLIC VERSION**

Court No. 20-03692                                                                                  Page 33

Plaintiff seeks to distinguish *Coated Paper* by recalling that the determination in that case stated: "[A]lthough the actual sales revenue may be collected outside the [People's Republic of China or] PRC, [Commerce is] calculating a subsidy rate using the sales price set or sales value of the product from the PRC . . . ."  Pl. Reply Br. at 9-10 (quoting *Coated Paper* IDM at cmt. 32)); *see also* Oral Argument Tr. at 24:17-25:4, 25:18-22.  Plaintiff argues that in the instant case, by contrast, "[t]here is no evidence that CS Wind Vietnam set, within Vietnam, the ultimate price of the wind towers."  Pl. Reply Br. at 10.

### 3.      Plaintiff's manipulation concerns

Plaintiff's third concern is that "allowing foreign producers with multiple global affiliates to restructure sales transactions and thereby themselves select which affiliate's sales denominator will be used in U.S. CVD cases opens a significant and concerning loophole for subsidy margin manipulation."  Pl. Br. at 22 (citing Letter from Wiley Rein LLP to Sec'y Commerce, re: *Utility Scale Wind Towers From The Socialist Republic of Vietnam:* Case Brief (Apr. 3, 2020) ("WTTC Case Br.") at 25-31, CR 107-108, PR 194). In this respect, plaintiff takes issue with four points: (1) CS Wind Vietnam and CS Wind Korea started to use toll processing agreements in 2018 "just as [CS Wind Vietnam] was excluded from a prior antidumping duty order through appeal litigation"[19]; (2) CS

---

[19] Despite the timing plaintiff alleges, Pl. Br. at 22, the use of toll production agreements dates to at least 2008, based on the record, and as later acknowledged by plaintiff at oral argument, Verification Mem. at 6, 9; Oral Argument Tr. at 6:11-25, 84:10-12; *see also supra* note 4.

**PUBLIC VERSION**

Court No. 20-03692                                                                                    Page 34

Wind Korea [[                                                                        ]] and began [[

                                                                        ]], which plaintiff claims as evidence that CS

Wind Korea [[                                                                                    ]]; (3) CS

Wind Korea [[

                                                                        ]]; and (4) according to plaintiff, CS Wind

Vietnam provided an insufficient rationale for using toll processing agreements to "better

control costs."  *Id.* at 22-23 (quoting Initial Questionnaire Resp. at Ex. 13.1; First Suppl.

Questionnaire Resp. at 3; Letter from Grunfeld, Desiderio, Lebowitz, Silverman &

Klestadt LLP to Sec'y Commerce, re: *CS Wind Verification Exhibits in the*

*Countervailing Duty Investigation of Utility Scale Wind Towers from Vietnam (C-552-*

*826)* (Mar. 4, 2020) ("Verification Exs.") at VE-4 at 59, CR 101-104) (citing Suppl.

Affiliation Resp. at Exs. SA-2 and SA-3; *CS Wind Viet. Co. v. United States*, 721 F.

App'x 993 (Fed. Cir. 2018)) (emphasis omitted); *see* Pl. Reply Br. at 8 (insisting that "CS

Wind[] [has a] well-established record of restructuring its subsidiaries for the purpose of

avoiding antidumping and subsidy duties"), 13-15.  Therefore, plaintiff concludes that

"there was important evidence on the record indicating that CS Wind entered into this

sales structure with its affiliates in order to manipulate its potential duty liability."  Pl. Br.

at 23.  Plaintiff asserts that Commerce "never actually *addressed* the argument" in the

IDM.  Pl. Reply Br. at 15.[20]

---

[20] Plaintiff points earlier to Commerce's discussion of a future manipulation concern that
(footnote continued)

**PUBLIC VERSION**

In response, the Government notes that "the party alleging manipulation must substantiate its allegations with more than speculation and conjecture." Def. Br. at 23 (citing *LMI-La Metalli Industriale, S.p.A. v. United States*, 912 F.2d 455, 460 (Fed. Cir. 1990)). The Government adds that plaintiff's points — "*e.g.*, the existence of a tolling arrangement, exclusion from a prior antidumping order, and other events that occurred prior to this investigation" — were both addressed by Commerce and insufficient to establish manipulation. *Id.* (citing IDM at 28).

Plaintiff also raises the Supreme Court case of *United States v. Eurodif S.A.* to support its point that margin manipulation presents a real risk, which Commerce should have addressed.[21] Pl. Br. at 23. Plaintiff summarizes *Eurodif*: "The Court noted that exempting uranium contracts from antidumping duties solely because they are structured as to provide services would result in injury to the domestic industry by

_____

was raised in *Coated Paper*. Pl. Reply Br. at 9 n.2 (quoting *Coated Paper* IDM at cmt. 32). There, Commerce recognized the petitioner's concern about the companies involved being able to change the sales price to their trading companies and agreed that manipulation "may be an issue to examine in future reviews"; however, Commerce determined ultimately that this concern was "not a basis to deny the [entered value] adjustment given that without an adjustment [Commerce] would not collect the correct amount of duties." *Coated Paper* IDM at cmt. 32.

[21] In *United States v. Eurodif S.A.*, the Supreme Court held that Commerce's decision to treat uranium enrichment transactions as contracts for goods (instead of contracts for services) was valid in the antidumping context under 19 U.S.C. § 1673, which covers only sales of goods. *United States v. Eurodif S.A.*, 555 U.S. 305, 308 (2009); *see* 19 U.S.C. § 1673 (defining when an antidumping duty must be imposed). In reaching this conclusion, the Court referenced the untracked and fungible nature of the uranium, as well as its substantial transformation during the transaction, as indicators of transfer of ownership and, therefore, reflective of a sale of goods. *Eurodif S.A.*, 555 U.S. at 319-22.

**PUBLIC VERSION**

Court No. 20-03692                                                                                               Page 36

making such contracts 'untouchable.'" *Id.* (quoting *United States v. Eurodif S.A.*, 555

U.S. 305, 307 (2009)).  Accordingly, plaintiff contends that in that case "Commerce

erred by allowing the respondent to replace its contracts for goods with a control [sic] for

processing services, allowing it to use such creativity to craft a substantially lowered

subsidy margin." *Id.*  Further, plaintiff asserts that Commerce "failed to even mention

the WTTC's argument" in its IDM and, therefore, "unreasonably and unlawfully failed to

address significant arguments of the WTTC that seriously undermined the agency's

reasoning and conclusions." *Id.* at 24 (citing *Altx, Inc. v. United States*, 25 CIT 1100,

1117-18, 167 F. Supp. 2d 1353, 1374 (2001)).  *But see* IDM at 28 (acknowledging

manipulation concern in the "Petitioner's Comments" section).

        The Government argues that *Eurodif* is inapposite because it concerned whether

Commerce should even apply the law, which is not at issue here:

>        There is no dispute that wind towers are a product subject to countervailing
>        duties. The only issue is what amount properly represents the value of the
>        exported product to which the subsidy should be attributed, the sales value
>        of the exported product (as [sic] Commerce's contends), or the tolling fee
>        paid for processing services (as WTTC argues).

Def. Br. at 24.  Therefore, the Government argues that plaintiff's point regarding *Eurodif*

is not relevant to the present dispute.  *Id.*

        **C.      Analysis**

        For the reasons discussed below, the court concludes that Commerce's choice of

denominator for the benefit calculation is not inconsistent with its regulations or with the

prior determinations presented by the parties.  However, as discussed *infra*, Section

**PUBLIC VERSION**

Court No. 20-03692                                                                                    Page 37

I.C.3, the court remands because Commerce did not discuss or address the evidence

that WTTC presented as related to manipulation or address the relevant argument on

manipulation in explaining its decision to use CS Wind Korea's sales value as the

denominator for the subsidy calculation.  The court considers plaintiff's main arguments

in turn: (1) whether Commerce acted consistently with its regulations; (2) whether

Commerce acted consistently with its past practice; and (3) whether Commerce

considered manipulation and addressed adequately plaintiff's manipulation claims.

### 1.    Whether Commerce acted consistently with its regulations

The first issue before the court is whether Commerce acted in a manner

consistent with its regulations in using the sales value of the wind towers sold by CS

Wind Korea — the parent corporation — in the denominator of the benefit calculation,

instead of using the value of the tolling services by its subsidiary CS Wind Vietnam.

*See* Pl. Br. at 2; Def. Br. at 17 (citing IDM at 30).  The court concludes that Commerce's

decision is consistent with its regulations.

The ad valorem subsidy rate regulation states that "[Commerce] will calculate an

*ad valorem* subsidy rate by dividing the amount of the benefit allocated to the period of

investigation or review by the *sales value* during the same period of the product or

products to which the Secretary attributes the subsidy."  19 C.F.R. § 351.525(a) (second

emphasis supplied).  Further, in cases of cross-owned corporations, "[Commerce]

normally will attribute a subsidy to the *products* produced by the corporation that

received the subsidy."  19 C.F.R. § 351.525(b)(6)(i) (emphasis supplied).

**PUBLIC VERSION**

In this case involving a cross-owned corporation, Commerce's regulations require that Commerce attribute the subsidy to the "products," which were the wind towers produced by CS Wind Vietnam, which — as a "corporation" under Commerce's regulations, 19 C.F.R. § 351.102(b)(23); *Countervailing Duties*, 63 Fed. Reg. at 65,400 — received the subsidy from the GOV.[22]  19 C.F.R. § 351.525(b)(6)(i).  Therefore, the denominator of the subsidy rate calculation was required to — and did — reflect the "sales value" of the wind towers.  19 C.F.R. § 351.525(a).

