C-552-826
Remand
Slip Op. 22-27
POI:  01/01/2018 – 12/31/2018
**Public Version**
E&C/OVI:  FS, CA

### *Wind Tower Trade Coalition v. United States*
### Court No. 20-03692, Slip. Op. 22-27 (CIT March 24, 2022)
### Utility Scale Wind Towers from Vietnam

### FINAL RESULTS OF REDETERMINATION
### PURSUANT TO COURT REMAND

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) has prepared these final results of

redetermination pursuant to the remand order of the U.S. Court of International Trade (CIT or

the Court) in *Wind Tower Trade Coalition v. United States*, Court No. 20-03692, Slip. Op. 22-27

(March 24, 2022) (*Remand Order*).  This action arises out of the *Final Determination* in the

countervailing duty (CVD) investigation on utility scale wind towers (wind towers) from the

Socialist Republic of Vietnam (Vietnam).[1]

The Court sustained Commerce's selection of the denominator used in Commerce's

subsidy calculations but remanded two issues to Commerce for further explanation.[2]  The first

issue concerns the possibility of manipulation in Commerce's selection of the denominator used

in the respondent's subsidy calculations, for which the Court instructed Commerce to discuss and

address certain additional evidence which was not addressed in the *Final Determination*.[3]  The

second issue concerns the origin of certain steel plate inputs, for which the Court instructed

Commerce to substantiate its conclusions in the *Final Determination* in light of the evidence that

---

[1] *See Utility Scale Wind Towers from the Socialist Republic of Vietnam:  Final Affirmative Countervailing Duty Determination and Negative Determination of Critical Circumstance*, 85 FR 40229 (July 6, 2020) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM).
[2] *See Remand Order* at 76-77.
[3] *Id.*

detracts from its conclusions, and to further explain its subsidy calculations for the Import Duty Exemptions program.[4]

On remand, Commerce provides further explanation and analysis of the evidence and arguments presented by the Wind Tower Trade Coalition (petitioners) concerning manipulation. Commerce also provides further explanation to substantiate its finding that certain steel plate inputs were sourced from within Vietnam, rather than imported.

On June 22, 2022, we released our Draft Results of Redetermination to interested parties.[5]  On June 29, 2022, we received comments from the petitioners.[6]  After considering these comments and analyzing the record, we have further explained our analysis from the Draft Results of Redetermination; however, we have not changed our calculations of the CVD rates. Accordingly, consistent with the Draft Results of Redetermination, the CVD rates calculated in the *Final Determination* remain unchanged.

## II.    BACKGROUND

On July 9, 2019, Commerce received a CVD petition concerning imports of wind towers from Vietnam on behalf of the petitioners.[7]  On August 6, 2019, Commerce published the initiation of the CVD investigation of wind towers from Vietnam.[8]  On August 28, 2019 the U.S. International Trade Commission (ITC) preliminarily determined that there was a reasonable indication that an industry in the United States is materially injured by reason of imports of wind

---

[4] *Id.* at 77.
[5] *See* Draft Results of Redetermination Pursuant to Court Remand, *Wind Tower Trade Coalition v. United States*, Court No. 20-03692, Slip. Op. 22-27 (CIT March 24, 2022), issued June 22, 2022 (Draft Results of Redetermination).
[6] *See* Petitioners' Letter, "Utility Scale Wind Towers from the Socialist Republic of Vietnam:  Comments on Draft Results of Redetermination," dated June 29, 2022 (Petitioners' Comments on Draft Results of Redetermination).
[7] *See* Petitioners' Letter, "Petition for the Imposition of Countervailing Duties on Utility Wind Towers from Vietnam," dated July 9, 2019.
[8] *See Utility Scale Wind Towers from Canada, Indonesia, and the Socialist Republic of Vietnam:  Initiation of Countervailing Duty Investigations*, 84 FR 38216 (August 6, 2019).

towers from Vietnam.[9]  On December 13, 2019, Commerce published the *Preliminary Determination*,[10] in which Commerce calculated a preliminary estimated subsidy rate for the mandatory respondent CS Wind Vietnam Co., Ltd. (CS Wind Vietnam), and assigned CS Wind Vietnam's subsidy rate as the estimated all-others rate.[11]  On July 6, 2020, Commerce published the *Final Determination*,[12] in which Commerce calculated a final subsidy rate for the mandatory respondent CS Wind Vietnam, and continued to assign the subsidy rate calculated for CS Wind Vietnam as the all-others rate.[13]  On August 19, 2020, the ITC notified Commerce of its affirmative final determination that pursuant to sections 705(b)(1)(A)(i) and 705(d) of the Tariff Act of 1930, as amended (the Act), that an industry in the United States is materially injured by reason of subsidized imports of subject merchandise from Vietnam.[14]  On August 26, 2020, Commerce published the CVD *Order* on wind towers from Vietnam.[15]

In the *Preliminary Determination* and the *Final Determination*, Commerce relied upon CS Wind Corporation (CS Wind Korea)'s sales value of subject merchandise produced by CS Wind Vietnam, rather than CS Wind Vietnam's tolling revenue, as the appropriate denominator in its subsidy calculations.[16]  Additionally, for purposes of its subsidy calculation of the Import Duty Exemptions on Imports of Raw Materials for Exporting Goods program, Commerce

---

[9] *See Utility Scale Wind Towers from Canada, Indonesia, Korea, and Vietnam*, 84 FR 45171 (August 28, 2019).
[10] *See Utility Scale Wind Towers from the Socialist Republic of Vietnam:  Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination with Final Antidumping Duty Determination*, 84 FR 68104 (December 13, 2019) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM).
[11] *Id.*
[12] *See Final Determination.*
[13] *Id.*
[14] *See* ITC's Letter, "Notification of ITC Final Determinations," dated August 19, 2020.
[15] *See Utility Scale Wind Towers from Canada, Indonesia, and the Socialist Republic of Vietnam:  Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Orders*, 85 FR 52543 (August 26, 2020) (the *Order*).
[16] *See Final Determination* IDM at Comment 6.

determined that the application of adverse facts available (AFA) was not warranted for steel plate sourced from within Vietnam.[17]

The Court remanded two issues:  (1) further explanation concerning the petitioners' potential manipulation arguments; and (2) Commerce's determination that certain steel plate was sourced from within Vietnam.[18]  For the first issue, the Court ordered Commerce to:  (1) discuss and address the evidence the petitioners provided as related to manipulation; (2) address the petitioners' manipulation argument as to the denominator used in the calculation of the subsidy rate[19]; and (3) explain whether Commerce considered manipulation in reaching its determination, or if it did not, why it did not.[20]  For the second issue, the Court ordered Commerce to:  (1) substantiate its conclusion that CS Wind Vietnam did not import steel plate in light of the evidence and arguments that detract from Commerce's conclusion that were presented by petitioners; (2) state the salience, if any, of the most favored nation (MFN) tariff rate to its determination that the raw material inputs in question came from Vietnam; (3) explain why Commerce has listed an MFN tariff rate in its calculations of the Import Duty Exemption program for the line entries of the raw materials inputs that have a listed Vietnamese country of origin; and (4) explain whether various scenarios would result in eligibility for benefits under the Import Duty Exemption program.[21]

---

[17] *Id.* at Comment 2.
[18] *See Remand Order* at 78-79.
[19] In the *Remand Order*, the Court referred to the "benefit" calculation.  For purposes of clarity, in CVD terms, the "benefit" is the value of the subsidy provided to the recipient; it is used as the numerator, and the denominator is the applicable sales value.  The numerator and the denominator are used to calculate the countervailable subsidy rate (or "CVD rate"),
[20] *See Remand Order* at 78.
[21] *Id.* at 78-79.

### III.   ANALYSIS

#### A.  Potential Manipulation

As summarized above, the Court ordered Commerce to discuss the evidence regarding potential manipulation presented by the petitioners, address the arguments regarding possible manipulation of the denominator used in the CVD rate calculation,[22] and explain whether Commerce considered manipulation when reaching its determination.

1.  <u>Evidence the Petitioners Provided as Related to Manipulation</u>

The Court identified four arguments raised by the petitioners regarding potential manipulation:  (1) CS Wind Vietnam and CS Wind Korea started to use toll processing agreements in 2018 "just as {CS Wind Vietnam} was excluded from a prior antidumping duty order through appeal litigation"; (2) CS Wind Korea [                                                    ] and began [                                                                    ] which the petitioners claim as evidence that CS Wind Korea [

                        ];[23] (3) CS Wind Korea [

                                                        ]; and (4) according to the petitioners, CS Wind Vietnam provided an insufficient rationale for using toll processing agreements.[24]

As an initial matter, during the investigation, the petitioners raised these manipulation arguments in their case brief as part of their argument that Commerce should reject CS Wind

---

[22] *See* footnote 17, *supra*.

