NON-CONFIDENTIAL VERSION

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| WIND TOWER TRADE COALITION,<br><br>     Plaintiff,<br><br>   v.<br><br>UNITED STATES,<br><br>     Defendant. | Before: Hon. Timothy M. Reif,<br>     Judge<br><br>Court No. 20-03692<br><br><u>NON-CONFIDENTIAL VERSION</u><br><br>Business Proprietary Information<br>Removed from Pages: 2-8 |

<u>PLAINTIFF'S COMMENTS ON REMAND DETERMINATION</u>

               Alan H. Price, Esq.
               Robert E. DeFrancesco, III, Esq.
               Maureen E. Thorson, Esq.
               Laura El-Sabaawi, Esq.

               WILEY REIN LLP
               2050 M Street, NW
               Washington, DC 20036
               (202) 719-7000

               *Counsel to the Wind Tower Trade Coalition*

Dated: September 7, 2022

Ct. No. 20-03692                                                                 NON-CONFIDENTIAL VERSION

## TABLE OF CONTENTS

                                                                                                           **Page**

I.     INTRODUCTION ............................................................................................................1
II.    BACKGROUND .............................................................................................................1
III.   ARGUMENT ..................................................................................................................2
        A.     Evidence of Manipulation................................................................................2
        B.     Origin of Steel Plate.........................................................................................6
IV.   CONCLUSION.............................................................................................................10

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*,
   61 F. Supp. 3d 1306 (Ct. Int'l Trade 2015) ...................................................................8

**Statutes**

19 U.S.C. § 1677a(d) (2000)............................................................................................7

Tariff Act of 1930 section 776(d) ...................................................................................7

**Regulations**

19 C.F.R. § 351.525(b)(6)(i) ...........................................................................................3

19 C.F.R. § 351.525(b)(7)................................................................................................3

**Administrative Materials**

*Citric Acid and Certain Citrate Salts From the People's Republic of China*,
   79 Fed. Reg. 108 (Dep't Commerce Jan. 2, 2014) .......................................................9

## I. INTRODUCTION

On behalf of Plaintiff the Wind Tower Trade Coalition (the "WTTC"), we respectfully submit the following comments on the final results of redetermination pursuant to remand issued by the Department of Commerce ("Commerce") regarding the countervailing duty investigation into utility scale wind towers from the Socialist Republic of Vietnam ("Vietnam"). Final Results of Redetermination Pursuant to Court Remand, *Wind Tower Trade Coalition v. United States*, Court No. 20-03692, Slip. Op. 22-27 (CIT Mar. 24, 2022) (July 22, 2022), ECF No. 37-1 ("Final Remand Results").

Petitioners respectfully submit that Commerce's Final Remand Results do not fully and adequately address the Court's remand requests and are inconsistent with both the facts and law. For the reasons provided below, Petitioners request that this Court reject the redetermination results and remand back to the agency for redetermination consistent with Slip Op. 22-27.

## II. BACKGROUND

The Court of International Trade (the "Court") remanded Commerce's final determination to address two issues. First, the Court found that Commerce failed to address WTTC's argument that using CS Wind Korea's reported sales value in the sales denominator could allow CS Wind Vietnam Co., Ltd. ("CS Wind Vietnam") to manipulate the countervailing duty ("CVD") rate. *Wind Tower Trade Coalition v. United States*, No. 20-03692, slip op. 22-27 (Ct. Int'l Trade Mar. 24, 2022), ECF No. 34 at 50 ("Slip Op. 22-27"). Specifically, the Court requested that Commerce:

> (1) discuss and address the evidence that WTTC presented as related to manipulation; (2) address WTTC's manipulation argument as to the denominator used in the benefit calculation; and (3) explain whether Commerce considered manipulation in reaching its determination, or if it did not, why it did not.

1

*Id.* at 76-77. Second, the Court held that it could not conclude that "'the record as a whole' supported Commerce's conclusion as to the supplier and country of origin" for certain steel plate due to the agency's failure to explain and support that conclusion. *Id.* at 74. As a result, the Court remanded Commerce's analysis of the origin of the steel plate at issue for Commerce to:

> (4) substantiate its conclusion that CS Wind Vietnam did not import the steel plate in light of the evidence and arguments that detract from Commerce's conclusion that were presented by WTTC; (5) state the salience, if any, of the [     ] rate to its determination that the raw material inputs in question came from Vietnam; and (6) explain why it has listed an [   ] tariff rate in its calculations of the Import Duty Exemptions program for the line entries of the raw material inputs in question that also are listed as having a country of origin of [     ]. In addressing these points, Commerce is to explain: (7)(a) if CS Wind Vietnam were the importer of record, would it be eligible to receive a benefit under the Import Duty Exemptions program; (7)(b) If CS Wind Korea were the importer of record and transferred the raw material inputs to CS Wind Vietnam, would either CS Wind Vietnam or CS Wind Korea be eligible to receive a benefit under that program; and (7)(c) if an unaffiliated third entity were the importer of record and sold the raw material inputs to CS Wind Korea for processing by CS Wind Vietnam, would CS Wind Vietnam be eligible to receive a benefit under that program.