Moreover, the court does not find persuasive plaintiff's argument that because CVD rules — in particular, 19 C.F.R. § 351.525(b)(6)(ii) through (v) — do not expressly apply to the tolling circumstance that, therefore, Commerce's denominator selection is contrary to its regulations.  *See* Pl. Reply Br. at 6-7.  Here, the CVD rules do not address tolling arrangements.  *See generally* 19 C.F.R. §§ 351.501-.528.  In fact, Commerce specifically foresaw that situations could vary, including from subsections (ii)

---

[22] Plaintiff states that Commerce "attribut[ed] the subsidies to CS Wind Korea."  Wind Tower Trade Coalition's Reply Brief ("Pl. Reply Br.") at 6, ECF No. 17 (citing Letter from Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP to Sec'y Commerce, re: *CS Wind First Supplemental Questionnaire Response: Countervailing Duty Investigation of Utility Scale Wind Towers from Vietnam (C-552-826)* (Nov. 6, 2019) ("First Suppl. Questionnaire Resp.") at 7, CR 76-82, PR 122-128)).  Contrary to this assertion, Commerce stated that "[t]he mandatory respondent in this investigation which received subsidies is CS Wind, located in Vietnam."  *Utility Scale Wind Towers from the Socialist Republic of Vietnam: Final Affirmative Countervailing Duty Determination and Negative Determination of Critical Circumstances* ("Final Determination"), 85 Fed. Reg. 40,229 (Dep't of Commerce July 6, 2020) (final affirm. countervailing duty deter. and negative deter. of critical circumstances) and accompanying IDM at 30, PR 215.  Moreover, the Government discusses that Commerce "attribute[d] the subsidy to the sales value of the product."  Def. Br. at 20.

through (v).  *See Countervailing Duties*, 63 Fed. Reg. at 65,399-65,400.  Consequently,

Commerce did not limit the applicability of its regulations, but rather drafted its

regulations to be able to accommodate such variation.  *See id.*  For example, in the

*CVD Preamble*, as described by the Government, *see supra*, Section I.B.2., Commerce

made clear that it was crafting "general rules of attribution" in 19 C.F.R. § 351.525(b)(2)

through (b)(7) because "[i]f [it] tried to account for all the possible permutations in

advance, the result would be an extremely lengthy set of rules that might prove unduly

rigid," *Countervailing Duties*, 63 Fed. Reg. at 65,399.  Similarly, Commerce noted that

its goal was to elaborate rules that were "sufficiently precise that parties can predict with

a reasonable degree of certainty how [Commerce] will attribute subsidies to particular

products in a given factual scenario," while "recognizing that unique and unforeseen

factual situations may make complete harmony among these rules impossible."  *Id.* at

65,399-65,400.

     In this case, Commerce elucidated in the IDM the reasons that Commerce used

CS Wind Korea's sales value as the denominator for specific programs.  *See* IDM at 4

(citing Memorandum from Davina Friedmann, Senior Case Analyst, AD/CVD

Operations, Off. VI, to Erin Kearney, Program Manager, AD/CVD Operations, Off. VI, re:

*Final Determination of Countervailing Duty Investigation of Utility Scale Wind Towers*

*from Vietnam: Calculation Memorandum for CS Wind Vietnam Co., Ltd.* (June 29, 2020)

("Calculation Mem."), CR 120-121, PR 217), 29-30.  Commerce explained the basis for

its preliminary decision to use the sales value: "Because CS Wind [Vietnam] served as

Court No. 20-03692                                                    Page 40

a toller of the subject merchandise, [Commerce] relied upon CS Wind Korea's sales

value of subject merchandise produced by CS Wind [Vietnam], rather than CS Wind

[Vietnam]'s tolling revenue, as the appropriate denominator in [its] subsidy calculations

for the final determination." *Id.* at 29 (citing PDM at 13, 5).  In addition, the calculation

used only the values that corresponded to the wind towers produced by CS Wind

Vietnam. *Id.* at 30; *see* Verification Mem. at 9 ("[Commerce] confirmed that the reported

sales information did not include sales to affiliates, service income, sales from

merchandise produced outside of the country, *etc.*").[23]  Therefore, instead of using CS

Wind Vietnam's "toll processing fees, or revenue," Commerce continued in its Final

Determination to use CS Wind Korea's sales value.  IDM at 29-30.

Despite plaintiff's argument above that using CS Wind Korea's sales value

distorts the attribution of the subsidy, the court concludes that, on the contrary, using

the processing value alone would not reflect adequately the sales value of the wind

towers and would, therefore, be inconsistent with Commerce regulations. *See* 19

C.F.R. § 351.525(a), (b)(6)(i); *see also* Def. Br. at 17 ("The value of processing services

does not include, among other things, the value of raw material inputs, and thus does

not properly represent the sales value of the products.").  Moreover, since CS Wind

Vietnam never owns but merely manufactures the wind towers, there is no CS Wind

---

[23] "[A] subsidy provided by a government for a specific product is attributed only to sales of that product for which the subsidy was provided (and any downstream products produced from that product), as it reduces the costs of a firm's sales of those products." *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,400 (Dep't of Commerce Nov. 25, 1998).

**PUBLIC VERSION**

Court No. 20-03692                                                               Page 41

Vietnam sales value to use.  *See* Verification Mem. at 4; Oral Argument Tr. at 10:13-18

("[T]he sales value of those products is recorded in CS Wind Korea's books, not in CS

Wind Vietnam's books because CS Wind Vietnam is not being paid the sales value of

the product.  They are simply being paid a processing fee for their services.").  By using

the sales value of the wind towers in the denominator, Commerce acted consistently

with its regulations.

   Further, Commerce reasoned that, because no trading company was involved,

no mark-up of the wind towers occurred, and so no EVA was warranted:

> Consistent with the intent of Commerce's regulations and the normal
> subsidy calculation methodology, we determine it appropriate to use CS
> Wind Korea's FOB sales value of the subject merchandise that it [sic] was
> produced by CS Wind [Vietnam], as it is the parent company that sold the
> merchandise to the United States.  The sales value used in the denominator
> of our subsidy calculations is limited to sales of subject merchandise
> produced by CS Wind [Vietnam] and sold by its parent company, CS Wind
> Korea, in the United States.  That is, there was no mark-up by an affiliated
> company, for instance, that would require an entered value adjustment to
> the sales of merchandise under investigation.

IDM at 29-30 (discussing 19 C.F.R. § 351.525(a)).  Commerce concluded: "CS Wind

Korea's sales value is consistent with the entered value of the subject merchandise

upon entry into the United States."  *Id.* at 30.  Therefore, Commerce explained

adequately the reason that an EVA — which is used to rectify situations in which the

entered value does not reflect the actual value of the goods, *see* PDM at 13 — was not

called for, and instead demonstrated a "rational connection" between the facts

pertaining to the sales value and toll processing fees and Commerce's decision to use

CS Wind Korea's sales value.  *Bowman Transp. Inc.*, 419 U.S. 281, 285 (1974) (quoting

**PUBLIC VERSION**

*Burlington Truck Lines*, 371 U.S. at 168); *see* IDM at 29-30; *see also CS Wind Viet. Co.*
*v. United States*, 832 F.3d 1367, 1376-1377 (Fed. Cir. 2016).

Finally, plaintiff asserts that Commerce should have applied the multinational firm

provision, 19 C.F.R. § 351.525(b)(7), because CS Wind Vietnam is "part of the

multinational CS Wind conglomerate."  Pl. Reply Br. at 7; *see* Pl. Br. at 18-19.

Commerce, in the IDM, described the reason that it determined that the multinational

firm provision did not apply in this case: "As CS Wind [Vietnam] is a subsidiary, and not

a multinational company, it does not have operations, such as production facilities, in

any countries other than in Vietnam."  IDM at 30.

The record supports Commerce's conclusion that CS Wind Vietnam — "the firm

that received a subsidy" under 19 C.F.R. § 351.525(b)(7) — does not itself have

production facilities outside of Vietnam.  *See* IDM at 30; Oral Argument Tr. at 32:14-

33:2; *see* 19 C.F.R. § 351.525(b)(7).[24]  Moreover, Commerce confirmed previously in

the administrative review that CS Wind Korea did not receive any subsidies.  PDM at 5

(citing Suppl. Questionnaire Resp. at 7).  Commerce considered "the relevant factors"

as to which entity received the subsidy and committed no "clear error of judgment" in

---

[24] As defined in the regulations, the meaning of "firm is used to refer to the recipient of
an alleged countervailable subsidy, including any . . . corporation."  19 C.F.R. §
351.102(b)(23).

**PUBLIC VERSION**

determining the multinational firm provision to be inapplicable.[25]  *State Farm*, 463 U.S.

at 30-31.  Therefore, Commerce's Final Determination was reasonable.[26]

Commerce's application of its regulations, which is clearly explained in the IDM,

is "reasonable and supported by the record as a whole" and comports with a plain

reading of the text of the regulations in the absence of a separate tolling provision.

*Shandong Huarong Gen. Corp.*, 25 CIT at 837, 159 F. Supp. 2d at 718 (citations

omitted), *aff'd sub nom. Shandong Huarong Gen. Grp. Corp.*, 60 F. App'x 797; *see* IDM

at 29-30.

"To survive judicial scrutiny, however, 'an agency's construction need not be

the *only* reasonable interpretation or even the *most* reasonable interpretation . . . .  [A]

court must defer to an agency's reasonable interpretation of a statute even if the court

might have preferred another."  *Shandong Huarong Gen. Corp.*, 25 CIT at 838, 159 F.

Supp. 2d at 719 (citations omitted), *aff'd sub nom. Shandong Huarong Gen. Grp. Corp.*,

---

[25] The Government noted that when a subsidiary itself has facilities in multiple countries, the provision would apply.  Oral Argument Tr. at 31:14-19.  However, the parties were aware of no instances in which Commerce had determined previously that the subsidiary — which lacks its own multinational operations — of a foreign parent company is itself a multinational firm under 19 C.F.R. § 351.525(b)(7).  Oral Argument Tr. at 31:14-19, 31:22-32:1.

[26] Even if the multinational firm provision were to apply to CS Wind Vietnam under the CS Wind Korea umbrella, Commerce still attributed appropriately the subsidy to the wind towers at issue under the plain language of the regulation, which directs Commerce to "attribute the subsidy to products produced by the firm within the country of the government that granted the subsidy."  19 C.F.R. § 351.525(b)(7); Def. Br. at 18-19.  In this case, as aligned with the regulation, Commerce attributed the subsidy to the wind towers produced by the firm within Vietnam to which the GOV granted the subsidy. *See* IDM at 30 (noting CS Wind Vietnam received subsidies).