[23] In the *Remand Order*, the Court states the petitioners claim that CS Wind Korea's [                        ] and [                                        ] is evidence CS Wind Korea [                                ].  *See Remand Order* at 34.  We note that in the petitioners' case brief, the petitioners claimed this as evidence of [                                        ], rather than evidence of [                                ].  *See* Petitioners' Letter, "Utility Scale Wind Towers from the Socialist Republic of Vietnam: Case Brief," dated April 3, 2020 (Petitioners' Case Brief), at 27.

[24] *See Remand Order* at 33-34.

Vietnam's request for an entered value adjustment.[25]  The petitioners did not raise these concerns as part of their argument that Commerce should rely on CS Wind Vietnam's tolling revenue, rather than on CS Wind Korea's sales value of subject merchandise produced by CS Wind Vietnam, as the appropriate denominator in its subsidy calculations.  Because Commerce continued to deny the entered value adjustment in the *Final Determination*, Commerce did not find it necessary to address in depth each related argument concerning potential manipulation in the *Final Determination*.  Further, to the extent that the petitioners' arguments concerning manipulation could relate to the denominator of the subsidy calculation, these arguments were not raised in administrative case briefs before Commerce.[26]  However, in compliance with the Court's order to address the arguments and evidence of manipulation on remand, we have analyzed the petitioners' concerns about potential manipulation and the evidence relevant to this issue.

    a.  *Claim that CS Wind Vietnam and CS Wind Korea started to use toll processing agreements in 2018*

The petitioners argue that CS Wind Vietnam changed its purchasing and sales pattern to "game the system" in anticipation of the filing of the CVD petition.  Specifically, the petitioners argue that [                                                                      ].[27]
A financial report excerpt on the record shows that

[                                                          ][28] and that CS Wind Vietnam did not purchase any

---

[25] *See* Petitioners' Case Brief at 25.
[26] Failing to raise arguments in administrative case briefs before Commerce constitutes a failure to exhaust administrative remedies.  *See Dorbest Ltd., vs. United States,* 604 F. 3d 1363 (CAFC 2010) ("Dorbest's failure to raise its issue in its administrative case brief constituted a failure to exhaust administrative remedies.").
[27] *See* Petitioners' Case Brief at 26.
[28] *See* CS Wind Vietnam's Letter, "CS Wind First Supplemental Questionnaire Response:  Countervailing Duty Investigation of Utility Scale Wind Towers from Vietnam (C-552-826)," dated November 6, 2019 (November 6th

materials from CS Wind Korea in 2018.[29]  However, we find that record evidence contradicts the petitioners' claim that CS Wind Vietnam's [

        ] coincided with the use of tolling agreements between CS Wind Korea and CS Wind Vietnam.  Record evidence demonstrates that CS Wind Korea and CS Wind Vietnam entered into tolling agreements during the period of investigation (POI),[30] but that similar toll processing agreements also existed between CS Wind Vietnam and CS Wind Korea long before the POI (2018), in the years [                ].[31]  Accordingly, the record evidence does not support the petitioners' contentions that the tolling arrangements were adopted to "game the system" in anticipation of this investigation, because CS Wind Vietnam and its parent had similar tolling agreements long before the POI.

        Further, we find that the toll processing agreements in effect during the POI were not unusual in their terms regarding which party was responsible for providing raw materials.  The toll processing agreements in effect during the POI stipulated that all raw materials and accessories were supplied by CS Wind Korea except for those specified in the contract (*e.g.*, paint, consumables).[32]  We find that tolling agreements in effect during the POI have substantially similar terms with the toll processing agreements on the record from prior years [                ].[33]

---

SQR), at 1; *see also* Memorandum, "Final Determination of Countervailing Duty Investigation of Utility Scale Wind Towers from Vietnam:  Calculation Memorandum from CS Wind Vietnam Co., Ltd.," dated June 29, 2020 (Final Calculation Memorandum), at Attachment 1 "Exchange Rate."
[29] *See* CS Wind Vietnam's Letter, "CS Wind Supplemental Affiliation Response:  Countervailing Duty Investigation of Utility Scale Wind Towers from Vietnam (C-552-826)," dated September 20, 2019 (September 20th SQR), at 2 and Exhibit SA-3.
[30] *Id.* at 1-2.
[31] *See* Memorandum, "Countervailing Duty Investigation of Utility Scale Wind Towers from the Socialist Republic of Vietnam," dated March 18, 2020 (Verification Report), at Exhibit VE-13.
[32] *See* September 20th SQR at 2.
[33] *See* Verification Report at Exhibit VE-13.

As explained above, we find that the record evidence contradicts the petitioners' claim that shortly before this investigation, CS Wind Vietnam changed its business practices by entering into tolling agreements with CS Wind Korea to "game the system."  Instead, the record shows that CS Wind Vietnam had a history of tolling agreements with CS Wind Korea that long predate the POI.  We find that record evidence demonstrates that CS Wind Vietnam and CS Wind Korea had historically entered into tolling agreements that governed various aspects of their commercial relationship, including purchases of raw materials.[34]  Tolling arrangements are common business practices that do not inherently evince efforts to manipulate the value of a company's sales, whether to an affiliate or to an unaffiliated party.  A company could adopt a more efficient business arrangement, including tolling, that reduces its costs.  As explained earlier, CS Wind Korea and CS Wind Vietnam had tolling arrangements long before this investigation with substantially similar terms; we do not consider the continuation of a preexisting business arrangement to be evidence of manipulation.  Accordingly, we find that information on the record does not support the petitioners' argument that CS Wind Vietnam changed its purchasing and sales agreements in anticipation of the filing of the CVD petition to "game the system."

     *b. Claim that CS Wind Korea [                                            ] and began ["                                      ] in order to [                                          ]*

The petitioners argue that CS Wind Vietnam and CS Wind Korea engaged in a scheme to minimize their liability for antidumping (AD) and countervailing duties.[35]  Specifically, the petitioners contend that [                                                     ] which the

---

[34] *Id.* at Exhibits 6, 9, and VE-14; *see also* November 6th SQR at 1 and 3.
[35] *See* Petitioners' Case Brief at 26-27.

petitioners claim is evidence that CS Wind Korea [

]36   Record evidence confirms that [

].37   While the petitioners

cite CS Wind Vietnam's IQR at Exhibit 13.1 as evidence that CS Wind Korea charged an

[                                ] in our review of this exhibit we could not locate evidence of an

[                         ] However, CS Wind Vietnam did not argue that the petitioners' contention that

CS Wind Korea charged [                                        ] is incorrect in its case brief or

rebuttal brief.38

However, we find that the petitioners have not demonstrated why these facts should be

considered evidence of manipulation.  We find that the petitioners have not demonstrated any

improper behavior by the respondent or its affiliates that constitutes manipulation.  As an initial

matter, the existence of an affiliated company that serves as an importer of record does not

inherently evince efforts to manipulate the value of sales, whether to an affiliate or to an

unaffiliated party.  Because 19 CFR 351.525(a) requires Commerce to "determine the sales value

of a product on an f.o.b. basis," the sales value that Commerce uses is net of movement

expenses, derived from the process a respondent charges its customers for the goods it sells, and

would not include for example, this type of fee.  Thus, the petitioners' concern that the sales

value Commerce has used in the denominator of its CVD rate calculations is overstated, and the

---

36 *Id.*  As noted above, the Court characterized the petitioners' argument as claiming that CS Wind Korea
[                                                    ]; whereas in the petitioners' case brief, the petitioners claimed that CS Wind
Korea [                              ].  For purposes of this remand redetermination, we have addressed the
petitioners' argument as raised in its case brief.

37 *See* CS Wind Vietnam's Letter, "CS Wind Vietnam Initial Questionnaire Response:  Countervailing Duty
Investigation of Utility Scale Wind Towers from Vietnam (C-552-826)," dated October 19, 2019 (CS Wind Vietnam
IQR), at Exhibit 13.1 and Exhibit 13.2.

38 *See* CS Wind Vietnam's Letter, "Resubmission of CS Wind Administrative Case Brief in the Countervailing Duty
Investigation on Utility Scale Wind Towers from Vietnam (C-552-826)," dated June 4, 2020; *see also* CS Wind
Vietnam's Letter, "CS Wind Rebuttal Brief:  Countervailing Duty Investigation on Utility Scale Wind Tower from
Vietnam (C-552-826)," dated April 20, 2020 (CS Wind Vietnam's Rebuttal Brief).

resulting CVD rate is understated, by the inclusion of this fee, is unfounded and unsupported by record evidence.