Confidential Opinion, *Wind Tower Trade Coalition v. United States*, No. 20-03692 (Ct. Int'l Trade Mar. 24, 2022), ECF No. 29 at 77 (internal citations omitted) ("Confidential Opinion").

Commerce's Final Remand Results do not fully and adequately address the Court's remand instructions and require further remand. The WTTC disagrees with Commerce's redetermination for the reasons discussed below.

### III.   ARGUMENT

#### A.   Evidence of Manipulation

In the Final Remand Results, Commerce continues to unreasonably disregard the potential for CS Wind to manipulate its margin through its relationship with its Korean parent company. The Court recognized that WTTC presented four reasons that CS Wind Vietnam's tolling arrangements and business practices "raised concerns about the potential impact of manipulation

on Commerce's subsidy calculation" and "warranted a response by Commerce." Slip Op. 22-27 at 52. Commerce's Final Results do not, however, support the agency's conclusion regarding manipulation with substantial record evidence or fully address WTTC's arguments regarding manipulation of the U.S. trade remedy laws.

As an initial matter, WTTC maintains that Commerce's use of CS Wind Korea's sales revenues in the denominator was inconsistent with its regulations and past practice. The potential for manipulation is at issue because Commerce improperly attributed CS Wind Vietnam's subsidies—inconsistent with 19 C.F.R. § 351.525(b)(6)(i). Likewise, Commerce's decision was also inconsistent with the "multinational firm" provision of 19 C.F.R. § 351.525(b)(7), which required Commerce to attribute a subsidy to products "produced by the firm within the country of the government that granted the subsidy." In this case, the Government of Vietnam provided subsidies to CS Wind Vietnam in Vietnam. As a result of Commerce's failure to adhere to its regulations and past decisions in analogous situations, the door is open for CS Wind to structure its global operations in a way that manufactures the most beneficial countervailing duty rate.

Commerce's Final Remand Results are also unsupported by substantial evidence and fail to fully respond to the Court's remand instructions. The Court requested that Commerce respond to evidence WTTC provided regarding the potential for manipulation of the subsidy margin. The four indicia of manipulation are (1) CS Wind Vietnam and CS Wind Korea's sudden [         ], (2) CS Wind Korea [                        ], (3) CS Wind Korea becoming the [             ], and (4) CS Wind Vietnam's claim that it used toll processing agreements to "better control costs." *See generally* Confidential Opinion at 34-35. While Commerce attempts to address this evidence in a piecemeal fashion, it fails to recognize how this

evidence, as a whole, demonstrates the potential for CS Wind to game U.S. AD/CVD law and its interest in doing so.

As discussed in WTTC's case brief in the underlying investigation, CS Wind's actions did not occur in isolation. Instead, CS Wind Korea restructured its relationship with its Vietnamese subsidiary while it was repositioning itself as [          ] and [

]. *See* Letter from Wiley Rein LLP to Sec'y Commerce, re: *Utility Scale Wind Towers From The Socialist Republic of Vietnam: Case Brief* (Apr. 3, 2020), C.R. 107-108, P.R. 194 at 26-28 ("WTTC's Case Brief"). Further, these abrupt actions occurred [


]. Taken as a whole, this series of actions and the time at which they occurred suggest that CS Wind was redesigning its operations to minimize the impact of new/renewed antidumping and countervailing duty investigations and orders.

Commerce's treatment of CS Wind's [          ] showcases Commerce's siloed approach. Commerce's Final Remand Results dismiss the abrupt shift from [

] to purchasing no inputs from CS Wind Group in 2018. Final Remand Results at 6-7. Commerce points to tolling arrangements from [          ] as evidence that CS Wind Vietnam's [          ] was unrelated to possible manipulation of U.S. trade law. However, the mere existence of these tolling contracts does not explain the reason for the [

].[1] Commerce ignores that the [          ] occurred amidst

---

[1] Indeed, [                                                                                      ]. *See* Memorandum from John McGowan & Julie Geiger, Int'l Trade Analysts, Off. VI, AD/CVD Operations, through Erin Kearney, Program Manager, Off. VI, AD/CVD Operations, to The File, re: *Verification of the Questionnaire*

numerous other structural changes at CS Wind Corporation that would have similar effects on reported costs.