PUBLIC VERSION

Court No. 20-03692                                                                                        Page 44

60 F. App'x 797 (quoting *U.S. Steel Grp. v. United States*, 225 F.3d 1284, 1287 (Fed.

Cir. 2000); *NSK Ltd. v. United States*, 115 F.3d 965, 973 (Fed. Cir. 1997); *Koyo Seiko*

*Co. v. United States*, 36 F.3d 1565, 1570 (Fed. Cir. 1994)).  Here, the use of CS Wind

Korea's sales value in the denominator of Commerce's calculation is fully consistent

with the regulations.  Commerce explained that it used CS Wind Korea's sales value

because CS Wind Korea effected the sales of the wind towers in the United States

instead of merely acting as the "toller," as had CS Wind Vietnam.  IDM at 29-30.  In

addition, Commerce explained the reason that it found the multinational firm provision to

be inapplicable based on CS Wind Vietnam's domestic-only operations and status as

the only subsidy recipient.  *Id.* at 30.  Accordingly, the court concludes that Commerce's

Final Determination is consistent with its regulations.

### 2.    Whether Commerce acted consistently with its past practice

Next, the court considers plaintiff's argument that Commerce acted inconsistently

with its past practice.  "Commerce's practice is to use the FOB sales value for the

denominator in its subsidy calculations."  PDM at 13 (citing 19 C.F.R. § 352.525(a)).

The parties present six prior Commerce determinations in their arguments with respect

**PUBLIC VERSION**

to a prior practice.[27]  The court examines each in turn and concludes that Commerce's

actions in this case are not inconsistent with its actions in those cases.[28]

In *Coated Paper*, Commerce attributed subsidies to the product using a sales

value from another country rather than the processing fee.  *Coated Paper* IDM at cmt.

32.  Plaintiff seeks to distinguish *Coated Paper* on the basis that the respondents' paper

producers set the price in the country that produced the subject goods, *id.*, whereas

---

[27] The six Commerce determinations are: (1) *Coated Paper*, 75 Fed. Reg. 59,212 (Dep't of Commerce Sept. 27, 2010) (final determ.) and accompanying IDM at cmt. 32; (2) *Pressure Pipe*, 74 Fed. Reg. 4,936 (Dep't of Commerce Jan. 28, 2009) (final affirm. countervailing duty deter.) and accompanying IDM at cmt. 3; (3) *Fabricated Structural Steel*, 85 Fed. Reg. 5,387 (Dep't of Commerce Jan. 30, 2020) (final neg. countervailing duty deter.) and accompanying IDM at cmt. 3; (4) *Tool Chests*, 82 Fed. Reg. 56,582 (Dep't of Commerce Nov. 29, 2017) (final affirm. countervailing duty deter.) and accompanying IDM at cmt. 14; (5) *Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China*, 75 Fed. Reg. 41,801 (Dep't of Commerce July 19, 2010) (final affirm. countervailing duty deter.) and accompanying IDM at cmt. 4; and (6) *Turkey Rebar 2018*, 83 Fed. Reg. 63,472 (Dep't of Commerce Dec. 10, 2018) and accompanying PDM.

[28] With respect to the *Turkey Rebar 2017* and *Turkey Rebar 2018* cases ("*Turkey Rebar* cases"), *see supra* notes 10 and 17, the court finds the comparison to the trading company scenario inapposite.  The trading company provision, 19 C.F.R. § 351.525(c), is inapplicable to the facts in this case.  Unlike in the *Turkey Rebar* cases, no trading company is involved in this case.  *See* IDM at 30.  In addition, in this case the tolling company *is* the respondent; therefore, the relationship between the tolling companies and the respondent in the *Turkey Rebar* cases does not resemble this scenario.  There, the benefits received by the tolling companies and the respondent were added in the numerator.  *See id.* at 10; *Turkey Rebar 2018* PDM.  Here, there are no such benefits from tolling companies to CS Wind Vietnam to add.  *See* IDM at 10.  Moreover, as Commerce explained, the *Turkey Rebar* cases did not involve a foreign parent-subsidiary tolling relationship as in this case.  *See id.*; *Turkey Rebar 2018* PDM.  Given the factual differences between these cases, the court concludes that Commerce did not act inconsistently with the *Turkey Rebar* cases in respect of its selection of the denominator in this case.

PUBLIC VERSION

here, CS Wind Korea set the price in Korea, Verification Mem. at 9 ("CS Wind Korea
internally estimates the price of each project based on estimates for tolling, materials,
profit, etc. on a per MT basis.").  This distinction is not pertinent to a consideration of
plaintiff's core argument that Commerce should have used the processing fees rather
than the sales value as the denominator.  Commerce's actions in this case are not
inconsistent with its actions in *Coated Paper*.

    In *Pressure Pipe*, Commerce relied on a respondent's sales value for the
denominator without adding an affiliate's sales value.  *Pressure Pipe* IDM at cmt. 3.
The affiliate bought finished goods from the respondent and consigned materials to the
respondent (and another affiliate of the respondent) for manufacturing before the
affiliate eventually sold the goods.  *Id.* at 9.[29]  Unlike in the instant case, however, in
*Pressure Pipe*, Commerce applied an EVA due to the affiliate's mark-up of the sales
value.  *See id.* at cmt. 3.  By contrast, Commerce determined that CS Wind Korea did
not charge a mark-up in this case and, therefore, Commerce did not grant an EVA.  *See*
IDM at 30.

    Plaintiff uses *Pressure Pipe* to argue that Commerce should not have used CS
Wind Korea's sales value.  However, *Pressure Pipe* differs in that Commerce's
determination in that case discussed which sales values to use, not *whether* to use
processing fees or a sales value, and applied an EVA that addressed the affiliate's

---

[29] Commerce described the transaction for the materials as following "the 'processing
trade' mode of consignment."  *Pressure Pipe* IDM at cmt. 2.

PUBLIC VERSION

sales value.  *See* Def. Br. at 20-21; Oral Argument Tr. at 28:18-23.  In this case, by

contrast, Commerce considered the difference between using processing fees and a

sales value and found an EVA to be unwarranted because CS Wind Korea's sales value

matched the value upon entry into the United States.  *See* IDM at 29-30.  Commerce's

actions in this case are not inconsistent with its actions in *Pressure Pipe*.

In *Tool Chests* and *Woven Ribbons from China*, plaintiff notes that Commerce

likewise excluded the sales values of non-Chinese affiliates that exported the subject

goods and relied for the sales value instead on the respondents' sales to the affiliates

alone.  Pl. Br. at 19-21.  However, the entities in those cases did not use tolling

arrangements.  *See* Def. Br. at 20-21 (citing *Woven Ribbons from China* IDM at cmt. 4;

*Tool Chests* IDM at cmt. 14).  This difference is critical because the tolling arrangement

in this case caused the transactions between the parent and the subsidiary to reflect

only toll processing fees and not the actual sales value of the wind towers.  *See* IDM at

29.  Given this distinction, the court concludes that Commerce's actions in this case are

not inconsistent with either *Tool Chests* or *Woven Ribbons from China*.

Further, plaintiff raises the *Fabricated Structural Steel* case to argue that post-

exportation revenue should not be included in the denominator.  Pl. Br. at 21.  However,

Commerce proclaimed in that determination itself that *Fabricated Structural Steel* was

an unconventional case.  *Fabricated Structural Steel* IDM at cmt. 3 (noting the "unique

facts presented in th[e] investigation"); *see also* Def. Br. at 21-22 (noting unusual "sales

situation" involving activities in the United States).  In particular, *Fabricated Structural*

**PUBLIC VERSION**

*Steel* featured extensive U.S.-based production activities.  *Fabricated Structural Steel*

IDM at cmt. 3.  By contrast, the record in this case does not state that either CS Wind

Vietnam or CS Wind Korea relied on U.S.-based activities to produce the wind towers.

Def. Br. at 22.  Accordingly, Commerce's actions in the instant case are not inconsistent

with *Fabricated Structural Steel*.

   Only two of the six determinations raised by the parties — *Coated Paper* and

*Pressure Pipe* — have facts that resemble the instant case.  *But cf. Guizhou Tyre Co. v.*

*United States*, 45 CIT __, __, 523 F. Supp. 3d 1312, 1341-1342 (2021) (finding that

Commerce had a past practice when plaintiff cited eight pertinent determinations and

Commerce in the relevant IDM recognized that its practice existed and also "evolved").

Further, one of the two determinations, *Pressure Pipe*, addressed a slightly different

question.  Commerce still reached different conclusions in *Coated Paper* and *Pressure*

*Pipe*, to the extent that those determinations are analogous. Therefore, the court

concludes that Commerce did not "change[] its practice" such that an "adequate

explanation" would be required.  *SKF USA Inc.*, 630 F.3d at 1373.  Accordingly,

Commerce's actions in this case are not inconsistent with the determinations presented

by the parties.

   **3.**  **Whether Commerce adequately addressed petitioner's**
       **manipulation concerns**

   The court turns finally to plaintiff's argument that Commerce did not respond

adequately to plaintiff's concerns about manipulation.  *See* Pl. Br. at 22-24; WTTC Case

Br. at 25-31.  In its IDM, Commerce explained the reason that it used CS Wind Korea's

**PUBLIC VERSION**

sales value for the denominator in its subsidy calculation and the reason that the sales

value was appropriate.  IDM at 4, 29-30 (noting the denominator "is limited to sales of

subject merchandise produced by CS Wind [Vietnam] and sold by . . . CS Wind Korea").

Commerce also included in its IDM plaintiff's comments that CS Wind Vietnam's

activities "permit manipulation of the CVD duty rate"[30] and that CS Wind Vietnam should

have but did not "explain why it modified its business practices such that it shifted a

majority of its revenue and profits from Vietnam to Korea."  *Id.* at 28.  *But see* First

Suppl. Questionnaire Resp. at 3 ("Since CS Wind Corporation handles all of the sales,

including the negotiations with those sales, it decided to establish tolling agreements

with CSWV so that it could better control costs.").

Commerce responded to the broader allegation that the denominator might have

been inaccurate.  *See* IDM at 29-30.  Commerce explained the reason that its subsidy

rate calculation effectively and appropriately accounted for the sales value of the

subsidized wind towers from Vietnam, as stated above.  *See id.*  However, Commerce

did not respond to the argument that CS Wind Vietnam manipulated the duty rate.