A company may alter its business practices after AD or CVD investigations commence for legitimate reasons.  For example, a company might change its internal record keeping system in order to better track information relevant to Commerce's proceedings.  While the petitioners argue that CS Wind Korea changed some of its business practices in reaction to AD/CVD investigations to [                                                      ], we find that the record contains insufficient evidence that the two practices in question, *i.e.*, an affiliate of the respondent [

                      ], affect calculation of a countervailing duty rate, let alone provide evidence of an effort to manipulate the CVD rate calculated.

    *c.  Claim that CS Wind Korea [*
                    *]*

The petitioners argue that CS Wind Korea and CS Wind Vietnam's corporate structure [

                                                  ].[39]  To support their argument, the petitioners cite the [                                                      ], which states [

                                                  ][40]  Although the [                                                      ] on the record show that CS Wind Vietnam stated that [

                      ],[41] the petitioners state that it is unclear exactly what [           ] CS Wind

---

[39] *See* Petitioners' Case Brief at 27.
[40] *Id.* (citing Verification Report at VE-4 at 59).
[41] *See* Verification Report at VE-4 at 59.

Vietnam is referencing.[42]  In general, we find that taking into account tax implications in structuring contracts is a legitimate commercial consideration.  Accordingly, we find that the fact that the companies structured their contracts in a particular way for tax reasons detracts from the petitioners' allegation that the tolling arrangement was adopted in response to this investigation to manipulate CVD rates.  We find that the record lacks evidence that CS Wind Korea and CS Wind Vietnam's [                    ] was designed to manipulate AD or CVD liability, as the petitioners claim.  To the contrary, the record evidence indicates that CS Wind Vietnam's [            ] was driven by tax reasons and, thus, was likely designed to optimize its tax treatment under any number of national or local tax regimes.[43]

> d.  *Claim that CS Wind Vietnam provided an insufficient rationale for using toll processing agreements*

Lastly, the petitioners argue that the tolling agreements between CS Wind Vietnam and CS Wind Korea shift the majority of revenue, profits, and benefits from Vietnam to Korea.[44]  Further, the petitioners argue that transfer prices between CS Wind Korea and CS Wind Vietnam were set arbitrarily and have a similar effect of artificially inflating CS Wind Korea's profit at the expense of the subsidiary company.[45]  The petitioners do not cite affirmative evidence to support their argument; rather, they argue that CS Wind Vietnam refused to answer Commerce's questions about the tolling agreements.[46]  However, the record shows that CS Wind Vietnam did answer Commerce's questions as to the reasons CS Wind Vietnam entered into toll processing agreements and the method by which CS Wind Korea set its transfer pricing.  For example, in response to Commerce's question regarding the reasons that CS Wind Vietnam entered into toll

---

[42] *See* Petitioners' Case Brief at 27.
[43] *See* Verification Report at VE-4 at 59.
[44] *Id.* at 27.
[45] *Id.* at 28.
[46] *Id.*

processing agreements, CS Wind Vietnam responded, "{s}ince CS Wind Corporation handles all of the sales, including the negotiations with those sales, it decided to establish tolling agreements with {CS Wind Vietnam} so that it could better control costs."[47]  In response to Commerce's questions about how transfer pricing was determined, CS Wind Vietnam responded:

> There is no set formula.  Normally, the sales price of wind towers comprises of material costs and processing costs.  CS Wind Corporation estimates consumption quantity of material and material prices based on the market prices.  CS Wind Corporation also estimates workload for production of the wind tower and determines processing fee including the profit margin.  The processing fee charged by {CS Wind Vietnam} to CS Wind Corporation is determined by some portion (percentage) of processing fee charged by CS Wind Corporation to the customer.  The percentage of processing fee is determined by CS Wind Group's internal transfer price policy.  Depending on the workload for production of the wind tower, processing fees can be differentiated due to the size of the wind tower and how many parts there are to be mounted in the wind tower.[48]

Despite the petitioners' claims to the contrary, we find that the record shows Commerce requested information about CS Wind Vietnam and CS Wind Korea's tolling agreements, and that CS Wind Vietnam provided information in response.  The record evidence indicates that the parties entered into tolling arrangement to "better control costs."[49]

Although the petitioners speculate that CS Wind Vietnam and CS Wind Korea used transfer prices and tolling agreements to transfer profit from CS Wind Vietnam to CS Wind Korea, the petitioners do not explain how this allegation impacts the appropriateness of using CS Wind Korea's sales of subject merchandise produced by CS Wind Vietnam as the denominator for the subsidy calculation.  In other words, the petitioners do not explain why the purported shifting of profit from CS Wind Vietnam to CS Wind Korea is relevant to their argument that the denominator is being manipulated for purposes of affecting the subsidy rate calculation, given

---

[47] *See* November 6th SQR at 3.
[48] *Id.* at 3-4.
[49] *See* November 6th SQR at 3.

that we are using CS Wind Korea's sales of subject merchandise produced by CS Wind Vietnam as the denominator. Based on the above analysis, we find that record evidence does not support the petitioners' claims of manipulation.

2. Petitioners' Manipulation Argument as to the Denominator Used in the CVD Rate Calculation

In the *Final Determination*, Commerce calculated the subsidy rate for each countervailable program used by CS Wind Vietnam by dividing the benefit received under each program by the FOB value of CS Wind Korea's sales of subject merchandise produced by CS Wind Vietnam.[50] Commerce then summed the rates for each countervailable subsidy program used by CS Wind Vietnam to determine CS Wind Vietnam's overall subsidy rate. The amount of countervailing duties payable is calculated by multiplying the overall subsidy rate by the entered value of the subject merchandise. In other words, the subsidy rate is the multiplier, the entered value is the multiplicand, and the result of the calculation is the countervailing duty applied. Therefore, in order for countervailing duties payable to decrease, either (1) the benefits received must be reduced; (2) CS Wind Korea's sales value of subject merchandise produced by CS Wind Vietnam must increase; or (3) the entered value of the product must decrease. The Court specifically instructed Commerce to examine potential manipulation of the denominator, *e.g.*, CS Wind Korea's sales value of subject merchandise produced by CS Wind Vietnam.[51]

As Commerce stated in the *Preliminary Determination*, in certain instances where Commerce finds that the sales value used to calculate the subsidy rate does not match the entered value of the subject merchandise, Commerce adjusts the subsidy rate through an entered value adjustment.[52] The petitioners' arguments, which they presented before the agency, are centered

---

[50] *See* Final Calculation Memorandum at Attachment 2 "Benefit Chart."
[51] *See Remand Order* at 78.
[52] *See Preliminary Determination* PDM at 13, unchanged in *Final Determination* IDM at Comment 6.

on possible manipulation of the entered value by the inappropriate application of an entered value adjustment.[53]   However, in this CVD investigation, Commerce determined that an entered value adjustment was not appropriate.[54]   Therefore, for purposes of this remand redetermination, we analyzed the petitioners' arguments as they could relate to manipulation of subsidy rates and CVD liability calculated without an entered value adjustment, as described above.

The petitioners speculate that CS Wind Vietnam and CS Wind Korea used tolling agreements and transfer prices to artificially inflate the profits and revenue of CS Wind Korea at the expense of CS Wind Vietnam.[55]   We find that the petitioners' argument regarding tolling agreements and transfer prices resulting in shifting corporate profit is not relevant to the CVD rate calculations because, as explained above, the profit of either CS Wind Vietnam or CS Wind Korea is not one of the factors that can impact either the subsidy rate or CVD liability calculations.   Additionally, the petitioners do not cite evidence or advance a theory explaining how tolling agreements or transfer prices could impact CS Wind Korea's sales value of subject merchandise produced by CS Wind Vietnam.

The petitioners argue that by [

], CS Wind Vietnam and CS Wind Korea have [

] and artificially inflated entered value; however, we find no evidence that these actions would result in a manipulative reduction of CVD liability.[56] Specifically, contrary to the petitioners' concern, if CS Wind Korea's [

], the denominator in the subsidy rate calculation (*i.e.*, CS Wind Korea's sales value of subject merchandise produced by CS Wind Vietnam) would decrease, and in turn, result in a

---

[53] *See* Petitioners' Case Brief at 25-31.
[54] *See Preliminary Determination* PDM at 13, unchanged in *Final Determination* IDM at Comment 6.
[55] *See* Petitioners' Case Brief at 28.
[56] *Id.* at 27.

larger subsidy rate.  Further, because CVD liability is calculated as the overall subsidy rate multiplied by entered value, artificially increasing entered value would result in a larger CVD liability.  Because Commerce denied the entered value adjustment, if we were to accept the petitioners' speculation as fact, the result would be *higher*, not *lower*, CVD liability.  It would be illogical for a respondent to manipulate its CVD rate with its entered value in a manner that would *increase* its duty liability.