Instead, Commerce simply adopts CS Wind's explanation for its [

], claiming that "{t}olling arrangements are common business practices that do not inherently evince efforts to manipulate the value of a company's sales" and that "{a} company could adopt a more efficient business arrangement, including tolling, that reduces its costs." *See* Final Remand Results at 8. These general conjectures are not supported by the record and are not based on CS Wind Vietnam's actual experience. Indeed, Commerce explicitly asked CS Wind to explain the "reason behind" structuring agreements as processing contracts, but CS Wind refused to answer, responding that its "business decision to structure it's {sic} sales in this manner is not relevant to the CVD case in Vietnam." *See* Letter from Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP to Sec'y Commerce, re: *CS Wind First Supplemental Questionnaire Response: Countervailing Duty Investigation of Utility Scale Wind Towers from Vietnam (C-552-826)* (Nov. 6, 2019), C.R. 76-81, P.R. 122-128 at 3. Ironically, the answer to Commerce's question is now extremely relevant to this case, but CS Wind refused to provide a response. While Commerce claims that CS Wind subsequently answered this question when it reported that tolling agreements were established to "better control costs," Final Remand Results at 12, this is the same cursory rationale the Court asked Commerce to discuss in further detail, and it has failed to do so. Moreover, this explanation plainly does not explain CS Wind's [

]. It also ignores the broader context in which the 2018 arrangements occurred, *i.e.*, directly in the wake of CS Wind's [

---

*Responses of CS Wind Vietnam Co., Ltd.: Countervailing Duty Investigation of Utility Scale Wind Towers from the Socialist Republic of China* (Mar. 18, 2020), C.R. 105, P.R. 186 at 9.

[         ].

For these reasons, Commerce's Final Remand Results are unsupported by substantial record evidence, inconsistent with the record as a whole, and fail to adequately address the Court's requests and concerns.

### B. Origin of Steel Plate

Regarding the issue of whether CS Wind Vietnam imported steel plate under the Import Duty Exemption program, the Court found that record evidence "raised concerns about the potential impact of a different country of origin of the steel plate in question on Commerce's subsidy calculation and, therefore, could seriously undermine Commerce's reasoning and conclusions." Slip Op. 22-27 at 70. In the Final Remand Results, Commerce found this record evidence to be insufficient to outweigh other evidence indicating that the steel plate could have been sourced from within Vietnam. Final Remand Results at 17. On this basis, Commerce has concluded that CS Wind Vietnam did not import the steel plate in question and did not receive benefits under the Import Duty Exemption program. *Id.* at 17-18.

The Final Remand Results, however, do not cite "substantial evidence" to support their conclusions with respect to the origin of the steel plate. Slip Op. 22-27 at 70-71. Instead of relying on record evidence identifying the country of origin of the steel plate in question, Commerce based its conclusion on "possibilities in which steel plate can be sourced from within Vietnam . . . ." Final Remand Results at 19. As an initial matter, Commerce's reliance on speculative "possibilities" underscores the degree to which CS Wind provided inaccurate and incomplete information on the country of origin for this steel plate during the underlying investigation. Based on the respondent's failure to provide accurate and complete information and failure to act to the

best of its ability, Commerce should follow its adverse facts available ("AFA") hierarchy and apply the highest subsidy rate under this program from another CVD proceeding involving Vietnam. *See* WTTC's Case Brief at 21. *See also* section 776(d) of the Tariff Act of 1930, *codified as amended at* 19 U.S.C. § 1677a(d) (2000).

Regardless, Commerce's conclusions are not adequately explained or supported by the record. The agency has determined that "evidence cited by the petitioners does not preclude possibilities in which steel plate can be sourced from within Vietnam even if the mill where the plate was produced was located outside Vietnam." Final Remand Results at 19 (citation omitted). Specifically, Commerce explained:

> The [            ] demonstrates that the steel plate was transported by [    ] from [        ] to [          ] and thus never left the country. Regardless, if [          ] imported the steel plate, neither CS Wind Korea nor CS Wind Vietnam would be the importer and would not be liable for import duties, if such duties were applicable, and would not be the beneficiary of any exemptions of those duties.