---

[30] Commerce summarized plaintiff's point:

> CS Wind [Vietnam] has a well-established record of restructuring its
> subsidiaries for the purpose of avoiding AD/CVD duties and taxes.  The
> record demonstrates that CS Wind [Vietnam] changed its purchasing and
> sales pattern to game the system in anticipation of the filing of this case.
> CS Wind also has a history of arbitrarily setting transfer prices.  CW [sic]
> Wind [Vietnam]'s tolling arrangement and transfer pricing schemes permit
> manipulation of the CVD duty rate.

IDM at 28.

PUBLIC VERSION

Court No. 20-03692                                                                                          Page 50

Commerce merely acknowledged plaintiff's concerns about manipulation.  *See* IDM at
28-30.

　　The court is required to sustain a determination that is "reasonable and
supported by the record as a whole, even if there is some evidence that detracts from
the agency's conclusion."  *Shandong Huarong Gen. Corp.*, 25 CIT at 837, 159 F. Supp.
2d at 718 (citations omitted), *aff'd sub nom. Shandong Huarong Gen. Grp. Corp.*, 60 F.
App'x 797.  Further, the court need not invalidate a determination even if Commerce did
not "explicitly address a party's non-dispositive argument," *NMB Sing. Ltd.*, 557 F.3d at
1323 (citing *Timken*, 421 F.3d at 1357), if Commerce nonetheless provided "an
explanation of the basis for its determination that addresses relevant arguments," 19
U.S.C. § 1677f(i)(3)(A).[31]  However, in this case, Commerce did not address petitioner's
(now plaintiff's) argument that using CS Wind Korea's sales value in the denominator
could allow CS Wind Vietnam to manipulate the CVD rate.

　　In reviewing a material injury determination by the Commission, this Court has
explained: "While the [Commission] need not address every argument and piece of
evidence, it must address significant arguments and evidence which seriously
undermines its reasoning and conclusions."  *Altx, Inc.*, 25 CIT at 1117-18, 167 F. Supp.
2d at 1374, *aff'd*, 370 F.3d at 1116 (internal citation omitted); *see Husteel Co. v. United*

---

[31] "We have previously held that § 1677f(i) does not require us to invalidate a decision
of Commerce if Commerce failed to explicitly address a party's non-dispositive
argument."  *NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1323 (Fed. Cir. 2009)
(citing *Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1357 (Fed. Cir. 2005)).

**PUBLIC VERSION**

Court No. 20-03692                                                                                      Page 51

*States*, 39 CIT __, __, 98 F. Supp. 3d 1315, 1359 (2015) (quoting *Altx, Inc.*, 25 CIT at

1117-18, 167 F Supp. 2d at 1374) (applying the standard in *Altx, Inc.* but concluding

"Commerce did not err in failing to specifically address" an "argument and

accompanying evidence [that] were not significant"); *see also Usinor v. United States*,

26 CIT 767, 784 (2002) (finding that the Commission needed to address evidence that

was "not peripheral or ancillary" because it had "direct and material bearing" on the

issue at hand and "call[ed] the accuracy and legitimacy of the Commission's findings

and conclusions squarely into question"); *cf. CP Kelco US, Inc. v. United States*, 38 CIT

1511, 1528, 24 F. Supp. 3d 1337, 1352 (2014), *aff'd*, 623 F. App'x 1012 (Fed. Cir. 2015)

(finding segment-specific evidence to be not "significant, undermining evidence"

because the Commission was tasked with "look[ing] to the industry as a whole").

        Here, Commerce explained the reason that it did not grant an EVA and the basis

for its selection of the denominator.  *See* IDM at 29-30.  Commerce explained that it has

typically assessed whether there is a mark-up and whether six additional factors have

been shown in its EVA analysis.  *See* PDM at 13; *supra* note 13; *see also* IDM at 30

(finding no mark-up).  Potential manipulation is not one of those factors described by

Commerce here.  *See* PDM at 13.  Even considering that there may be a shift in the

way in which Commerce calculates an EVA, *see Canadian Solar Inc. v. United States*,

45 CIT __, __, 537 F. Supp. 3d 1380, 1394-99 (2021), Commerce found no mark-up

here, *see* IDM at 30 ("[T]here was no mark-up by an affiliated company, for instance,

that would require an entered value adjustment . . . .").  In addition, in this case,

**PUBLIC VERSION**

Court No. 20-03692                                                                                      Page 52

Commerce summarized plaintiff's manipulation argument in the "*Petitioner's Comments*"

subsection of Comment 6 of the IDM.  *See* IDM at 28.

Nonetheless, plaintiff during the review presented four reasons that, it asserted,

CS Wind Vietnam's tolling arrangement and business practices — and Commerce's

consequent utilization of CS Wind Korea's sales value in the denominator of

Commerce's subsidy calculation — permitted "the potential of subsidy margin

manipulation" by CS Wind Vietnam.[32]  Pl. Reply Br. at 15; *see* Pl. Br. at 22-24 (citing

WTTC Case Br. at 25-31); WTTC Case Br. at 25-31.  This set of arguments, which

raised concerns about the potential impact of manipulation on Commerce's subsidy

calculation, warranted a response by Commerce.  *See* Statement of Administrative

Action, accompanying H.R. Rep. No. 103–826(I), at 892, *reprinted in* 1994 U.S.C.C.A.N.

4040, 4216 ("[Commerce] must specifically reference in [its] determination[] factors and

arguments that are material and relevant or must provide a discussion or explanation in

the determination that renders evident the agency's treatment of a factor or argument.");

*Altx, Inc.*, 25 CIT at 1117-18, 167 F. Supp. 2d at 1374, *aff'd*, 370 F.3d 1108; *SKF USA*

---

[32] These four reasons are set forth *supra*, Section I.B.3 at pp. 33-34.  They include CS Wind Vietnam and CS Wind Korea starting to use toll processing agreements in 2018, CS Wind Korea [[                                                        ]] and [[                                                                                    ]], CS Wind Korea [[                                                        ]], and CS Wind Vietnam's rationale for using toll processing agreements.  Pl. Br. at 22-23 (quoting Initial Questionnaire Resp. at Ex. 13.1; First Suppl. Questionnaire Resp. at 3; Verification Exs. at VE-4 at 59) (citing Suppl. Affiliation Resp. at Exs. SA-2 and SA-3; *CS Wind Viet. Co.*, 721 F. App'x 993) (emphasis omitted); *see* Pl. Reply Br. at 8, 13-15.

PUBLIC VERSION

*Inc.*, 630 F.3d at 1373-74 (quoting *Timken*, 421 F.3d at 1358); *Coated Paper* IDM at

cmt. 32; *supra* note 32.

Plaintiff cites Commerce's discussion of manipulation in *Coated Paper* as support

for plaintiff's contention that Commerce should have further addressed manipulation in

this case.  Pl. Reply Br. at 9 n.2 (citing *Coated Paper* IDM at 106).  In that case,

Commerce noted a petitioner's concern with respect to potential manipulation, but then

went on to explain why Commerce did not agree with the concern:

> We acknowledge petitioner's concern about the Gold companies' ability to
> manipulate the CVD rate in the future by adjusting its sales price to GEHK
> or CU.  *However, this is not a basis to deny the adjustment given that
> without an adjustment we would not collect the correct amount of duties.*
> Instead, we agree that this may be an issue to examine in future reviews,
> and, if this investigation results in a CVD order, we will carefully monitor the
> continued basis for making this adjustment in those future proceedings in
> order to avoid any such manipulation.

*Coated Paper* IDM at cmt. 32 (emphasis supplied).  Similarly, in this case, the court

does not conclude that WTTC's arguments to Commerce were necessarily persuasive;

rather, the court concludes that the evidence presented and arguments warranted a

response from Commerce to demonstrate that its CVD methodology was supported by

substantial evidence.

As support for its contention that margin manipulation could occur and should be

prevented, plaintiff also raises the Supreme Court's decision in the *Eurodif* case.  Pl. Br.

at 23 (citing *Eurodif S.A.*, 555 U.S. at 307).  The court does not find plaintiff's reliance

on *Eurodif* to be persuasive.  In that case, the Court first noted the unique nature of the

product — uranium — and then affirmed that Commerce was reasonable to treat

**PUBLIC VERSION**

uranium enrichment contracts as contracts for the sale of goods rather than contracts

for services.  *Eurodif S.A.*, 555 U.S. at 319-22.  To do otherwise, the Court added,

would lead to the "absurd result" that "antidumping duties would primarily chastise the

uncreative."  *Id.* at 321-22.

In this case, there is no comparable "absurd result" that could lead to

nonapplication of the CVD law.  Nevertheless, Commerce — unlike the Supreme Court

in its consideration in *Eurodif* of the unique circumstances raised by uranium processing

problems that could arise from restructuring due to a company's use of processing

services, *id.* at 319-22 — does not discuss the risk of CVD margin manipulation.

In sum, the court concludes that Commerce did not discuss or address the

evidence that WTTC presented or address the relevant argument on manipulation.  The

court remands for Commerce to: (1) discuss and address the evidence that WTTC

presented as related to manipulation; (2) address WTTC's manipulation argument as to

the denominator used in the benefit calculation; and (3) explain whether Commerce

considered manipulation in reaching its determination, or if it did not, why it did not.

II.    **Whether Commerce's acceptance of CS Wind Vietnam's steel plate documentation for the Import Duty Exemptions program is supported by substantial evidence**

The court remands Commerce's finding as to the origin of the steel plate in

question for Commerce to address its treatment of evidence that the steel plate in

question was not sourced from Vietnam as set forth *infra*, Section II.C.  However, the

**PUBLIC VERSION**

Court No. 20-03692                                                                                          Page 55

court sustains Commerce's decision not to apply AFA for the Import Duty Exemptions

program.[33]

A.    **Legal framework**

Commerce "shall . . . use the facts otherwise available in reaching the applicable

determination" if the record lacks "necessary information" or if a party: (1) withholds

requested information; (2) fails to provide timely information in the form and manner

requested; (3) "significantly impedes a proceeding"; or (4) provides unverifiable

information.  19 U.S.C. § 1677e(a).  If Commerce finds that a party "failed to cooperate

by not acting to the best of its ability to comply with a request for information,"

Commerce may use an adverse inference and need not make or employ any

assumptions about information a party would have otherwise provided.  *Id.* § 1677e(b);

*see Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003)

("Compliance with the 'best of its ability' standard is determined by assessing whether

respondent has put forth its maximum effort to provide Commerce with full and

complete answers to all inquiries in an investigation.").