Lastly, while the petitioners argue that [

] is evidence that CS Wind Korea's corporate structure exists only [


], we find that the petitioners do not advance an argument on how this relates to the appropriate denominator to use in the subsidy rate calculation.  Unlike previous arguments, the petitioners do not even offer speculation as to how this [                    ] could impact the denominator.  Accordingly, with respect to this allegation, we find that the petitioners have failed to establish even a *prima facie* case of manipulation of the denominator.

3. <u>Commerce's Consideration of Manipulation in Reaching its Determination</u>

As an initial matter, Commerce considers all arguments made in case and rebuttal briefs when reaching its final determinations.  In this case, because the petitioners' manipulation arguments centered on urging Commerce to deny the entered value adjustment, which Commerce did for other reasons, Commerce did consider all arguments, including those related to potential manipulation, in reaching its findings in the *Final Determination*.  Because Commerce denied the entered value adjustment, it was not necessary for Commerce to specifically address every piece of evidence of potential manipulation cited by the petitioners for the *Final Determination*.

As explained in the *Preliminary Determination* and *Final Determination*, in determining the appropriate denominator to use in the subsidy calculation, Commerce considers the basis for the respondents' receipt of benefits under each program.[57]  The Court found that Commerce's choice of denominator was not inconsistent with its regulations or prior determinations.[58] Commerce takes manipulation concerns seriously; however, we determined that the record evidence did not substantiate the petitioners' claims, that the petitioners failed to adequately explain how some of the alleged facts result in manipulation, and that in some instances the facts alleged by the petitioners as evidence of manipulation of CVD rate by the respondent would actually have increased the amount of countervailing duties due.  Further, the petitioners' arguments concerning manipulation were made within the context of the petitioners' case brief argument that Commerce should deny CS Wind Vietnam an entered value adjustment.  As explained above, because Commerce denied the entered value adjustment, most of, if not all, of the petitioners' manipulation claims were irrelevant to Commerce's decision to use as the denominator in the subsidy rate calculations the value of CS Wind Korea's sales of subject merchandise produced by CS Wind Vietnam.  Therefore, for these final results of redetermination, Commerce did not change its determination regarding the appropriateness of using the value of CS Wind Korea's sales of subject merchandise produced by CS Wind Vietnam as the denominator in the subsidy rate calculation.

## B.  Origin of Steel Plate

As summarized above, the Court ordered Commerce to substantiate its conclusion that CS Wind Vietnam did not import steel plate in light of the petitioners' arguments and evidence that detracts from Commerce's conclusion, explain the salience of the MFN tariff rate to

---

[57] *See Preliminary Determination* PDM at 5, unchanged in *Final Determination* IDM at Comment 6.
[58] *See Remand Order* at 76-77.

Commerce's determination that the steel plate inputs came from Vietnam, explain why

Commerce listed an MFN tariff rate in its Import Duty Exemption program calculations for

inputs listed as being sourced from Vietnam, and explain whether various scenarios would result

in eligibility for benefits under the Import Duty Exemption program.[59]

1. Substantiation of Commerce's Conclusion that CS Wind Vietnam Did Not Import Steel Plate

In the *Final Determination*, Commerce determined, based on record evidence, that CS

Wind Vietnam did not import the steel plate in question.[60]  The petitioners argued that the steel

plate could not have been sourced from within Vietnam because it claimed that the reported

Vietnamese supplier of steel plate does not operate a plate mill in Vietnam and, therefore, could

not have produced the steel plate.[61]  Based on this evidence, the petitioners claimed that CS

Wind Vietnam failed to report necessary information regarding its receipt of benefits under the

Import Duty Exemptions Program, and therefore Commerce should apply a rate based on

adverse facts available (AFA) for this program.[62]  The Court also instructed Commerce to

address the petitioners' argument that a section from CS Wind Vietnam's Initial Questionnaire

response stated that "CS Wind Corporation supplies all main materials – steel plate, flange, steel

plate for door frame and internal mounting items – from outside Vietnam by CS Wind

Corporation."[63]

We find the evidence cited by the petitioners insufficient to outweigh the record evidence

demonstrating that the steel plate was sourced from within Vietnam and because CS Wind

Vietnam did not import this steel plate, it did not receive benefits under the Import Duty

---

[59] *See Remand Order* at 78-79.
[60] *See Final Determination* IDM at 17.
[61] *See* Petitioners' Case Brief at 15.
[62] *Id.* at 14.
[63] *See Remand Order* at 56 (citing CS Wind Vietnam IQR 21).

Exemption program.  In CS Wind Vietnam's Initial Questionnaire Response, the respondent stated:

> CS Wind Corporation supplies all main materials – steel plate, flange, steel plate for door frame and internal mounting items – from outside of Vietnam for the production of the wind towers.  Therefore, most of {the} raw materials are exported to Vietnam by CS Wind Corporation.[64]

The petitioners cite the first sentence of this section as evidence that the steel plate in question was sourced from outside Vietnam.  Although CS Wind Vietnam stated that all main materials were supplied from outside Vietnam, it also stated in the next sentence that "most," not all, of the raw materials are exported to Vietnam.[65]  In response to Commerce's questionnaires, CS Wind Vietnam provided lists of suppliers of raw materials,[66] invoices,[67] and packing lists.[68]  This documentation shows that CS Wind Vietnam's statement that "most," not all, of the raw materials are exported to Vietnam is accurate.[69]  At verification, Commerce further examined CS Wind Vietnam's raw material purchases and found no discrepancies with the information reported in CS Wind Vietnam's questionnaire responses.[70]  Specifically, Commerce examined raw material purchase orders and invoices showing that the steel plate was purchased by CS Wind Korea from a Vietnamese supplier.[71]  During verification, Commerce also asked company officials to explain why the company's reporting, in its table submitted in the October 9, 2019 Initial Questionnaire, relating to the Import Duty Exemptions on Raw Materials program, included certain purchases of raw materials or inputs for which Vietnam is listed as a country of

---

[64] *See* CS Wind Vietnam IQR at 21.
[65] *Id.*
[66] *See* CS Wind Vietnam's Letter, "CS Wind First Supplemental Questionnaire Response – Remaining Questions: Countervailing Duty Investigation of Utility Scale Wind Towers from Vietnam (C-552-826)," dated November 8, 2019 (Remaining Questions), at SQ2-6a.
[67] *See* November 6th SQR at SQ2-18, pp. 18.
[68] *Id*. at pp. 19.
[69] *See* November 6th SQR at SQ2-20; *compare*, *e.g.*, lines 3948-51, 4002, 4073, 4075, 4104, 4105, 4107-09, 4136-37, 4139-40, 4144-47, 5520, 9826, 10288, 10394 *with* line 12922.
[70] *See Final Determination* IDM at 17.
[71] *See* Verification Report at Exhibit VE-15, 68-75.

origin.[72]  Company officials explained that if the supplier is from outside of Vietnam, but the raw materials are sourced from inside Vietnam, then these raw material inputs still need to be entered into the E-customs system even if they are not imported by CS Wind Vietnam.[73]  The petitioners argue that this explanation was an admission that the documents provided were "inaccurate and incomplete."[74]  However, Commerce examined documents at verification that substantiated CS Wind Vietnam's explanation.[75]  We find that, rather than being an "incomplete" submission, the inclusion of raw material inputs sourced from within Vietnam, for which CS Wind Vietnam did not receive import duty exemptions, is a case of over-reporting.

With respect to the petitioners' argument that the steel plate could not have been sourced from within Vietnam because the reported Vietnamese supplier of steel plate does not operate a plate mill in Vietnam, we find that the evidence cited by the petitioners does not preclude possibilities in which steel plate can be sourced from within Vietnam even if the mill where the plate was produced was located outside Vietnam.[76]  Record evidence demonstrates that [          ] purchased the steel plate from [              ] for use by [                ].  The [                 ] demonstrates that the steel plate was transported by [      ] from [            ] to [                 ] and thus never left the country.[77]  Regardless, if [          ] imported the steel plate, neither CS Wind Korea nor CS Wind Vietnam would be the importer and would not be liable for import duties, if such duties were applicable, and would not be the beneficiary of any exemptions of those duties.  Therefore, the petitioners' contention that this plate must have come from outside of Vietnam, and must have been imported

---

[72] *Id.* at 16; *see also* CS Wind Vietnam IQR at Exhibit C-3.
[73] *Id.*
[74] *See* Petitioners' Case Brief at 16.
[75] *See* Verification Report at VE-15.
[76] *See* CS Wind Vietnam's Rebuttal Brief at 17.
[77] *See* Verification Report at VE-15, p. 71.

by CS Wind Vietnam, is not substantiated by their allegation that the supplier in question lacks a plate mill in the country.  In administrative proceedings, Commerce has to weigh and select from competing evidence.  While the petitioners have cited certain evidence to support their allegation, as explained above, we find that the totality of the evidence supports the finding that the steel plate in question is sourced from within Vietnam, and therefore, import duties would not have been applicable to CS Wind Vietnam's purchases of steel plate such that CS Wind Vietnam could not have benefitted from import duty exemptions.  In particular, we find that the verified documentation showing steel plate purchase orders and invoices from a Vietnamese supplier outweighs the evidence cited by the petitioners.  Accordingly, for these final results of redetermination we have made no changes to our *Final Determination* concerning the Import Duty Exemption program.