*Id.* (citing Letter from Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP to Sec'y Commerce, re: *CS Wind Verification Exhibits in the Countervailing Duty Investigaion of Utility Scale Wind Towers from Vietnam (C-552-826)* (Mar. 4, 2020), C.R. 101-104, P.R. 185 at Exhibit VE-15, p. 71 ("CS Wind Verification Report")). This explanation does not support Commerce's conclusion that the steel plate in question was sourced from within Vietnam. Indeed, it concedes that the plate could well be non-Vietnamese but attempts to sidestep the issue with speculation about whether [          ] might have been the importer of the plate, and what impacts this might have on responsibility for import duties. But nothing in the record documentation that Commerce cited shows [          ] imported the steel plate. CS Wind Verification Report at Exhibit VE-15, p. 71. Instead, the documentation [

7

]. *Id.* Thus, the conclusion that "neither CS Wind Korea nor CS Wind Vietnam would be the importer and would not be liable for import duties" is sheer conjecture. Final Remand Results at 19. In fact, [

]. CS Wind Verification Report at Exhibit VE-15, p. 71. In short, Commerce's conclusion that "{n}either CS Wind Korea nor CS Wind Vietnam would be the importer and would not be liable for import duties" is based on speculative "possibilities," not on substantial evidence. Final Remand Results at 19.

The Final Remand Results also fail to adequately address a key piece of record evidence: the steel plate could not have been sourced from within Vietnam because the reported Vietnamese supplier of steel plate does not operate a plate mill in Vietnam. Slip Op. 22-27 at 69-70. *See also* Final Remand Results at 17 (citing WTTC's Case Brief at 15). Without addressing this evidence, however, Commerce still concludes in the Final Remand Results that the steel plate in question "is sourced from within Vietnam." Final Remand Results at 20. The issue here, though, is not where the goods were "sourced." Instead, the issue is where the goods originated – in Vietnam, or outside of Vietnam. The Court specifically found that it was "necessary for Commerce to demonstrate that its conclusion on country of origin for these transactions was supported by substantial evidence considering the record *as a whole.*" Slip Op. 22-27 at 70-71 (emphasis added). As the Court has found elsewhere, "if any single material aspect of Commerce's determination is shown unreasonable, then the determination 'as a whole' unravels." *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306, 1324 (Ct. Int'l Trade 2015) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) (stating that "substantiality of evidence must

take into account whatever in the record fairly detracts from its weight.")). Here, even if Commerce's statement that the plate in question was "sourced" in Vietnam is read as a determination that that plate was actually produced/originated there, that conclusion unravels because at least one material aspect of the conclusion is unreasonable. Specifically, Commerce based its determination on speculative "possibilities" with respect to the steel plate, while ignoring evidence that shows that the steel plate could not have been produced within Vietnam. Final Remand Results at 19. On this basis, the conclusions in the Draft Results are unreasonable. Rather than continue them, Commerce should apply AFA because of the respondent's failure to provide necessary information that would have allowed for a determination based on substantial evidence.

      Finally, Commerce concluded that:

> {E}ven if Commerce were to determine incorrectly that the steel plate at issue was imported (which it did not), Commerce's determination would have no effect on the calculation of the benefit under this program, because the imported steel plate would have been subject to {a} duty rate of zero, pursuant to {MFN} status.

Final Remand Results at 21. This conclusion is also not based on substantial evidence. Commerce has recognized elsewhere that MFN duty rates "reflect the general tariff rate applicable to world trade" for members of the World Trade Organization ("WTO"). *See, e.g.*, Issues and Decision Memorandum accompanying *Citric Acid and Certain Citrate Salts From the People's Republic of China*, 79 Fed. Reg. 108 (Dep't Commerce Jan. 2, 2014) (final results of countervailing duty admin. rev.; 2011) at cmt. 13.F. Not all countries in the world, however, are members of the WTO (*e.g.*, "Observer" countries). MFN status between countries is also not fixed, as shown by the recent revocation of the Russian Federation's MFN status by the United States and other countries. Commerce's determination that the steel plate in question was subject to MFN duty rates is dependent upon the identification of the plate's country of origin, but Commerce failed to base its country-of-origin determination on substantial record evidence. Without information that the

respondent failed to provide, the agency cannot determine the country of origin of the steel plate and cannot determine the level of benefit that the respondent received under the program. Accordingly, on the basis of AFA, Commerce should have applied a subsidy rate of 4.46% to the program in the Final Remand Results, but failed to do so. WTTC's Case Brief at 21.

## IV. CONCLUSION

For the reasons contained herein, the WTTC respectfully requests that the Court reject Commerce's final results of redetermination and remand to Commerce for further consideration.

Respectfully submitted,

*/s/ Alan H. Price*
Alan H. Price, Esq.
Robert E. DeFrancesco, Esq.
Maureen E. Thorson, Esq.
Laura El-Sabaawi, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the Wind Tower Trade Coalition*

Dated: September 7, 2022

CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Plaintiff's Comments on Remand Determination, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2016), is 3,034 words.

    /s/ Alan H. Price
(Signature of Attorney)

    Alan H. Price
(Name of Attorney)

*The Wind Tower Trade Coalition*
(Representative Of)

September 7, 2022
(Date)

}