B.    **Positions of the parties**

Plaintiff argues that "Commerce erred in concluding that CS Wind Vietnam

properly reported the country of origin of a portion of its steel plate purchases as

Vietnam and thus in not calculating a benefit received on those purchases under the

---

[33] *See supra* note 5 for background on the Import Duty Exemptions program.

**PUBLIC VERSION**

Court No. 20-03692                                                                      Page 56

Import Duty Exemptions program."  Pl. Br. at 13 (citing IDM at cmt. 2).  Plaintiff presents

three supporting and related arguments.

First, plaintiff argues that Commerce "improperly disregarded evidence contrary

to its conclusion" when it "apparently ignored the substantial record evidence that CS

Wind Vietnam's steel plate was not in fact produced in Vietnam, but was imported."  *Id.*

Specifically, plaintiff insists that CS Wind Vietnam "effectively stated" that it imported the

steel plate.  Pl. Reply Br. at 3.  As CS Wind Vietnam responded to Commerce during

the underlying investigation, "CS Wind Corporation supplies all main materials — steel

plate, flange, steel plate for door frame and internal mounting items — from outside of

Vietnam for the production of the wind towers.  Therefore, most of [sic] raw materials

are exported to Vietnam by CS Wind Corporation."  Initial Questionnaire Resp. at 21;

*see* Pl. Br. at 13; Def. Br. at 13.  Plaintiff also notes that CS Wind Vietnam reported the

steel plate purchases within the exhibit that details import duty exemptions.  Pl. Br. at

13-14 (citing Initial Questionnaire Resp. at Exs. C-3[34], C-4.2).

Moreover, plaintiff points to evidence that its supplier, [[          ]], lacked a steel

production facility in Vietnam and that CS Wind Vietnam entered all of its plate inputs

into the GOV's E-customs system, "further indicating that they were imported."  *Id.* at 14

---

[34] The court notes that there are two other spreadsheets on the record that are similar to
Exhibit C-3.  *See* Initial Questionnaire Resp. at Exs. C-3; First Suppl. Questionnaire
Resp. at Ex. SQ2-20; Calculation Mem. at attch. II, tab "Raw Materials.Rev.ATT2.BPI."
In each of these spreadsheets, it appears that many lines are relevant, but that
defendant and the record occasionally though not consistently refer to specific lines.
*See, e.g.*, *infra* pp. 62-63 and notes 41 & 45.

**PUBLIC VERSION**

Court No. 20-03692                                                                 Page 57

(citing Comments on CS Wind Initial Questionnaire Resp. at 8-9 and Exs. 6, 7;

Verification Mem. at 16).  Plaintiff argues that CS Wind Vietnam did not dispute its

evidence [[                                    ]] and chose not to provide mill test certificates to prove

country of origin.  *Id.* (quoting WTTC Case Br. at 17).

In addition, the parties disagree over the source documentation.  Plaintiff

explained at oral argument that the [[                                    ]] that CS Wind Vietnam

provided stated: "[[                                    ]]" followed by both "[[

]]" and "[[

]]."  Oral Argument Tr. at

85:25-86:14 (quoting First Suppl. Questionnaire Resp. at Ex. SQ2-18); *see also* First

Suppl. Questionnaire Resp. at Ex. SQ2-18 (noting "[[

]]").[35]  Plaintiff concludes that "Commerce merely accepted CS Wind

Vietnam's deficient and contradictory reporting," [[

]].  Pl. Br. at 14-15 (citing IDM at cmt. 2;

Verification Exs. at VE-15 at 68-75).  At oral argument, however, the Government

responded that [[                                    ]] and that

the same source documentation listed the country of origin as "VN - VIETNAM."  Oral

Argument Tr. at 72:25-73:7 (citing First Suppl. Questionnaire Resp. at Ex. SQ2-18),

86:24-87:11.

---

[35] The court notes that Exhibit SQ2-18 appears in the Confidential Joint Appendix at bar
code 3907984-05 and in the Non-Confidential Joint Appendix at bar code 3908090-06.

Further, the Government asserts that CS Wind Vietnam's statement that "most of [its] raw materials are exported to Vietnam," Initial Questionnaire Resp. at 21; *see* Def. Br. at 13, is "consistent with how CS Wind reported its purchases of steel plate" from both within and beyond Vietnam.  Def. Br. at 13-14 (citing First Suppl. Questionnaire Resp. at Ex. SQ2-20).

The second line of reasoning that plaintiff presents to buttress its argument that Commerce erred in its consideration of whether CS Wind Vietnam used the Import Duty Exemptions program for certain inputs is that Commerce did not "adequately address relevant arguments of the parties" by "failing to fully investigate" the origin of the steel plate inputs.  Pl. Br. at 15 (citing 19 U.S.C. § 1677f(i)(3)(A); *Altx, Inc.*, 25 CIT at 1117-18, 167 F. Supp. 2d at 1374, *aff'd*, 370 F.3d at 1116).  Plaintiff asserts that country-of-origin information was "critically important" for Commerce to calculate a subsidy rate for the Import Duty Exemptions program, but that Commerce did not require CS Wind Vietnam to provide such information despite WTTC's requests.  *Id.* at 16 (citing Comments on CS Wind Initial Questionnaire Resp. at 9; Letter from Wiley Rein LLP to Sec'y Commerce, re: *Utility Scale Wind Towers from Socialist Republic of Vietnam: Petitioner's Pre-Verification Comments* (Feb. 19, 2020) ("WTTC Pre-Verification Comments") at 13, CR 98, PR 181).  Plaintiff also notes that CS Wind Vietnam raised a possibility on rebuttal that its supplier imported steel and then processed it into steel plate, changing its country of origin to Vietnam.  *Id.* (citing CS Wind Rebuttal Br. at 17-19).  Plaintiff maintains that, as a result of this late statement and insufficient

**PUBLIC VERSION**

investigation by Commerce, "whether and to what extent CS Wind Vietnam's steel plate was merely further processed in Vietnam was never explored, and whether that further processing was in fact sufficient to transform the country of origin of the plate." *Id.* at 17; *see* Pl. Reply Br. at 3-4.

The Government asserts that Commerce considered WTTC's arguments, verified CS Wind Vietnam's transactions and "found no material discrepancies." Def. Br. at 12-13 (citing IDM at 11-12, 15-17; Verification Mem. at 17; Verification Exs. at VE-15 at 68-75). As to the country of origin, "CS Wind [Vietnam] reported all imports of raw materials during the POI, which included the imports of raw materials sourced from outside and from within Vietnam." IDM at 17 (citing Second Suppl. Questionnaire Resp. at Ex. SQ-2-20); *see also* Def. Br. at 11-12. The Government adds that Commerce reviewed CS Wind Vietnam's documentation and responses from company officials and concluded that "the supporting documentation, including invoices and packing lists, showed the origin of certain raw materials to be within Vietnam." IDM at 17 (citing Verification Exs. at VE-15 at 68-75); *see also* Def. Br. at 12.

Regardless, the Government notes that "Vietnam imposes a zero percent import duty on all MFN imports of steel plate," which CS Wind Vietnam explained through screenshots of its entry of the applicable HTS numbers into Vietnam's customs webpage. Def. Br. at 14-15 (citing Second Suppl. Questionnaire Resp. at 1-2 & Exs. 1-3)). Therefore, the Government concludes that "there is no benefit for countervailing

Court No. 20-03692                                                                                          Page 60

duty purposes." *Id.* at 15.  The Government states that, given this conclusion, it is

"unnecessary to resolve" the issue of the steel plate's country of origin.  *Id.* at 15 n.6.

However, plaintiff insists that Commerce should have but failed to discuss this

reasoning in its IDM.  Pl. Reply Br. at 5 (quoting *State Farm*, 463 U.S. at 50).  Plaintiff

also reiterates that Commerce should have further ascertained the country of origin,

and, by not doing so, "improperly disregarded evidence contrary to its ultimate

conclusion."  *Id.* at 2.

Plaintiff's third argument with respect to the Import Duty Exemptions program is

that Commerce should have applied partial AFA because CS Wind Vietnam withheld

information, impeded significantly the CVD proceeding and provided unverifiable

information.  Pl. Br. at 15 n.3 (citing WTTC Case Br. at 14-21) (asserting that CS Wind

Vietnam submitted "unclear and contradictory reporting" as to the country of origin of the

steel plate); Oral Argument Tr. at 55:10-14 (citing 19 U.S.C. § 1677e(a)(2)(A), (a)(2)(C)-

(D)); *see* Pl. Reply Br. at 2.  Further, plaintiff states that "CS Wind failed to identify the

ultimate supplier and country of origin of its steel plate, and thus that the record did not

contain information to determine whether import duties should have been required on

those purchases."  Pl. Br. at 6 (citing Letter from Wiley Rein LLP to Sec'y Commerce,

re: *Utility Scale Wind Towers from the Socialist Republic of Vietnam: Petitioner's Pre-*

*Preliminary Comments* (Nov. 20, 2019) at 18, CR 87, PR 138).

The Government defends Commerce's decision not to apply AFA by making two

points.  First, the Government disputes plaintiff's argument that CS Wind Vietnam

PUBLIC VERSION

provided insufficient information, countering that CS Wind Vietnam "fully cooperated,"

"provided detailed questionnaire responses," and "provided all necessary information for

determining the import duty exemption program's benefit."  Def. Br. at 11.  In its IDM,

Commerce responded to WTTC's point by finding that AFA was not warranted because

"CS Wind [Vietnam] merely over-reported raw material inputs in its questionnaire

response."  IDM at 17.  The Government notes that "applying AFA would be improper"

based on such over-reporting.  Def. Br. at 12.