2. Salience of the MFN Rate

The MFN rate was not salient to Commerce's consideration of the origin of the steel plate in the *Final Determination* and, thus, Commerce did not consider the MFN rate when determining that CS Wind Vietnam did not benefit from import duty exemptions on its purchases of steel plate from a supplier in Vietnam.  As discussed above, Commerce determined that the steel plate was sourced from within Vietnam based on the documentation CS Wind Vietnam provided.  Invoices, packing lists, and examination of CS Wind Vietnam's purchases at verification were used to determine that the steel plate in question was sourced from Vietnam.[78]

However, the MFN rate is relevant to Commerce's determination with respect to the Import Duty Exemption Program for other reasons.  The Import Duty Exemption Program at

---

[78] *See* Remaining Questions at SQ2-6a; *see also* November 6th SQR at SQ2-18, pp. 18; and Verification Report at VE-15.

issue falls under 19 CFR 351.519, covering "remission or drawback of import charges upon export."  Section 351.519(a)(3)(ii) of Commerce's regulations states:

> If the Secretary determines that the exemption of import charges upon export confers a benefit, the Secretary normally will consider the amount of the benefit to be the import charges that otherwise would have been paid on the inputs not consumed in the production of the exported product, making normal allowance for waste, and the amount of charges other than import charges covered by the exemption.

When Commerce determines that a benefit has been conferred, the applicable tariff rate is used to determine "the import charges that otherwise would have been paid," pursuant to our regulations.  Tariff rates including the MFN rate can be used in this calculation of the benefit, when applicable.  For example, if the MFN import duty rate that would be normally applied to a particular input is zero, the amount of the benefit resulting from the import duty exemption on the input would also be zero.  Accordingly, even if Commerce were to determine incorrectly that the steel plate at issue was imported (which it did not), Commerce's determination would have no effect on the calculation of the benefit under this program, because the imported steel plate would have been subject to a duty rate of zero, pursuant to MFN status; thus, there would be no benefit from the Import Duty Exemption Program for the steel plate at issue.

3.  Inclusion of the MFN Rate in Calculations of the Import Duty Exemption Program

In the final calculation memorandum, Commerce included a table for the Import Duty Exemption Program based on CS Wind Vietnam's reporting of its raw material inputs.[79]  As previously discussed, CS Wind Vietnam included in this table inputs that were sourced from within Vietnam.  The table also included a column listing the relevant agreement that determines the tariff rate, for example, the Vietnam-Korea Free Trade Agreement (VKFTA), or the Most

---

[79] *See* Final Calculation Memorandum at Attachment II.

Favored Nation rate.[80]  These agreements and corresponding tariff rates are relevant only when materials are imported.  Material sourced from within Vietnam by CS Wind Vietnam is not subject to import duties, as it is not imported by CS Wind Vietnam.  Therefore, several of the columns in this table are not relevant to the inputs sourced from within Vietnam but were included and over-reported for reasons discussed above.  Commerce found it unnecessary to ask for a table without "MFN" listed for Vietnamese inputs, as it was irrelevant to the calculations. The MFN rate for the type of steel plate at issue, if imported, is zero percent, meaning that no import duties are due on imports of this steel plate from MFN countries.  Accordingly, regardless of whether the steel plate is domestically sourced (*i.e.*, not subject to import duties) or imported (in which case it is subject to zero percent MFN import duty rate), there is no benefit from the exemption under the program.  The listing of the "MFN" rate for Vietnamese inputs in this table did not affect our calculations, nor did it influence our determination that the steel plate in question was sourced from within Vietnam.

4.  Importation Scenarios That Result in Benefits

The countervailable program at issue is the Import Duty Exemptions on Raw Materials for Exporting Goods Program.  Import duty reimbursements for imported raw materials for exporting goods are governed by Article 16.6 of the Law on Import and Export Duty 2016, dated April 6, 2016, and Article 10 of Decree No. 134/2016/ND-CP, dated September 1, 2016, Decree No. 08/2015/ND-CP, dated January 21, 2015 (Decree 08) and Circular No. 38/2015/TT-BTC, dated March 25, 2015 (Circular 38).[81]  Under the program, import duty exemptions are provided for imported raw materials that are incorporated into exported goods, or directly used in the

---

[80] *See* CS Wind Vietnam IQR at 23 for a description of this table, including the list of relevant free trade agreements.
[81] *See* Government of Vietnam's Letter, "Utility Scale Wind Towers from Vietnam, Case No. C-552-826: Government of Vietnam's Initial Questionnaire Response," dated October 4, 2019 (GOV IQR), at Exhibit E-2.

production of such goods.[82]  The amount of the exemption is equal to the amount of the duty corresponding to the value of imported materials actually used in the production of the finished goods that are exported.  This amount is determined or declared at the time of reporting to Vietnam's Customs agency on the use of imported raw materials for manufacture of exported goods, in accordance with customs regulations.[83]

Commerce found that the "Raw Materials for Exporting Goods Program" used by CS Wind confers a benefit equal to the total amount of the duties exempted, in accordance with section 771(5)(E) of the Act and 19 CFR 351.519(a)(4).[84]  CS Wind Vietnam used this program for raw material inputs other than steel plate.[85]

With respect to the three hypothetical scenarios that the Court put forward, as a general matter, the importer of record is the party liable for payment of duties with respect to any particular entry.  A party that is not an importer of record does not have duty liability and, thus, an exemption from paying duties under the "Raw Materials for Exporting Goods Program" program would not provide any benefit to that party.  There is no record evidence that CS Wind Vietnam imported the steel plate at issue.  Commerce calculates the benefits conferred based on the facts of a given situation, such as the product imported and the import duties otherwise owed on that product.  As the facts of any situation can vary greatly, Commerce has a well-established practice to base its decisions on the facts of the specific case at issue, which is what Commerce did here.

---

[82] *Id.* at Exhibit E-1.
[83] *Id*.
[84] *See Preliminary Determination* PDM at 9-12 for further discussion of the details of this program and how Commerce found it to be countervailable.
[85] *See* Final Calculation Memorandum at Attachment II.

IV.     INTERESTED PARTY COMMENTS

We summarize and discuss the comments submitted by interested parties below.

**Issue 1:  Potential Manipulation**

*Petitioners' Comments*

- In the Draft Results of Redetermination, Commerce did not support its conclusion regarding manipulation with substantial record evidence or fully address the petitioners' arguments regarding manipulation of U.S. trade remedy laws.[86]

- Commerce's use of CS Wind Korea's sales revenues in the denominator was inconsistent with its regulations and past practices.[87]

- Commerce attempted to address the evidence of manipulation in piecemeal fashion, but failed to recognize how this evidence, as a whole, demonstrates the potential for CS Wind Vietnam to game U.S. AD/CVD laws.[88]

- CS Wind Vietnam and CS Wind Korea's actions did not occur in isolation.  Taken as a whole, the series of actions and the time at which they occurred suggest that CS Wind Vietnam and CS Wind Korea were redesigning their operations to minimize the impact of new/renewed AD and CVD investigations and orders.[89]

- Commerce dismissed the abrupt shift from [

] to purchasing no inputs in 2018.[90]

Commerce pointed to prior tolling agreements as evidence these shifts were unrelated to manipulation.  However, the mere existence of prior tolling contracts does not explain the

---

[86] *See* Petitioners' Comments on Draft Results of Redetermination at 3.
[87] *Id.*
[88] *Id.* at 4.
[89] *Id.*
[90] *Id.* at 4-5.

shift in purchasing inputs.  Commerce ignored that these shifts occurred amidst numerous

other structural changes at CS Wind Korea that would have similar effects on reported

costs.[91]

- Commerce adopted CS Wind Vietnam's explanation that "{t}olling arrangements are

    common business practices that do not inherently evince efforts to manipulate the value of a

    company's sales" and that "{a} company could adopt a more efficient business arrangement,

    including tolling, that reduces costs."  However, these general conjectures are not supported

    by the record and are not based on CS Wind Vietnam's actual experience.[92]

- Commerce explicitly asked CS Wind Vietnam to explain the "reason behind" structuring

    agreements as processing contracts, but CS Wind Vietnam refused to answer.  While

    Commerce claims CS Wind Vietnam subsequently answered this question when it reported

    that tolling agreements were established to "better control costs," this is the same rationale

    the Court asked Commerce to discuss in further detail.[93]

- Commerce failed to consider the broader context in which the 2018 tolling arrangements

    occurred (*i.e.*, in the wake of CS Wind Vietnam [


    ]).[94]

- Commerce's Draft Results of Redetermination are unsupported by substantial evidence,

    inconsistent with the record as a whole, and fail to adequately address the Court's requests

    and concerns.[95]

---

[91] *Id.* at 4-5.
[92] *Id.* at 5.
[93] *Id.* at 5-6.
[94] *Id.* at 6.
[95] *Id.*

**Commerce's Position:**  The petitioners first argue that Commerce's use of CS Wind Korea's sales value of subject merchandise produced by CS Wind Vietnam in its subsidy rate calculation was inconsistent with Commerce's regulations and past practice.[96]  In the *Remand Order*, the CIT concluded that "Commerce's choice of denominator for the benefit calculation is not inconsistent with its regulations or with the prior determinations presented by the parties."[97]  Accordingly, because the CIT decided this issue in favor of the agency, it did not remand this issue.[98]  Thus, in these results of redetermination it is unnecessary for us to consider the argument that the Court already rejected.