The Government makes a second point, explaining that "the record evidence

demonstrates that the MFN import duty rate for steel plate in Vietnam is zero percent."

*Id.* at 6; *see* IDM at 17 n.66 (citing Second Suppl. Questionnaire Resp. at Ex. SQ2-

20).[36]  The Government adds that "regardless of whether the steel plate was produced

in Vietnam or imported," CS Wind Vietnam did not receive ultimately any benefit for the

steel plate through the Import Duty Exemptions program.  Def. Br. at 6; *see also* Oral

Argument Tr. at 68:9.

Plaintiff's second and third arguments with respect to the Import Duty

Exemptions program relate to WTTC's request during the investigation that Commerce

instruct CS Wind Vietnam to "explain who are the ultimate suppliers of the [raw material

---

[36] The court notes that Exhibit SQ2-20 is part of CS Wind Vietnam's first supplemental
questionnaire response, not its second supplemental questionnaire response as noted
incorrectly by Commerce.  *See* First Suppl. Questionnaire Resp. at Ex. SQ2-20; IDM at
17 n.66 (citing Second Suppl. Questionnaire Resp. at Ex. SQ2-20).

**PUBLIC VERSION**

inputs in question]."[37]  Comments on CS Wind Initial Questionnaire Resp. at 9; *see* Pl.

Br. at 16.  WTTC also requested that Commerce "evaluate the country of origin reported

by CS Wind for its imported raw materials."  WTTC Pre-Verification Comments at 13.

Plaintiff insists that CS Wind Vietnam "did not provide the ultimate supplier of the

material at issue," Oral Argument Tr. at 58:9-11, and that there is "no information on the

record to make that determination [of the country of origin of the steel plate], so from

there, we don't know what the country of origin is," *id.* at 64:11-16.

       The Government points out, however, that CS Wind Vietnam provided

spreadsheets with information about the suppliers of each raw material purchase for the

wind towers and that these spreadsheets included the country of origin for the steel

plate at issue, which is listed as Vietnam.  Def. Br. at 14 (citing First Suppl.

Questionnaire Resp. at Exs. SQ2-18 at 18-19 and SQ2-20 (comparing lines 3948-51,

4002, 4073, 4075, 4104, 4105, 4107-09, 4136-37, 4139-40, 4144-47, 5520, 9826,

10288, 10394 with line 12940); First Suppl. Questionnaire Resp. – Remaining

Questions at 1 and Ex. SQ2-6a); *see* First Suppl. Questionnaire Resp. at Ex. SQ2-20;

First Suppl. Questionnaire Resp. – Remaining Questions at Ex. SQ2-6a; *see also* Oral

Argument Tr. at 56:1-25, 57:11-12.  In addition, CS Wind Vietnam listed [[

       ]] as the supplier of its steel plate of Vietnamese origin and noted an

---

[37] Plaintiff asserts that Commerce requested that CS Wind Vietnam identify its "ultimate suppliers" on page 2 of the first supplemental questionnaire response.  Oral Argument Tr. at 57:15-20.  Page 2 is not included in the Joint Appendix.  *See* First Suppl. Questionnaire Resp.

**PUBLIC VERSION**

Court No. 20-03692                                                              Page 63

MFN tariff rate.  First Suppl. Questionnaire Resp. at Ex. SQ2-20; *see also* Calculation

Mem. at attch. II, tab "Raw Materials.Rev.ATT2.BPI."[38]  CS Wind Vietnam provided also

a "List of [sic] Supplier by material type," which included steel plate from "[[

                                                                          ]]" with country "VN" purchased by [[

                        ]].  First Suppl. Questionnaire Resp. – Remaining Questions at Ex.

SQ2-6a.  The Government points further to the verification memorandum and a

verification exhibit that showed a commercial invoice [[



                                                                                                         ]], in

addition to various other parts of the record supporting its contention about the country

of origin of the steel plate.  Oral Argument Tr. at 87:20-89:22 (citing Verification Exs. at

VE-15 at 68-75; Verification Mem. at 16-17; First Suppl. Questionnaire Resp. at Ex.

SQ2-18; First Suppl. Questionnaire Resp. – Remaining Questions at Ex. SQ2-6a; IDM

at 17); Def. Br. at 14 (citing First Suppl. Questionnaire Resp. at Exs. SQ2-18 at 18-19

and SQ2-20 (comparing lines 3948-51, 4002, 4073, 4075, 4104, 4105, 4107-09, 4136-

37, 4139-40, 4144-47, 5520, 9826, 10288, 10394 with line 12940); First Suppl.

Questionnaire Resp. – Remaining Questions at 1 and Ex. SQ2-6a; Verification Exs. at

VE-15 at 68-75); First Suppl. Questionnaire Resp. at Ex. SQ2-18.

---

[38] This spreadsheet is entitled "VAT and Import Tariff Exemptions Template."  *See* First
Suppl. Questionnaire Resp. at Ex. SQ2-20.

**PUBLIC VERSION**

Court No. 20-03692                                                                      Page 64

Moreover, the Government details that CS Wind Vietnam's verification memorandum accounts satisfactorily for the reason that materials sourced from within and beyond Vietnam — amounting to "*overinclusive*" reporting — were reported to E-customs.  Def. Br.at 11-12 (citing IDM at 17).  Specifically, CS Wind Vietnam responded at verification that "if the supplier is from outside of Vietnam, but the raw materials are sourced from inside Vietnam, then these raw material inputs still need to be entered into the E-customs system even if they are ultimately not imported."  Verification Mem. at 16 (citing Verification Exs. at VE-15 at 68-75); *see* IDM at 15.  The verification exhibit shows an invoice and packing list both listing [[

]].[39]  Verification Exs. at VE-15 at 68-75.  Commerce found "no discrepancy."  IDM at 17; *see also* Verification Mem. at 17.  Further, Commerce found that "CS Wind provided relevant and accurate documentation that identified the country of origin for these transactions."  IDM at 17.

### C.    Analysis

The court remands the Final Determination to Commerce for it to take the actions set forth in this section but sustains Commerce's decision not to apply AFA.

"[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  *Altx, Inc.*, 370 F.3d at 1116 (quoting *Matsushita Elec. Indus. Co.*, 750 F.2d

---

[39] The Government concedes that there is nothing in the record to determine whether the unaffiliated supplier itself imported the steel plate that it provided to CS Wind Vietnam.  Oral Argument Tr. at 74:3-6, 77:16-17.

**PUBLIC VERSION**

at 933) (internal quotation marks and citations omitted)).  Yet, "[t]he substantiality of

evidence must take into account whatever in the record fairly detracts from its weight."

*Universal Camera Corp.*, 340 U.S. at 488; *see Nippon Steel Corp.*, 458 F.3d at 1351.  It

is possible that Commerce's conclusion that "the raw material [at issue] was sourced

from a supplier within Vietnam" was reasonable.  IDM at 17.  However, the court does

not have a basis in the record to reach this conclusion because Commerce did not: (1)

substantiate its conclusion that CS Wind Vietnam did not import the steel plate in light of

the evidence and arguments that detract from Commerce's conclusion that were

presented by WTTC; (2) state the salience, if any, of the MFN rate to its

determination that the raw material inputs in question came from Vietnam; and (3)

explain why it has listed an MFN tariff rate in its calculations of the Import Duty

Exemptions program for the line entries of the raw material inputs in question that also

are listed as having a country of origin of Vietnam.  *See* Calculation Mem. at attch. II,

tab "Raw Materials.Rev.ATT2.BPI."

Plaintiff's first argument is that Commerce "improperly disregarded" relevant

evidence pertaining to the country of origin of some of the steel plate.  Pl. Br. at 13.

Plaintiff's second argument is that Commerce did not "adequately address" plaintiff's

arguments because it failed to investigate fully the ultimate country of origin of the steel

plate inputs that CS Wind Vietnam purchased from a supplier in Vietnam.  Pl. Br. at 15.

These arguments are related.  Accordingly, the court addresses them together.

**PUBLIC VERSION**

Court No. 20-03692                                                                                          Page 66

Commerce stated that it reviewed all purchases of the raw material inputs, the

verbal explanation from CS Wind Vietnam officials and the supporting source

documentation.  IDM at 17; *see, e.g.*, discussion and record citations, *supra* note 6 and

Section II.B at pp. 57-60, 62-64.  Commerce explained that it sought, received and

examined reporting on "*all* imports of raw materials during the POI, which included the

imports of raw materials sourced from outside and from within Vietnam," and examined

"sourced documentation pertaining to the inputs of raw materials sourced from within

Vietnam."  IDM at 17 (emphasis supplied).  In addition, Commerce found that CS Wind

Vietnam provided all requisite documentation for the inputs as to the supplier and

country of origin.  *Id.*

However, Commerce did not address its treatment of all of the evidence raised

by plaintiff that detracts from Commerce's conclusion as to the import status of the steel

plate.[40]  *See Universal Camera Corp.*, 340 U.S. at 488.  Instead, Commerce addressed

some but not all information pertaining to country of origin in the IDM, including

information and related argumentation that appeared to be contrary to its conclusion

---

[40] *See supra* Section II.B; Pl. Br. at 13-17.  This evidence includes: CS Wind Vietnam's
questionnaire statements that "all main materials," including steel plate, were provided
by CS Wind Korea from outside of Vietnam and that CS Wind Vietnam imports steel
plate; the conflicting language on the [[                              ]] as to [[
                                        ]]; and the evidence that [[
                                        ]].  Initial Questionnaire Resp. at 21; First Suppl.
Questionnaire Resp. at 9 and Ex. SQ2-18; Letter from Wiley Rein LLP to Sec'y
Commerce, re: *Utility Scale Wind Towers from the Socialist Republic of Vietnam:
Comments on CS Wind's Initial Questionnaire Response* (Oct. 23, 2019) at 8-9 and
Exs. 6, 7.

**PUBLIC VERSION**

that the steel plate was not imported.  IDM at 17; *see also Nippon Steel Corp.*, 458 F.3d

at 1351 (internal quotations omitted).

The record references several times Vietnam as the country of origin of the

steel plate in question.  *See* Initial Questionnaire Resp. at Exs. C-3 & C-4.2; First Suppl.