Next the petitioners argue that Commerce's Draft Results of Redetermination are unsupported by substantial evidence.[99]  To the contrary, Commerce examined the record evidence and found that petitioners' allegation was unsupported.  When faced with a deficient or unsupported claim by an interested party, as is the case here, Commerce does not have an obligation to perform research on behalf of the petitioners and fill in the blanks in the petitioners' allegations.[100]  The burden of creating an adequate record lies with interested parties and not with Commerce.[101]  Additionally, the U.S. Court of Appeals for the Federal Circuit (CAFC) has determined that even in situations where manipulation is possible, "speculation as to its existence must yield to evidence."[102]  We continue to find that the petitioners have failed to sufficiently support their allegations with record evidence.

---

[96] *Id.* at 3.
[97] *See Remand Order* at 76 and 37-48.
[98] *Id.* at 78-79.
[99] *See* Petitioners' Comments on Draft Results of Redetermination at 4 and 6.
[100] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination,* 77 FR 63788 (October 17, 2012), and accompanying IDM at Comment 10.
[101] *See QVD Food Co., Ltd. v. United States,* 658 F.3d 1318, 1324 (CAFC 2011).
[102] *See Cf. LMI-La Metalli Industriale, S.p.A. v. United States*, 912 F.2d 455, 460 (Fed. Cir. 1990).

Specifically, the Court ordered Commerce to "discuss and address the evidence that {*the petitioners*} *presented* as related to manipulation."[103]  We considered the manipulation allegation and supporting evidence as presented by the petitioners, and we found:  that the record evidence did not substantiate the petitioners' claims; that the petitioners failed to adequately explain how some of the alleged facts result in manipulation; and, that in some instances the facts alleged by the petitioners as evidence of manipulation of the CVD rate by the respondent would actually have increased the amount of countervailing duties due, a result contrary to the one with which the petitioners are concerned.[104]

The petitioners also argue that Commerce did not fully address their arguments concerning potential manipulation, and that Commerce erred in considering evidence in isolated, piecemeal fashion, rather than as a whole.[105]  The Court identified four arguments raised by the petitioners regarding potential manipulation and ordered Commerce to address the arguments and evidence of manipulation on remand:  (1) CS Wind Vietnam and CS Wind Korea started to use toll processing agreements in 2018 "just as {CS Wind Vietnam} was excluded from a prior antidumping duty order through appeal litigation"; (2) CS Wind Korea [

] and began [

] which the petitioners claim as evidence that CS Wind Korea [

];[106] (3) CS Wind Korea [

]; and

---

[103] *See Remand Order* at 78 (emphasis added).
[104] *See* Draft Results of Redetermination at 15-16.
[105] *See* Petitioners' Comments on Draft Results of Redetermination at 4.
[106] In the *Remand Order*, the Court states that the petitioners claim that CS Wind Korea's [
] and [                                                              ] is evidence CS Wind Korea [                                ].  *See Remand Order* at 34.  We note that in the petitioners' case brief, the petitioners claimed this as evidence of [                                            ], rather than evidence of [
].  *See* Petitioners' Letter, "Utility Scale Wind Towers from the Socialist Republic of Vietnam: Case Brief," dated April 3, 2020 (Petitioners' Case Brief), at 27.

(4) according to the petitioners, CS Wind Vietnam provided an insufficient rationale for using toll processing agreements.[107]  We analyzed each argument, above, and we concluded that none of the four claims of potential manipulation was supported by record evidence.

We find that the petitioners' allegations of potential manipulation are unsupported by record evidence, regardless of whether the pieces of information are considered individually or collectively.  We are not persuaded by petitioners' argument that the facts, which did not support their allegations of manipulation, when viewed individually, support the opposite conclusion, when considered collectively.[108]  As explained above, none of the petitioners' claims of potential manipulation are supported by record evidence, and the petitioners failed to advance a theory explaining how the business practices that they cited could result in potential manipulation.[109] Because the petitioners neither present sufficient evidence nor advance a theory explaining how any of the cited business practices could manipulate the denominator of the subsidy rate calculation (*i.e.*, CS Wind Korea's sales value of subject merchandise produced by CS Wind Vietnam), we find that the record evidence does not substantiate the allegation of manipulation. Rather, we find that, when considered individually or collectively, the petitioners' evidence of potential manipulation amounts to multiple unsubstantiated claims, none of which have the potential to affect the denominator we used to calculate the countervailable subsidy rate, CS Wind Korea's sales value of subject merchandise produced by CS Wind Vietnam.

The petitioners further argue that Commerce failed to consider the broader context in which the 2018 tolling agreements occurred (*i.e.*, in the wake of CS Wind Vietnam [

---

[107] *See Remand Order* at 33-34.
[108] *See Nexteel Co. v. United States*, 355 F. Supp. 3d 1336, 1351 (CIT  2019) ("It does not stand to reason that individually, the facts would not support a particular market situation, but when viewed as a whole, these same facts could support the opposite conclusion.").
[109] *See supra* at 6-15.

]).[110]  In response to the petitioners' claim

that CS Wind Korea [                                        ] and began [

                    ] in order to [

        ], we found that:

> A company may alter its business practices after AD or CVD investigations
> commence for legitimate reasons.  For example, a company might change its
> internal record keeping system in order to better track information relevant to
> Commerce's proceedings.  While the petitioners argue that CS Wind Korea
> changed some of its business practices in reaction to AD/CVD investigations to
> [                                        ], we find that
> the record contains insufficient evidence that the two practices in question, *i.e.*,
> an affiliate of the respondent [
>                    ], affect calculation of a countervailing
> duty rate, let alone provide evidence of an effort to manipulate the CVD rate
> calculated.[111]

Moreover, as we have explained herein, because CVD liability is calculated as the overall

subsidy rate multiplied by entered value, artificially increasing entered value (for example with

an [                    ]) would result in a larger CVD liability and it would be illogical for a

respondent to manipulate its CVD rate with its entered value in a manner that would *increase*

its duty liability.

Similarly, we find that the fact that the 2018 tolling agreements occurred subsequent to

CS Wind Vietnam [

        ] does not lead to the conclusion the 2018 tolling agreements were meant to manipulate

Commerce's subsidy rate calculation.  As explained above, there are legitimate reasons for a

company to alter its business practices both before, during or after AD or CVD investigations

commence.  Further the 2018 tolling agreements do not amount to a shift in business practices

---

[110] *See* Petitioners' Comments on Draft Results of Redetermination at 6.
[111] *See* Draft Results of Redetermination at 10.

because we found that "CS Wind Korea and CS Wind Vietnam had tolling arrangements long before this investigation with substantially similar terms."[112]  Therefore, even when taking into account the broader context in which the 2018 tolling agreements occurred, we continue to find that information on the record does not support the petitioners' argument that CS Wind Vietnam changed its purchasing and sales agreements in anticipation of the filing of the CVD petition to "game the system."[113]

The petitioners argue that Commerce dismissed the "abrupt shift" from [

] to purchasing no inputs in 2018.[115]  Further, the petitioners argue that the mere existence of prior tolling contracts does not explain the shift in purchasing inputs and that these shifts would have an effect on reported costs.  Commerce considered the change in [

], but Commerce does not agree that this change in the [                                    ] amounts to evidence of manipulation.  The change in [

] is explained by the nature of tolling arrangements.  As a general matter, a tolling arrangement is an agreement between one company that owns raw materials and another company that processes such materials.  As explained above, Commerce did examine CS Wind Vietnam's use of tolling agreements and its rationale for using tolling agreements instead of purchasing raw materials itself.[116]  The record evidence indicates that the parties entered into a tolling arrangement to

---

[112] *Id.* at 7.
[113] *Id.* at 8.
[114] [                                                                  ].  *See* November 6th SQR at 1; *see also* Final Calculation Memorandum at Attachment 1 "Exchange Rate."
[115] *See* Petitioners' Comments on Draft Results of Redetermination at 4-5.
[116] *See supra* at 6-8 and at 11-13.