Questionnaire Resp. at Ex. SQ2-18; First Suppl. Questionnaire Resp. – Remaining

Questions at Ex. SQ2-6a; Verification Exs. at VE-15 at 68-75; First Suppl.

Questionnaire Resp. at Ex. SQ2-20; *see also* Verification Mem. at 16-17.[41]  Commerce

---

[41] The Verification Memorandum states:

> We traced selected line items reported in Exhibit C-3 of CS Wind's October
> 9, 2019 [Initial Questionnaire Response or] IQR to the company's accounts
> and source documents.  Specifically, we requested that company officials
> prepare documentation for raw material purchases/imports on-site during
> verification.  This included purchase numbers [[
>                                                  ]].  We noted no discrepancies other than those
> reported in minor correction 3, above.

Verification Mem. at 17.  [[                                        ]].  Initial Questionnaire Resp. at
Ex. C-3 at l. 11729.  Further, the Verification Memorandum states:

> According to Ms. Ahn, a member of the logistics team, company officials
> manually enter raw materials for re-export following processing in Vietnam's
> E-customs system on a project-by-project basis.  *See, e.g.*, pages 6-10 of
> VE-15.  We asked company officials to explain why Vietnam is listed as a
> country of origin for certain raw material purchases in Exhibit C-3 of its
> October 9, 2019 IQR.  Officials explained that if the supplier is from outside
> of Vietnam, but the raw materials are sourced from inside Vietnam, then
> these raw material inputs still need to be entered into the E-customs system
> even if they are ultimately not imported.  *See, e.g.*, pages 68-75 of VE-15.

Verification Mem. at 16.  Commerce addressed this explanation in its IDM.  *See* IDM at
17 ("In addition to the verbal explanation provided by company officials as to why those
(footnote continued)

**PUBLIC VERSION**

verified the questionnaire responses of CS Wind Vietnam that identified the country of

origin of the raw material inputs in question as Vietnam.  IDM at 17.  Based on its

verification, Commerce found that "the sales of these certain raw materials were made

through CS Wind Korea, but only on paper; the raw material for those transactions was

sourced from a supplier within Vietnam."[42]  *Id.*; *see also* First Suppl. Questionnaire

Resp. at 3.

Plaintiff insists that there was "no information on the record" for Commerce to

determine the country of origin of the steel plate.  Oral Argument Tr. at 64:11-16.  That

conclusion is not correct.  As the court has noted, CS Wind Vietnam provided

spreadsheets that listed the country of origin for the steel plate at issue as Vietnam.

*See* First Suppl. Questionnaire Resp. at Ex. SQ2-20; First Suppl. Questionnaire Resp. –

Remaining Questions at Ex. SQ2-6a; *see also* Oral Argument Tr. at 56:1-25, 57:11-12.

Moreover, [[

]].  Verification Exs. at VE-15 at 68-75; *see also* Initial

Questionnaire Resp. at Ex. C-4.2 Verification Mem. at 17; First Suppl. Questionnaire

---

purchases were included in the spreadsheet, we examined source documentation
supporting those purchases that were made from within Vietnam." (citing Verification
Exs. at VE-15 at 68-75)).

[42] The IDM states: "Contrary to the petitioner's assertions, the supporting
documentation, including invoices and packing lists, showed the origin of certain raw
materials to be within Vietnam. . . .  Thus, for these transactions at issue, we find that
CS Wind provided relevant and accurate documentation that identified the country of
origin for these transactions."  IDM at 17 (footnote omitted).

**PUBLIC VERSION**

Resp. at Ex. SQ2-18; *see* First Suppl. Questionnaire Resp. – Remaining Questions at Ex. SQ2-6a, discussed *supra*.  In addition, it is uncontested that CS Wind Vietnam does receive some other [[          ]] from [[       ]].  *See* First Suppl. Questionnaire Resp. – Remaining Questions at Ex. SQ2-6a.[43]

   Nonetheless, the document notations on the [[                    ]] forms, which plaintiff raises, also refer to [[

     ]] at the same time that they list [[        ]] as the country of origin.  First Suppl. Questionnaire Resp. at Ex. SQ2-18.  Commerce does not reference explicitly this evidence or clarify its conclusion as to whether or how it considered this evidence in its IDM.  *See supra* note 6; IDM at 16-19.[44]  In addition, Commerce does not address the evidence that is presented by WTTC that the seller, [[        ]], could not have produced the steel plate in Vietnam, which calls into question the accuracy of Commerce's conclusion as to the country of origin of the steel plate that CS Wind Vietnam received.  *See* Comments on CS Wind Initial Questionnaire Resp. at 8-9 and Exs. 6, 7.

---

[43] CS Wind Vietnam also noted that "some steel scrap is generated from *steel plates sourced from Vietnamese suppliers* (for internal components) and comingled."   First Suppl. Questionnaire Resp. at 9 (emphasis supplied).

[44] Commerce does not cite this exhibit, First Suppl. Questionnaire Resp. at Ex. SQ2-18, in the IDM and it is unclear to the court whether the document notations in Exhibit SQ2-18 otherwise appear in the verification exhibit that is cited by Commerce, Verification Exs. at VE-15 at 68-75, [[                                                                ]], *id.* at 69-70.

**PUBLIC VERSION**

Court No. 20-03692                                                                                           Page 70

Based on Commerce's decision, the court is unable to conclude that Commerce's finding as to the origin of the steel plate in question is supported by substantial evidence. It was reasonable for Commerce to accept CS Wind Vietnam's explanation of the reason that it submitted its domestic information in an import duty exemptions spreadsheet to E-customs, as Commerce noted in the IDM. *See supra* note 41; Verification Mem. at 16; Initial Questionnaire Resp. at Exs. C-3, C-4.2.

Nevertheless, Commerce did not address other important evidence raised by WTTC. That evidence raised concerns about the potential impact of a different country of origin of the steel plate in question on Commerce's subsidy calculation and, therefore, could seriously undermine Commerce's reasoning and conclusions. *See supra* note 40; *Altx, Inc. v. United States*, 25 CIT at 1117-18, 167 F. Supp. 2d at 1374, *aff'd*, 370 F.3d at 1116 (internal citation omitted); *SKF USA Inc.*, 630 F.3d at 1374 (quoting *Timken*, 421 F.3d at 1358); Pl. Br. at 13. Commerce said that it found no discrepancy in the source documentation, IDM at 17; however, there is information in the record that suggests a discrepancy, *see supra* Section II.B and note 40. Therefore, Commerce needs to explain its conclusion considering the core arguments and evidence, including those raised by WTTC, as to the country of origin. *See Altx, Inc. v. United States*, 25 CIT at 1117-18, 167 F. Supp. 2d at 1374 (concluding the Commission "must address significant arguments and evidence which seriously undermines its reasoning and conclusions"), *aff'd*, 370 F.3d at 1116. The court does not conclude that the evidence was necessarily persuasive; rather, the court concludes that it is

necessary for Commerce to demonstrate that its conclusion on country of origin for these transactions was supported by substantial evidence considering the record as a whole.

In addition, plaintiff argues that Commerce did not explain the salience of the MFN zero percent rate to the determination.  *See* Pl. Reply Br. at 5 (citing Def. Br. at 4-5); *id.* (quoting *State Farm*, 463 U.S. at 50).  Commerce recited CS Wind Vietnam's comment on rebuttal in the underlying investigation about the MFN rate.  *See* IDM at 15 ("[E]ven if Commerce disagreed with the country of origin as being Vietnam, the record demonstrates a duty exemption rate of zero percent for this input under the Most Favored Nations (MFN) status.").  However, the court agrees that Commerce did not explain the salience, if any, of the MFN zero percent rate to its determination.  *See* Calculation Mem. at attach. II, tab "Raw Materials.Rev.ATT2.BPI."  In a footnote, Commerce cited an exhibit provided by CS Wind Vietnam containing information to support that there would have been a zero percent tariff rate on the steel plate in question even if it had been imported.  *See* IDM at 17 n.66 (citing Second Suppl. Questionnaire Resp. at Ex. SQ2-20); *see* First Suppl. Questionnaire Resp. at Ex. SQ2-

**PUBLIC VERSION**

20.[45][46]  Commerce also stated that "documentation examined at verification

demonstrated that CS Wind paid the appropriate amount of duties on its raw material

purchases."  IDM at 17 (citing Verification Mem. at 16-17; Verification Exs. at VE-15;

Initial Questionnaire Resp. at Ex. C-3).  Within the footnote for that sentence,

Commerce included a citation to a spreadsheet that was provided by CS Wind Vietnam

that is similar to Exhibit SQ2-20.  *See* IDM at 17 n.71 (citing Initial Questionnaire Resp.

at Ex. C-3).

However, Commerce did not actually discuss the salience of the MFN zero

percent tariff rate that is listed for the relevant purchases in these spreadsheets or

address contrary evidence regarding the import status of the steel plate in question.

Without more, Commerce's explanation and footnote citations do not permit the court to

reasonably discern the agency's path to its conclusion that the origin of the steel plate

was Vietnam, *see* IDM at 17, or whether Commerce relied upon the apparent MFN

tariff rate in reaching its decision, *State Farm*, 463 U.S. at 43 (quoting *Bowman Transp.*

---

[45] As the Government raised at oral argument, Commerce noted also an import duty
rate of zero percent as a part of its calculations.  Oral Argument Tr. at 91:17-24 (citing
Calculation Mem. at attch. II, tab "Raw Materials.Rev.ATT2.BPI," ll. 11729 & 12940);
*see* Calculation Mem. at attch. II, tab "Raw Materials.Rev.ATT2.BPI"; *see also* Def. Br.
at 5 (citing Calculation Mem. at attch. II, tab "Raw Materials.Rev.ATT2.BPI," ll. 11729 &
12940).

[46] The court is also not swayed by plaintiff's argument that there would have been a
non-zero import rate for the subject inputs had they come from Japan, for instance. Oral
Argument Tr. at 60:2-6 (citing Verification Exs. at VE-15).  First, there is no evidence on
the record that the steel plate in question came from Japan.  In addition, the record
shows [[

                          ]].  Verification Exs. at VE-15 at 75.