"better control costs."[117]  On this record, we find that the tolling arrangement is a commercial business arrangement that serves a legitimate purpose, as explained by CS Wind Vietnam.

Moreover, although the petitioners characterize the change in purchasing raw materials as abrupt, they have not demonstrated why this would constitute manipulation.  In this case, CS Wind Vietnam and CS Wind Korea entered into a tolling arrangement that is similar to other tolling arrangements that the parties have used in the past.  The toll processing agreements in effect during the POI were not unusual in their terms regarding which party was responsible for providing raw materials.  These agreements stipulated that all raw materials and accessories were to be supplied by CS Wind Korea except for those specified in the contract (*e.g.*, paint, consumables).[118]  We find that these agreements have substantially similar terms when compared to the toll processing agreements on the record from prior years [                    ].[119]  Thus, we find it reasonable to conclude that the change in purchasing of raw materials, regardless of whether abrupt or not, was necessitated by the need to comply with the terms of the tolling arrangement.

While the petitioners argue that this change in the [                    ] would have an effect on reported costs, no explanation or evidence is offered to support this contention.[120]  Without supporting evidence for their argument, we are unable to conclude that the overall reported cost of the subject merchandise would be affected by which affiliate [

] in such a manner that would result in inaccurate reporting or constitute manipulation.  Further, the denominator of the subsidy rate calculation is not the reported cost of the subject merchandise, but rather CS Wind Korea's sales value of subject merchandise produced by CS

---

[117] *See* November 6th SQR at 3.
[118] *See* September 20th SQR at 2.
[119] *See* Verification Report at Exhibit VE-13.
[120] *See* Petitioners' Comments on Draft Results of Redetermination at 5.

Wind Vietnam.  The petitioners do not point to any record evidence that demonstrates how

[                                                    ] may have distorted the sales value of CS Wind Korea's

sales of subject merchandise produced by CS Wind Vietnam.  Because neither the numerator nor

the denominator of the subsidy rate calculation includes the reported cost of subject merchandise,

the reported costs (including the raw materials) do not affect the subsidy rate calculation.[121]

Therefore, we do not find the fact that CS Wind Vietnam [

                                        ] to be evidence of manipulation.  Further, CS Wind Vietnam

explained that instead of purchasing raw materials from CS Wind Korea, it entered into tolling

agreements.[122]  As explained earlier, we analyzed these tolling agreements and found them

consistent with the toll processing agreements on the record from prior years.[123]  Therefore, we

have no basis to conclude that this business practice constitutes manipulation of Commerce's

subsidy rate calculation.

Finally, the petitioners argue that CS Wind Vietnam refused to provide a response to

Commerce's question regarding the reason why CS Wind Vietnam entered into toll processing

agreements with CS Wind Korea.[124]  The petitioners cite to the first half of CS Wind Vietnam's

response, in which CS Wind Vietnam objects to Commerce's line of questioning, stating, "We

fail to see how this question has anything to do with this case.  CS Wind Corporation's business

decision to structure its sales in this manner is not relevant to the CVD case in Vietnam."[125]

---

[121] The numerator in the subsidy rate calculation is the benefit, *i.e.*, amount of subsidy conferred to CS Wind Vietnam.  The denominator in the subsidy rate calculation is CS Wind Korea's sales value of subject merchandise produced by CS Wind Vietnam.  CS Wind Korea's sales value was not based upon reported *cost*, but rather invoice *prices* to its unaffiliated customers.  *See* Final Calculation Memorandum; *see also Preliminary Determination* PDM at 4-6; *Final Determination* IDM at Comment 6; and CS Wind Vietnam's Letter, "CS Wind Initial Questionnaire Response:  Countervailing Duty Investigation of Utility Scale Wind Towers from Vietnam (C-552-826)," dated October 9, 2019, at 5-6.
[122] *See* November 6th SQR at 1.
[123] *See supra* at 7.
[124] *See* Petitioners' Comments on Draft Results of Redetermination at 5-6.
[125] *See* November 6th SQR at 3.

However, despite CS Wind Vietnam's initial objection, it went on to answer Commerce's question, stating:

> CS Wind Corporation has only sales and administrative functions in Korea. The company has established production facilities outside of Korea such as Vietnam, China and *etc.* to handle the production side of the business.  Since CS Wind Corporation handles all of the sales, including the negotiations with those sales, it decided to establish tolling agreements with CSWV so that it could better control costs.[126]

Therefore, we find that CS Wind Vietnam responded to Commerce's question.

The petitioners argue that Commerce relied on the same "cursory" rationale that CS Wind Vietnam provided regarding its use of tolling agreements, and that Commerce failed to discuss this rationale in further detail as the Court instructed.[127]  We disagree.  The Court instructed Commerce to address the evidence that the petitioners presented as *related to manipulation*.[128]  In the petitioners' administrative case brief, the petitioners argued that CS Wind Vietnam's "inadequate" response regarding the reason behind its use of tolling agreements left the petitioners "speculating that CS Wind is only doing so to artificially inflate their profits at the expense of the subsidiary."[129]  In the Draft Results of Redetermination, we found that the petitioners' speculation is related to items that would not have affected our subsidy rate calculation:  "shifting corporate profit is not relevant to the CVD rate calculations because, as explained above, the profit of either CS Wind Vietnam or CS Wind Korea is not one of the factors that can impact either the subsidy rate or CVD liability calculations."[130]  Therefore, we did further discuss CS Wind Vietnam's response as it related to manipulation.  The petitioners'

---

[126] *Id.*
[127] *See* Petitioners' Comments on Draft Results of Redetermination at 5-6.
[128] *See Remand Order* at 78 (emphasis added).
[129] *See* Petitioners' Case Brief at 27.
[130] *See* Draft Results of Redetermination at 13-14.

speculation regarding CS Wind Vietnam's reasons for using tolling agreements does not constitute evidence of manipulation of the subsidy rate or CVD liability calculations.

While the petitioners argue that Commerce relied on "general conjecture" to justify CS Wind Vietnam's "inadequate" response to Commerce's questions, the record reflects that CS Wind Vietnam provided adequate responses to our questions, and thus, we are unable to draw conclusions regarding the rationale behind a company's business practices without sufficient evidence.  Further, Commerce inquired at verification as to why CS Wind Vietnam completed a wind tower project in 2017 without entering into a tolling agreement with CS Wind Korea.[131] CS Wind Vietnam's company officials explained that this scenario may happen when a customer contacts CS Wind Vietnam directly, rather than first contacting CS Wind Korea, and the customer has a provision that CS Wind Vietnam is to purchase the raw materials from the customer.[132]  We find that, while depending on the facts, the timing of events could provide relevant context, we cannot conclude that behavior is intended to manipulate subsidy rates simply because it occurred slightly before or after an AD or CVD investigation was initiated.  As explained above, we find that the petitioners failed to present sufficient evidence to support its potential manipulation allegation regarding tolling agreements and failed to present a theory on how tolling agreements could distort the *sales value* of CS Wind Korea's sales of subject merchandise produced by CS Wind Vietnam, which is the variable used as the denominator in our subsidy rate calculations.  The CAFC held that speculation of manipulation must yield to evidence.[133]  In this case, the petitioners have failed to present sufficient evidence to support their manipulation allegation.

---

[131] *See* Verification Report at 10.
[132] *Id.*
[133] *See Cf. LMI-La Metalli Industriale, S.p.A. v. United States*, 912 F.2d 455, 460 (Fed. Cir. 1990).

In conclusion, Commerce has considered the petitioners' allegations and found that they were either contradicted, or not supported, by information on the record.  Further, the petitioners failed to present a coherent theory on how the business practices they cite could affect the sales value of CS Wind Korea's sales of subject merchandise produced by CS Wind Vietnam, which is the variable used as the denominator in the subsidy rate calculations.  Therefore, we have made no change to the denominator used in the subsidy rate calculation.