**PUBLIC VERSION**

*Inc.*, 419 U.S. at 286); *see* Calculation Mem. at attch. II, tab "Raw

Materials.Rev.ATT2.BPI."

       The court turns next to plaintiff's contention that Commerce should have applied

AFA for the Import Duty Exemptions program.  The court concludes that Commerce's

decision not to apply AFA was supported by substantial evidence because CS Wind

Vietnam did not withhold requested information, impede significantly the CVD

proceeding or provide unverifiable information.  *See* 19 U.S.C. § 1677e(a)(2)(A),

(a)(2)(C)-(D)).

       As described above, CS Wind Vietnam satisfied Commerce's requests for

information about where CS Wind Vietnam acquired its inputs.  IDM at 17; *see* Oral

Argument Tr. at 90:2-3 ([[                                                              ]]).  *See*

*generally Certain Fabricated Structural Steel from Canada*, 85 Fed. Reg. 5,387 and

accompanying IDM at cmt. 3 ("There is no requirement for the respondents to report

subsidies received by unaffiliated parties.").  As noted, CS Wind Vietnam did not

withhold information, but rather "over-reported" information about its raw material inputs,

including supplier and country of origin.  IDM at 17; *see, e.g.*, Initial Questionnaire Resp.

at Ex. C-3; First Suppl. Questionnaire Resp. – Remaining Questions at Ex. SQ2-6a.

       In addition, CS Wind Vietnam did not impede the proceeding or verification.  On

the contrary, Commerce reviewed the information from CS Wind Vietnam, whose

officials cooperated with Commerce on the question of country of origin.  Verification

Mem. at 16-17.  In its IDM, Commerce concluded that "CS Wind provided relevant and

PUBLIC VERSION

accurate documentation that identified the country of origin" and "paid the appropriate

amount of duties" and that "there is nothing missing from the record."[47]  IDM at 17 (citing

Verification Mem. at 16-17; Verification Exs. at VE-15; Initial Questionnaire Resp. at Ex.

C-3).  The court concludes that Commerce's decision not to apply AFA is supported by

substantial evidence and is consistent with law.  *See* 19 U.S.C. § 1677e(a)(2)(A),

(a)(2)(C)-(D).

Accordingly, the court cannot conclude that "the record as a whole" supported

Commerce's conclusion as to the supplier and country of origin due to Commerce's

failure to: (1) substantiate its conclusion that CS Wind Vietnam did not import the steel

plate in light of the evidence and arguments that detract from Commerce's conclusion

that were presented by WTTC, discussed above; (2) state the salience, if any, of the

MFN rate to its determination that the raw material inputs in question came from

Vietnam; and (3) explain why it has listed an MFN tariff rate in its calculations of the

Import Duty Exemptions program for the line entries of the raw material inputs in

question that also are listed as having a country of origin of Vietnam.  *Shandong*

*Huarong Gen. Corp.*, 25 CIT at 837, 159 F. Supp. 2d at 718 (citations omitted), *aff'd sub*

*nom. Shandong Huarong Gen. Grp. Corp.*, 60 F. App'x 797; *see* IDM at 17; Calculation

Mem. at attch. II, tab "Raw Materials.Rev.ATT2.BPI."  However, with respect to AFA,

---

[47] There is no information in the record to support the conclusion that the identity of a supplier to a supplier to CS Wind Vietnam is relevant to Commerce's investigation of the Import Duty Exemptions program.  *See* Oral Argument Tr. at 61:6-62:23.

**PUBLIC VERSION**

the court concludes that CS Wind Vietnam cooperated fully with Commerce and, accordingly, Commerce's decision on this basis to not apply AFA was reasonable.

For the reasons set forth above, the court remands for Commerce to: (1) substantiate its conclusion that CS Wind Vietnam did not import the steel plate in light of the evidence and arguments that detract from Commerce's conclusion that were presented by WTTC; (2) state the salience, if any, of the MFN rate to its determination that the raw material inputs in question came from Vietnam; and (3) explain why it has listed an MFN tariff rate in its calculations of the Import Duty Exemptions program for the line entries of the raw material inputs in question that also are listed as having a country of origin of Vietnam.  *See* Calculation Mem. at attch. II, tab "Raw Materials.Rev.ATT2.BPI."  In addressing these points, Commerce is to explain: (4)(a) if CS Wind Vietnam were the importer of record, would it be eligible to receive a benefit under the Import Duty Exemptions program; (4)(b) if CS Wind Korea were the importer of record and transferred the raw material inputs to CS Wind Vietnam, would either CS Wind Vietnam or CS Wind Korea be eligible to receive a benefit under that program; and (4)(c) if an unaffiliated third entity were the importer of record and sold the raw material inputs to CS Wind Korea for processing by CS Wind Vietnam, would CS Wind Vietnam be eligible to receive a benefit under that program.

As noted, the court sustains Commerce's decision not to apply AFA for the Import Duty Exemptions program.

PUBLIC VERSION

## CONCLUSION

"Good fortune is guiding our affairs better than we could have desired, for there you see, friend Sancho Panza, thirty or more enormous giants with whom I intend to do battle and whose lives I intend to take, and with the spoils we shall begin to grow rich, for this is righteous warfare, and it is a great service to God to remove so evil a breed from the face of the earth."

"'What giants?' said Sancho Panza."

"'Those you see over there,' replied his master, 'with the long arms; sometimes they are almost two leagues long.'"

"'Look, your grace,' Sancho responded, 'those things that appear over there aren't giants but windmills, and what looks like their arms are the sails that are turned by the wind and make the grindstone move.'"

"'It seems clear to me,' replied Don Quixote, 'that thou art not well-versed in the matter of adventures: these are giants; and if thou art afraid, move aside and start to pray whilst I enter with them in fierce and unequal combat.'"[48]

* * *

For the foregoing reasons, the court concludes that Commerce's choice of denominator for the benefit calculation is not inconsistent with its regulations or with the prior determinations presented by the parties.  However, the court remands Commerce's Final Determination for Commerce to: (1) discuss and address the

---

[48] Miguel de Cervantes, *Don Quixote* 58 (Edith Grossman trans., Ecco 2003) (1605).

**PUBLIC VERSION**

evidence that WTTC presented as related to manipulation; (2) address WTTC's

manipulation argument as to the denominator used in the benefit calculation; and (3)

explain whether Commerce considered manipulation in reaching its determination, or if

it did not, why it did not.

In addition, the court remands Commerce's Final Determination for Commerce

to: (4) substantiate its conclusion that CS Wind Vietnam did not import the steel plate in

light of the evidence and arguments that detract from Commerce's conclusion that were

presented by WTTC; (5) state the salience, if any, of the MFN rate to its

determination that the raw material inputs in question came from Vietnam; and (6)

explain why it has listed an MFN tariff rate in its calculations of the Import Duty

Exemptions program for the line entries of the raw material inputs in question that also

are listed as having a country of origin of Vietnam.  *See* Calculation Mem. at attch. II,

tab "Raw Materials.Rev.ATT2.BPI."   In addressing these points, Commerce is to

explain: (7)(a) if CS Wind Vietnam were the importer of record, would it be eligible to

receive a benefit under the Import Duty Exemptions program; (7)(b) If CS Wind Korea

were the importer of record and transferred the raw material inputs to CS Wind Vietnam,

would either CS Wind Vietnam or CS Wind Korea be eligible to receive a benefit under

that program; and (7)(c) if an unaffiliated third entity were the importer of record and

sold the raw material inputs to CS Wind Korea for processing by CS Wind Vietnam,

would CS Wind Vietnam be eligible to receive a benefit under that program.  Commerce

had the opportunity to provide clear explanations in its IDM so as to "explain the basis

PUBLIC VERSION

for its decisions," but failed to do so.  *NMB Sing. Ltd.*, 557 F.3d at 1319.  In addition, the court sustains Commerce's decision not to apply AFA for the Import Duty Exemptions program.  Accordingly, the court grants in part and denies in part plaintiff's motion for judgment on the agency record and sustains in part and remands in part Commerce's Final Determination.

Based on the foregoing reasons, it is hereby

**ORDERED** that plaintiff's motion is GRANTED in part and DENIED in part; it is further

**ORDERED** that Commerce's Final Determination is sustained in part and remanded in part; it is further

**ORDERED** that on remand Commerce: (1) discuss and address the evidence that WTTC presented as related to manipulation; (2) address WTTC's manipulation argument as to the denominator used in the benefit calculation; and (3) explain whether Commerce considered manipulation in reaching its determination, or if it did not, why it did not; it is further

**ORDERED** that on remand Commerce: (4) substantiate its conclusion that CS Wind Vietnam did not import the steel plate in light of the evidence and arguments that detract from Commerce's conclusion that were presented by WTTC; (5) state the salience, if any, of the MFN rate to its determination that the raw material inputs in question came from Vietnam; and (6) explain why it has listed an MFN tariff rate in its calculations of the Import Duty Exemptions program for the line entries of the raw

**PUBLIC VERSION**

material inputs in question that also are listed as having a country of origin of

Vietnam.  In addressing these points, Commerce is to explain: (7)(a) if CS Wind

Vietnam were the importer of record, would it be eligible to receive a benefit under the

Import Duty Exemptions program; (7)(b) If CS Wind Korea were the importer of record

and transferred the raw material inputs to CS Wind Vietnam, would either CS Wind

Vietnam or CS Wind Korea be eligible to receive a benefit under that program; and

(7)(c) if an unaffiliated third entity were the importer of record and sold the raw material

inputs to CS Wind Korea for processing by CS Wind Vietnam, would CS Wind Vietnam

be eligible to receive a benefit under that program; it is further

     **ORDERED** that Commerce shall file its remand redetermination within 90 days

following the date of this Opinion and Order; it is further

     **ORDERED** that, within 14 days of the date of filing of Commerce's remand

redetermination, Commerce must file an index and copies of any new administrative

record documents; and it is further

     **ORDERED** that, if applicable, the parties shall file a proposed scheduling order

with page limits for comments on the remand results no later than seven days after

Commerce files its remand redetermination with the court.


                            /s/     Timothy M. Reif    
                            Timothy M. Reif, Judge


Dated:   March 24, 2022        
       New York, New York