### Issue 2:  Origin of Steel Plate

*Petitioners' Comments*

- CS Wind Vietnam provided inaccurate and incomplete information on the country of origin of steel plate, and Commerce should apply AFA as a result.[134]

- The issue is not where the steel plate is "sourced," but where the steel plate originated.[135]

- Commerce based its conclusion regarding the origin of the steel plate on "possibilities in which steel plate can be sourced from within Vietnam," rather than relying on record evidence identifying the country of origin of the steel plate.[136]

- The Draft Results of Redetermination fail to address a key piece of record evidence:  the reported Vietnamese supplier of steel plate does not operate a plate mill in Vietnam.[137]

- [                    ]'s status as the [                ] for the transaction indicates that [

                                                  ].[138]

- If the steel plate were imported, it is incorrect to assume it would be subject to the MFN rate.[139]

---

[134] *See* Petitioners' Comments on Draft Results of Redetermination at 7.
[135] *Id*. at 9.
[136] *Id*. at 7.
[137] *Id.* at 8.
[138] *Id*.
[139] *Id.* at 10.

**Commerce's Position:**  The petitioners argue that CS Wind Vietnam provided "inaccurate and incomplete" information, and that Commerce should apply AFA as a result.[140]  In the *Final Determination*, Commerce did not find the use of AFA to be appropriate, because CS Wind Vietnam fully cooperated with Commerce's information requests and provided all necessary information for determining the benefit of the Import Duty Exemption program.[141]  Commerce requested that CS Wind Vietnam submit "a schedule of all inputs of raw materials used in the production of subject merchandise during the POI for which import duty exemptions were received."[142]  In its questionnaire response, CS Wind Vietnam reported both domestic and imported input purchases, the total value of each purchase, applicable duty rates, the import duty amounts paid, and the benefit that CS Wind Vietnam received (if any).[143]  CS Wind Vietnam officials explained that they included domestic purchases in this table as they were required to report them to the Vietnam Customs authority, stating, "if the supplier is from outside Vietnam, but the raw materials are *sourced from inside Vietnam*, then these raw material inputs still need to be entered into the E-customs system *even if they are ultimately not imported*" (emphasis added).[144]  CS Wind Vietnam's responses were overinclusive by including these domestic purchases of raw materials.  Therefore, we found that it would be inappropriate for Commerce to apply AFA when CS Wind Vietnam provided complete and detailed responses to Commerce's request for information.[145]  The Court sustained this determination.[146]  Accordingly, it is unnecessary for us to revisit on remand the AFA issue that the Court already decided in favor of the agency.

---

[140] *Id*. at 7.
[141] *See Final Determination* IDM at 17.
[142] *Id.*; *see also* CS Wind IQR at II.C.
[143] *See* November 6th SQR at SQ2-20.
[144] *See* Verification Report at 16; *see also Final Determination* IDM at 17.
[145] *See Final Determination* IDM at 17.
[146] *See Remand Order* at 78.

The petitioners claim that the central issue regarding the steel plate is "where the goods originated – in Vietnam, or outside of Vietnam."[147]  However, this is incorrect.  The central issue is whether CS Wind Vietnam received a benefit for this steel plate from the Import Duty Exemption program.  As explained previously, under the program, import duty exemptions are provided for imported raw materials that are incorporated into exported goods, or directly used in the production of such goods.[148]  The amount of the exemption is equal to the amount of the duty applicable to the value of imported materials actually used in the production of the finished goods that are exported.  To answer the central question of whether CS Wind Vietnam received a benefit for this steel plate from the Import Duty Exemption program, Commerce needed to determine which inputs CS Wind Vietnam imported, and whether CS Wind Vietnam paid the appropriate corresponding duties on imported inputs.  Accordingly, the Court ordered Commerce to "substantiate its conclusion that CS Wind Vietnam did not import the steel plate in light of the evidence and arguments that detract from Commerce's conclusion that were presented by WTTC" and ordered Commerce to address several questions, including questions that relate to the identity of the importer of record.[149]  We analyzed the record evidence and the petitioners' comments to address the Court's specific instructions.

The petitioners argue that Commerce based its conclusion regarding the origin of the steel plate on "possibilities in which steel plate can be sourced from within Vietnam," rather than relying on record evidence identifying the country of origin of the steel plate,[150] and expressed concern that Commerce has not adequately addressed the evidence that the supplier of the steel

---

[147] *See* Petitioners' Comments on Draft Results of Redetermination at 9.
[148] *See* GOV IQR at Exhibit E-1.
[149] *See Remand Order* at 78-79.
[150] *See* Petitioners' Comments on Draft Results of Redetermination at 7.

plate does not operate a plate mill in Vietnam.[151]  However, we find that the petitioners' focus on whether the steel plate supplier operates a plate mill in Vietnam is not dispositive to the analysis of whether CS Wind Vietnam received a benefit with respect to the steel plate at issue under the Import Duty Exemption program.  The Import Duty Exemption Program provides import duty exemptions for imported raw materials that are incorporated into exported goods, or directly used in the production of such goods.[152]  Thus, the relevant question for analysis of CS Wind Vietnam's use of this program is whether CS Wind Vietnam imported the steel plate.  We determined that the steel plate was sourced (purchased) from within Vietnam based on evidence on the record, including invoices, packing lists, and examination of CS Wind Vietnam's purchases at verification.[153]

   With respect to the evidence cited by the petitioners, we find that, even if the supplier did not operate a plate mill in Vietnam, as the petitioners claim, it does not establish that CS Wind Vietnam imported the plate.  Even if the supplier did not itself produce the plate in Vietnam, it could have purchased and resold in Vietnam the plate produced by another company.  Invoices and packing lists on the record, as well as an examination of CS Wind Vietnam's purchases at verification, show that the steel plate in question was sourced from Vietnam, *i.e.*, purchased in the domestic market and not imported by CS Wind Vietnam.[154]  As we explained earlier, to receive the benefit under the program, a party has to be an importer of record, and has to have imported steel plate and paid duties on the imported plate to which the exemption might apply.  However, we find no evidence that CS Wind Vietnam imported the steel plate at issue and paid

---

[151] *Id.* at 8.
[152] *See* GOV IQR at Exhibit E-1.
[153] *See* Draft Results of Redetermination at 19-20; *see also* Remaining Questions at SQ2-6a; November 6th SQR at SQ2-18, pp. 18; and Verification Report at VE-15.
[154] *Id.*

import duties on it.  Rather, the record evidence demonstrates that CS Wind Vietnam's affiliate purchased the plate in Vietnam from an unaffiliated party.[155]

Regarding the invoice for the purchase of the steel plate, the petitioners argue that [

]'s status as the [                              ] indicates that [

].[156]  The same invoice demonstrates that the steel plate was purchased from within Vietnam as the supplier was

[                         ] and was, therefore, not imported by an affiliate of CS Wind Korea.[157] Moreover, there does not appear to be anything unusual about [

] to a transaction.  CS Wind Korea, the parent company of CS Wind Vietnam, is [

] because it purchases and maintains title to all inputs.  Specifically, CS Wind Vietnam stated in its initial questionnaire response that "CS Wind Corporation purchases a majority of the inputs used to produce wind towers outside of Vietnam and provides them to {CS Wind Vietnam} for the production of the wind towers," and that "CS Wind Corporation retains title of the inputs and does not charge {CS Wind Vietnam} for the inputs."[158]

The petitioners argue that if the steel plate were imported, it would be incorrect to assume the steel plate would be subject to an MFN rate because not every country in the world is a member of the WTO.[159]  However, given that the record evidence shows that the steel plate was sourced from within Vietnam rather than imported by CS Wind Vietnam, this point is not relevant.  Only if the record evidence demonstrated that the steel plate at issue was imported by

---

[155] *Id.*
[156] *See* Petitioners' Comments on Draft Results of Redetermination at 8.
[157] *See* Verification Report at VE-15, p. 71.
[158] *See* CS Wind Vietnam IQR at 5.
[159] *See* Petitioner's Comments on Draft Results of Redetermination at 10.

CS Wind Vietnam from another country, which it does not, would we need to determine whether that country is subject to the MFN rate.

In conclusion, Commerce's determination that CS Wind Vietnam sourced the steel plate in question from within Vietnam is supported by record evidence.  Commerce considered evidence disputing the origin of the plate (*i.e.*, that the reported supplier does not have a plate mill within Vietnam) but found that this evidence was outweighed by other record evidence showing the plate was sourced from within Vietnam (*i.e.*, invoices and purchase records). Accordingly, we have made no changes to our determination that CS Wind Vietnam did not receive a benefit under the Import Duty Exemption program for steel plate sourced from within Vietnam.

## V.      FINAL RESULTS OF REDETERMINATION

Pursuant to the Court's *Remand Order*, we have provided further explanation and analysis of the evidence and arguments presented by the petitioners concerning manipulation. We have also provided further explanation to substantiate our finding that certain steel plate inputs were sourced from within Vietnam, rather than imported.  Based on the results of our analyses, the CVD rates calculated in the *Final Determination* remain unchanged.

7/21/2022

X 

Signed by: LISA WANG

Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance